FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

MAR 26 2003

JAMES R. LARSEN, CLERK
DEPUTY
SPOKANE, WASHINGTON

AO 241 (Rev. 5/85)

PETITION UNDER 28 USC § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District Eastern | |
|---|---|---|
| Name Thomas A. DiBartolo | Prisoner No. 77608 | Case No. CS-03-0094-LRS |

Place of Confinement: Rhode Island Department of Corrections Maximum Security PO Box 8273, Cranston, RI. 02920

Name of Petitioner (include name under which convicted): Thomas A. DiBartolo

v.

Name of Respondent (authorized person having custody of petitioner): Carol Porter, WCC; Ashbel T. Wall, III RICC; Joseph Lehman, WA. ST. DOC

The Attorney General of the State of: Washington

## PETITION

1. Name and location of court which entered the judgment of conviction under attack Superior Court State of Washington, County of Spokane

2. Date of judgment of conviction Murder first Degree

3. Length of sentence 320 months

4. Nature of offense involved (all counts) One count Murder in the first Degree

5. What was your plea? (Check one)
   (a) Not guilty ☒
   (b) Guilty ☐
   (c) Nolo contendere ☐
   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury ☒
   (b) Judge only ☐

7. Did you testify at the trial?
   Yes ☒ No ☐

8. Did you appeal from the judgment of conviction?
   Yes ☒ No ☐

AO 241 (Rev. 5/85)

9. If you did appeal, answer the following:

(a) Name of court Courts of Appeals, Division III States of Washington

(b) Result Conviction affirmed

(c) Date of result and citation, if known July 13, 2000 101 Wn.App. 1039

(d) Grounds raised

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

(1) Name of court Supreme Courts States of Washington

(2) Result Petition for Review denied

(3) Date of result and citation, if known May 1, 2001 143 Wn. 2d 1026

(4) Grounds raised Admitting evidences of affairs, exclusion of expert testimony, excluding utterance testimony, denial of motions for change of venue & mistrial, denying motion for new trial.

(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

(1) Name of court

(2) Result

(3) Date of result and citation, if known

(4) Grounds raised

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
Yes ☒ No ☐

11. If your answer to 10 was "yes," give the following information:

(a) (1) Name of court Courts of Appeals, Division III States of Washington

(2) Nature of proceeding Personal Restraints Petition

(3) Grounds raised Abuses of discretion, Due Process violation, in-effectives assistances of counsel, juror bias & misconducts,

AO 241 (Rev. 5/85)

Perjured testimony, false evidence and misconduct

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☒

(5) Result Denied petition

(6) Date of result January 14, 2003

(b) As to any second petition, application or motion give the same information:

(1) Name of court Supreme Court State of Washington

(2) Nature of proceeding Motion for Discretionary Review

(3) Grounds raised abuse of discretion, juror bias & misconduct, ineffective assistance of counsel, abuse of discretion, prosecutorial misconduct, and false evidence

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☐

(5) Result Still pending

(6) Date of result Filed Habeas simultaneously to avoid time bar

(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

(1) First petition, etc. Yes ☒ No ☐

(2) Second petition, etc. Yes ☒ No ☐

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

12. State *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same.

CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

AO 241 (Rev. 5/85)

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.
(b) Conviction obtained by use of coerced confession.
(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.
(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.
(e) Conviction obtained by a violation of the privilege against self-incrimination.
(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.
(g) Conviction obtained by a violation of the protection against double jeopardy.
(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.
(i) Denial of effective assistance of counsel.
(j) Denial of right of appeal.

A. Ground one: Trial court abused its discretion by not requiring an evidentiary hearing regarding juror B bias & misconduct.

Supporting FACTS (state *briefly* without citing cases or law) An evidentiary hearing was being held on a separate incident of juror misconduct. It was during this questioning that juror F notified the court and counsel of the improper behavior of juror B. The State motioned to remove the jurors, citing juror F's obvious anxiety and the disturbance this misconduct could have on the trial. The judge made no inquiry into the allegations.

B. Ground two: Mr. DiBartolo's right to a fair and impartial jury was violated by juror bias & misconduct.

Supporting FACTS (state *briefly* without citing cases or law): Juror F's disclosures of juror B's misconduct and bias shows that Mr. DiBartolo did not recieve a fair trial. Further, juror F's burden of being exposed to extraneous information is forbidden as a right to an impartial jury.

AO 241 (Rev. 5/85)

C. Ground three: Mr. DiBardo had ineffective counsel when Ms. Moreno did not move for removal of Juror B and Juror F.

Supporting FACTS (state *briefly* without citing cases or law): The allegation of juror misconduct produced by court record required a response from defendant's counsel to remove Juror B and Juror F. Ms. Moreno had simultaneously been moving the court for a mistrial based on a security guard's comments and argued against the motion to remove the jurors because it was the State's motion.

D. Ground four: Trial court abused its discretion by not holding a dispositive hearing and allowed prejudicial testimony.

Supporting FACTS (state *briefly* without citing cases or law): No prior hearing regarding Dr. Perasckovic's testimony was held. When defense counsel objected to the Dr.'s ability to qualify as a witness in testifying to a forensic determination, the trial court's ruling to overrule the objection without a hearing outside the presence of the jury to determine whether the Dr. qualified as an expert was an abuse of discretion.

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them:

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ☒ No ☐

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a) At preliminary hearing Maryann C. Moreno, WSBA No. 13256, 838-5633
505 W. Riverside Ave., Ste 630, Spokane, WA. 99201

(b) At arraignment and plea Maryann C. Moreno, WSBA No. 13256, 838-5633
505 W. Riverside Ave., Ste 630, Spokane, WA. 99201

AO 241 (Rev. 5/85)

E. Ground Five: Prosecution misconduct violated Mr. DiBartolo's rights by expressing personal opinion, mischaracterizing evidence, making statements contrary to testimony

Supporting FACTS (state *briefly* without citing cases or law): Statements made that the gun was thrown out with the glove not supported by evidence & testimony. Statements about the distance between the gun and the victim are not supported by evidence & testimony. Statements about defendant's failure to call daughter's friends is prejudicial.

F. Ground Six: Prosecution misconduct when he produced false and prejudicial evidence

Supporting FACTS (state *briefly* without citing cases or law): Prosecution used perjured testimony regarding time of death. Produce photographs of the park that were erroneous & prejudicial. The life-size photo of the victim used in closing arguments continually fell off the easel, drawing the juror's attention to the photo, which was prejudicial.

AO 241 (Rev. 5/85)

(c) At trial Maryann C. Moreno, WSBA No. 13256 509-838-5633
505 W. Riverside Ave., Ste 630, Spokane, WA. 99201

(d) At sentencing Mrs. Moreno

(e) On appeal Lorraine A. Parlange, WSBA No. 25139 509-258-7077
561 Jackson Terrace Dr., Newport, WA. 99156

(f) In any post-conviction proceeding Pro Se

(g) On appeal from any adverse ruling in a post-conviction proceeding Pro Se

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes ☐ No ☒

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐ No ☒
(a) If so, give name and location of court which imposed sentence to be served in the future: ________

(b) Give date and length of the above sentence: ________

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☐ No ☒

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

________
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed on

3-20-03
(date)

Thomas A. DiBartolo
Signature of Petitioner

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| THOMAS A. DIBARTOLO, Petitioner,<br><br>vs.<br><br>JOSEPH LEHMAN, Secretary, DEPARTMENT OF CORRECTIONS OF THE STATE OF WASHINGTON, CAROL PORTER, Superintendent, WASHINGTON CORRECTION CENTER, and ASHBEL T. WALL, III, Superintendent, RHODE ISLAND CORRECTIONS CENTER, Respondents. | No.<br><br>PETITIONER'S MEMORANDUM IN SUPPORT OF HABEAS CORPUS PETITION |

Petitioner, Thomas A. DiBartolo, submits this memorandum in support of his Habeas Corpus Petition.

## I. BASIS FOR CUSTODY AND STATEMENT OF THE CASE

Petitioner seeks relief from personal restraint in the form of a 320-month prison sentence imposed for his 1998 Spokane County conviction of the first degree murder of his wife Patricia DiBartolo. Mr. DiBartolo filed a direct appeal of his conviction and the Court of Appeals affirmed. See State v. DiBartolo, noted at 101 Wn. App. 1039, 2000 WL 968474 (2000), review denied, 143 Wn.2d 1026 (2001). Mr. DiBartolo filed a Personal Restraint Petition and the Court of Appeals denied. See Personal Restraint Petition v. Thomas Anthony DiBartolo, 21076-6-III,

opinion filed January 14, 2003. Mr. DiBartolo has filed a Motion for Discretionary Review with the Supreme Court of the State of Washington, cause No. 73568-9. Mr. DiBartolo has filed this Habeas simultaneously with the District Court to avoid the time bar issue should the Supreme Court deny review.

## II. ISSUES

A. The trial court abuse it's discretion by not requiring an evidentiary hearing to determine the precise prejudicial effect of the extraneous information Juror F notified the court of regarding juror b's improper behavior and bias against Mr. DiBartolo.

B. The failure to hold an evidentiary hearing on the claims made by Juror F of Juror B's bias is a constitutional violation of Mr. DiBartolo's sixth amendment right to due process.

C. Mr. DiBartolo was denied his sixth amendment right to counsel when his attorney failed to address the gravity of the juror misconduct based upon Juror B's bias.

D. The trial court abuse it's discretion when it allowed the emergency room doctor to testify regarding the time of death of the victim in violation of ER 702 and ER 104.

E. The prosecution violated the defendant's due process right and committed misconduct during closing arguments by repeatedly referencing his personal opinion of the defendant's guilt, mischaracterizing the evidence and making statements contrary to witness testimony.

F. The prosecution violated the defendant's due process rights and committed misconduct when he produced prejudicial and false evidence.

## III. ARGUMENT

**A. The trial court abuse it's discretion by not requiring an evidentiary hearing to determine the precise prejudicial effect of the extraneous information Juror F notified the court of regarding juror b's improper behavior and bias against Mr. DiBartolo.**

In the present case, an evidentiary hearing was being held on a separate incident of juror misconduct. It was during this questioning of each of the jurors that Juror F attempted to notify the court of the bias statements and the improper behaviors of Juror B. Verbatim Report of Proceedings (RP) at 4976. The trial court at that time inquired into the matter and later ruled on the motion by the State to remove these jurors without an evidentiary hearing.

The trial court, upon learning or a possible incident of juror misconduct, must hold an evidentiary hearing to determine the precise nature of the extraneous information. But cases following *United States v. Bagnariol*, 665 F.2d 877, 884-85 (9th Cir. 1981) have modified that seemingly categorical statement. *United States v. Angulo*, 4 F.3d 843, 847 (9th Cir. 1993) states current Ninth Circuit law on the subject: "An evidentiary hearing is not mandated every time there is an allegation of jury misconduct or bias. Rather, in determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source.

In general, it would be preferable to resolve the question of juror bias during an evidentiary hearing rather than through a postverdict claim. When, however, this type of issue is raised postverdict and the moving party has made a prima facie showing of bias, an evidentiary hearing is always the preferred course of action. Here, it is possible that the State could have rebutted the inference of juror bias through further inquiry at an evidentiary hearing. Had that approach been taken, then the parties would have had the opportunity to examine Juror B, and the trial court could have made a determination based on its assessment of the juror's responses, credibility, and demeanor whether or not Juror B, in fact, held a bias such that he could not have decided the case fairly and impartially. Moreover, through further inquiry, the parties could have examined other jurors about whether Juror B's bias played a role during their deliberations, and Juror B would have had the opportunity to explain his statements and the context in which they were made. The trial court, however, decided not to conduct an evidentiary hearing and, based only on the

comments made by Juror F, denied the State's motion for removal of one or both jurors. Verbatim Report of Proceedings (RP) at 4991. This court should reverse Mr. DiBartolo's conviction or remand back for retrial because the trial court did not hold an evidentiary hearing to explore the allegation that Juror B was biased. The trial court abused it's discretion by it's failure to hold such a hearing and the trial judge failed to appreciate the degree of prejudice reflected in the remarks reported to have been made by Juror B. The trial judge failed to override the defense's objection to the removal of Juror F and Juror B before the commencement of the trial deliberations and Mr. DiBartolo has made a showing of bias that necessitates a new trial.

Because of the trial judge's "unique opportunity to observe the jurors during trial, to hear the defenses asserted, and to hear the evidence," the judge's "conclusion about the effect of the alleged misconduct deserves substantial weight." (quoting *United States v. Bagnariol*, 665 F.2d 877, 885 (9th Cir. 1981) (per curiam)). However, in the present Court's review, the Court must consider the entire record in determining whether the state has met its burden of demonstrating that extrinsic evidence did not contribute to the verdict." We do not have a "bright line test for determining whether a defendant has suffered prejudice from an instance of juror misconduct," *Sassounian v. Roe*, 230 F.3d 1097, 1109 (9th Cir. 2000), but instead weigh a number of factors to determine whether the jury's exposure to extraneous information necessitates a new trial. These factors include: (1) whether the material was actually received, and, if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jurors discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the material affected the verdict. *Dickson v. Sullivan*, 849 F.2d 403 (9th Cir. 1988). "Because the ultimate question is whether it can be concluded beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict, no one of these factors is dispositive."(citing *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986)).

The court must be mindful that it "need not conclude that the verdict as to [the appellants] would have been different but for the jury tampering," *Dutkel*, 192 F.3d at 899, in order to reverse the convictions. The government has the burden of establishing not that the Mr. DiBartolo would have been convicted with or without the juror bias, but rather, as Dutkel instructs, that there is no "reasonable possibility" that Juror F was "affected in her freedom of action as a juror." In directing courts to consider such factors as whether the affected juror was frightened or distracted, and in placing the focus on the jury's deliberative process rather than on its verdict, Dutkel implicitly rejects the "overwhelming evidence of guilt" rationale.

That would appear to be the approach adopted by the court in *Tobias v. Smith*, 468 F. Supp. 1287 (W.D.N.Y. 1979), a case in which one juror, following the verdict, swore in an affidavit that two other jurors had made patently racist comments during deliberations before voting to convict the African-American defendant. After noting that Rule 606(b) permits testimony regarding whether extraneous prejudicial influences were improperly brought to the jury's attention, the court concluded "that the statements in the juror's affidavit [were] sufficient to raise a question as to whether the jury's verdict was discolored by improper influences and that they [were] not merely matters of juror deliberations." The court ordered that a hearing be held during which the parties would "have an opportunity to question those jurors who [could] be found as to what was said and what occurred."

Moreover, at least two jurors, Rankins and Kennelly, testified that they thought the call had been received into evidence. Although only two, or possibly three, jurors remembered hearing about the improper information, "[t]he number of jurors affected by the misconduct does not weigh heavily in_the prejudice calculus for even a single juror's improperly influenced vote deprives the defendant of an unprejudiced, unanimous verdict." *Lawson v. Borg*, 60 F.3d 608, 613 (9th Cir. 1995); see *Dickson v. Sullivan*, 849 F.2d 403 (9th Cir. 1988) In extraordinary

circumstances, "courts may presume bias based on the circumstances." *Dyer*, 151 F.3d at 981. See also *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556-57 (1984) (Blackmun, Stevens, and O'Connor, JJ., concurring) (accepting that "in exceptional circumstances, that the facts are such that bias is to be inferred"); id. at 558, 104 S.Ct. 845 (Brennan and Marshall, Page 677 JJ., concurring in the judgment) (agreeing that "[t]he bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as [a] matter of law") (alterations in original) (quotations omitted); *United States v. Wood*, 299 U.S. 123, 133, 57 S.Ct. 177, 81 L.Ed. 78 (1936); *Smith v. Phillips*, 455 U.S. 209, 221-24, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (O'Connor, J., concurring); *United States v. Burr*, 25 F. Cas. 49, 50 (D. Va. 1807) ("He may declare that notwithstanding these prejudices he is determined to listen to the evidence, and be governed by it; but the law will not trust him.").

A *Remmer* hearing must begin with a strong presumption that the jury tampering affected the jury's decision making as to *Dutkel*. The "burden rests heavily upon the Government" to prove otherwise. *Remmer* I, 347 U.S. at 229. The inquiry should focus on whether Juror B's affected Juror F's behavior —— and the behavior of the other jurors —— during deliberations. It should also focus on whether the information provided to the Court by Juror F influenced, to the detriment, Mr. DiBartolo's. In order to now grant relief, the court need not conclude that the verdict would have been different but for the jury tampering, but rather that the course of deliberations was materially affected by Juror B's bias behavior. The government must now show that there is no reasonable possibility that Juror F (or any other juror) "was . . . affected in the freedom of action as a juror" as to *Dutkel*. *Remmer* II, 350 U.S. at 381. Unless the court is

convinced that there is no reasonable possibility that the deliberations in Mr. DiBartolo's case were affected by the tampering, the court must vacate Mr. DiBartolo's conviction.

**B. The failure to hold an evidentiary hearing on the claims made by Juror F of Juror B's bias is a constitutional violation of Mr. DiBartolo's sixth amendment right to due process.**

Mr. DiBartolo's claim is a matter of due process, and the trial court should have conducted an evidentiary hearing before ruling on the State's motion for removal of Juror F. A jury's alleged exposure to extraneous information, the claimed introduction of extrinsic evidence, is framed as a constitutional violation of Mr. DiBartolo's Sixth Amendment right. "A defendant is entitled to a new trial when the jury obtains or uses evidence that has not been introduced during trial if there is a reasonable possibility that the extrinsic material could have affected the verdict." *Dickson v. Sullivan*, 849 F.2d 403, 405 (9th Cir. 1988). "The state bears the burden of proving that constitutional errors are harmless beyond a reasonable doubt."

Unless the court can find Mr. DiBartolo's claim of juror bias entirely frivolous or wholly implausible, it must order a Remmer hearing to explore the degree of the intrusion and likely prejudice suffered by the defendant. In evaluating such prejudice, the court "need not conclude that the verdict . . . would have been different but for the jury tampering, but rather that the course of deliberations was materially affected by the intrusion." This court must examine whether Juror B's bias interfered with the jury's deliberations by distracting one or more of the jurors and further consider whether the jury was "substantially swayed" by the alleged misconduct. The standard that must be applied by the appellant court must derive from jury misconduct cases that involve allegations of jury tampering. This court must not err in basing its decision on the erroneous

evidence of appellants' guilt and must consider the effect of Juror B's prejudicial behavior and extreme bias had on the course of deliberations. Mr. DiBartolo has shown sufficient evidence of the effect of Juror B's bias on the trial deliberations to remand this matter back to the Superior court for further consideration. For example, in the interview with juror F, she described the impact of Juror B's' comments had upon her person (See attachment A).

*United States v. Dutkel*, 192 F.3d 893 (9th Cir. 1999) expressly distinguishes the "prosaic kinds of jury misconduct" cases cited by the court from the "much more serious intrusion" of a bribe or threat. Under Dutkel, Mr. DiBartolo has made a prima facie showing that the intrusion "interfered with the jury's deliberations by distracting one or more of the jurors. . . ." *Dutkel*, 192 F.3d at 897. As in *Dutkel*, there is evidence that Juror F's contacts with Juror B left her " 'visibly scared of this man', 'she was crying the other day in the jury room, apparently she feels threatened by another juror', 'she was visibly shaken today', 'She's made it clear that she doesn't like this man, she I believe, feels threatened by him". Id. at 4991 (See Attachment B). As in Dutkel, Juror F's fears "may well have prevented [her] from thinking about the evidence or paying attention to the judge's instructions." Finally, because Juror F was so concerned that Juror B would find out that she has brought their adversities to the Court's attention she had to worry not only about her feelings of being threatened, but also about whether or not the Court would continue to conceal her predicament from her fellow jurors. Juror F would then be hesitant about engaging in the normal give and take of deliberations, for fear of further harassment.

Because it is clear that Mr. DiBartolo has made a prima facie showing that Juror B had an adverse effect on Juror F's deliberations, the government now would carry the "heavy burden" of

demonstrating that "there is no reasonable possibility that Fleming or any other juror, 'was . . . affected in freedom of action as a juror' as to [appellants]." *Dutkel*, 192 F.3d at 899 (quoting *Remmer* II, 350 U.S. at 381). Unless the court is convinced that there is no reasonable possibility that the deliberations as to [appellants] were affected by the tampering, the court must vacate [the] convictions."

("If only one juror was unduly biased or improperly influenced, *Dickson* was deprived of his sixth amendment right to an impartial panel."); *Dyer v. Calderon*, 151f.3d 970, 973 (9th Cir. 1998) ("The Sixth Amendment guarantees criminal defendants a verdict by impartial, indifferent jurors. The bias or prejudice or even a single juror would violate Dyer's right to a fair trial."); *United States v. Gonzalez*, 214 F.3d 1109 (9th Cir. 2000); *Tinsley v. Borg*, 895 F.2d 520, 523-24 (9th Cir. 1990) ("Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury.") *Harrington v. California*, 395 U.S. 250, 254 (1969) (recognizing that "we must reverse if we can imagine a single juror whose mind might have been made up because of Cooper's and Bosby's [inadmissible] confessions and who otherwise would have remained in doubt and unconvinced"); *United States v. Delaney*, 732 F.2d 639, 643 (8th Cir. 1984) ("If a single juror is improperly influenced, the verdict is as unfair as if all were."). The Sixth Amendment guarantees a criminal defendant a fair trial by a panel of impartial, indifferent jurors. See *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Actual bias against a defendant on a juror's part is sufficient to taint an entire trial. See *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977).

The impracticability of attempting to analyze the effect of jury composition error while

bias. Actual bias is defined by RCW 4.44.170(2) as follows: [T]he existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging[.] Under this definition, the issue of actual bias goes to whether a particular juror's state of mind is such that he or she can try a case impartially and without prejudice to a party. *Brady v. Fibreboard Corp.*, 71 Wn. App. 280, 283, 857 P.2d 1094 (1993), *review denied,* 123 Wn.2d 1018 (1994). In this case, the statements, taken as a whole, create a clear inference of bias. In particular, the statements revealed by Juror F of Juror B's aversions toward the witnesses and Mr. DiBartolo. Presumptively, these statements demonstrated that Juror B held certain discriminatory views which could affect his ability to decide Mr. DiBartolo's case fairly and impartially. This case therefore raises a valid issue of juror misconduct and as a matter of due process, the trial court should have conducted an evidentiary hearing before ruling on the State's motion for the removal of Juror F.

Under Washington law, the right to a jury trial includes the right to an unbiased and unprejudiced jury. *State v. Parnell,* 77 Wn.2d 503, 507, 508, 463 P.2d 134 (1969). The failure to provide a defendant with a fair hearing violates minimal standards of due process. *Parnell,* at 507 (quoting *Irvin v. Dowd,* 366 U.S. 717, 722, 6 L.Ed.2d 751, 81 S.Ct. 1639 (1961)). As stated by our Supreme Court in *Parnell:* "[M]ore important than speedy justice is the recognition that every defendant is entitled to a fair trial before 12 unprejudiced and unbiased jurors. Not only should there be a fair trial, but there should be no lingering doubt about it." *Parnell,* at 508. Accordingly, as a matter of due process, the trial court erred when it ruled on the motion for the removal of

Juror F without having conducted an evidentiary hearing.

Approximately 4 ½ years have passed since Mr. DiBartolo was convicted. Given this passage of time and the associated difficulty of obtaining both juror witnesses and adequate recollections, this court must reverse and remand for a new trial, or vacate the conviction. Mr. DiBartolo has made a sufficient showing of juror bias and that the bias violated his due process rights.

**C. Mr. DiBartolo was denied his sixth amendment right to counsel when his attorney failed to address the gravity of the juror misconduct based upon Juror B's bias.**

A criminal defendant received constitutionally inadequate representation if: (1) the defense attorney's performance was deficient, i.e., fell below an objective standard of reasonableness based on a consideration of all the circumstances, and (2) such deficient performance prejudiced the defendant, i.e., there is a reasonable probability that the outcome would have been different had the representation been adequate. *State v. Brett*, 126 Wn.2d 136, 198-99, 892 P.2d 29 (1995), cert. denied, 516 U.S. 1121 (1996); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. King*, 130 Wn.2d 517, 531, 925 P.2d 606 (1996).

Here, although Mr. DiBartolo did not receive the jury he was entitled to and was thereby deprived of his right to a fair trial, in order to establish prejudice Mr. DiBartolo has to prove that his counsel's error actually affected the outcome of the proceeding. However, application of such an actual prejudice standard constitutes an impossibility for Mr. DiBartolo. Because there is no way to ascertain the impact of the trial judge's denial of the State's motion to remove Juror F had on the result of a trial, Mr. DiBartolo's claim of denial of due process must be presumed

prejudicial. See *Riggins v. Nevada*, 504 U.S. 127, 137 (1992) (presuming prejudice when "[e]fforts to prove or disprove actual prejudice from the record before us would be futile, and guesses whether the outcome of the trial might have been different . . . would be purely speculative"). The prejudice inquiry as articulated in *Strickland* is not limited solely to ascertaining the error's effect on the result of a trial —— rather, "the ultimate focus of the inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Strickland*, 466 U.S. at 696. In fact, *Strickland* itself acknowledges that"[i]n certain Sixth Amendment contexts, prejudice is presumed." *Strickland*, 466 U.S. at 692. When the performance of counsel has been so egregious as to amount to a constructive denial of counsel, we presume prejudice. See *United States v. Cronic*, 466 U.S. 648, 659-60 & n. 25 (1984) (when counsel "fails to subject prosecution's case to meaningful adversarial testing," or counsel has been absent at critical stage, prejudice is presumed); *Lozada v. Deeds*, 498 U.S. 430, 432 (1991) (presuming prejudice when counsel failed to file notice of appeal); *United States v. Swanson*, 943 F.2d 1070, 1074 (9th Cir. 1991) (presuming prejudice when counsel conceded that there was no reasonable doubt as to elements of crime).

In the present case, Mr. DiBartolo's counsel objected to the State's motion to remove Juror F. Mr. DiBartolo claims that this objection and subsequent denial of the State's motion by the Court denied him of his due process rights and there is a reasonable probability that the outcome would have been different had the representation been adequate and Mr. DiBartolo's counsel had at the time of this hearing the opportunity to cure the juror bias. The record will show that Mr. DiBartolo's counsel was deficient in her representation of her client and that Mr. DiBartolo's six

amendment right to adequate representation was violated. (See Attachment C).

The record shows that Mr. DiBartolo was not present during these proceedings. Mr. DiBartolo's counsel had assured him that his presence was not required, that the matter of juror misconduct had been solved, and had at that time similarly brought forth her own motion for a mistrial on another matter of juror misconduct entirely. (See Attachment D). Mr. DiBartolo argues that her conflict of interest with the two pending motions before the court at that time obscured her ability to effectively represent Mr. DiBartolo. Similarly, when counsel is burdened by an actual conflict of interest, a defendant need only demonstrate that this conflict had an adverse effect on counsel's performance, not on the outcome of the trial, since "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Strickland*, 466 U.S. at 692. See *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980) ("[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief."). Finally, when employing *Strickland*'s prejudice standard would effectively eviscerate the right, the Court presumes prejudice. See *Penson v. Ohio*, 488 U.S. 75 (1988) (presuming prejudice when defendant was not represented on appeal because "[f]inding harmless error or a lack of *Strickland* prejudice in cases such as this . . . would leave indigent criminal appellants without any of the protections afforded by Anders."). When it is not possible or practical to analyze prejudice on a case-by-case basis and a presumption of prejudice is required in order to protect an important substantive right, the *Strickland* prejudice inquiry necessitates application of the presumed prejudice rule. The Eighth Circuit recently held that when a counsel's performance has led to an error that is "not amenable to harmless error analysis, but

require[s] automatic reversal," prejudice must also be presumed for purposes of the *Strickland* analysis. See *McGurk v. Stenberg*, No. 97-4253, 1998 WL 850128 (8th Cir. Dec. 10, 1998).

Other courts have reached similar conclusions when counsel's error has affected the jury trial mechanism. See, e.g., *Government of Virgin Islands v. Weatherwax*, 20 F.3d 572, 579-80 (3d Cir. 1994) ("Prejudice should not be presumed; but when juror misconduct is coupled with the trial court's failure to hold a voir dire to determine the outcome of the misconduct on the jury function, proof of actual prejudice is excused and a new trial is warranted."); *Hollis v. Davis*, 941 F.2d 1471, 1483 (11th Cir. 1991) (presumption of *Strickland* prejudice is warranted when attorney's error resulted in all-white jury, race was at issue in case, and trial transcript was not available for review); *Smith v. Gearinger*, 888 F.2d 1334, 1338-39 (11th Cir. 1989) (presuming partiality of juror in accord with state law for purposes of *Strickland* inquiry).

Mr. DiBartolo has shown that his trial counsel knew, or should have known, that the matter of a partial and bias jury was objectionable and Mr. DiBartolo has established his trial counsel's deficient performance based upon defense counsel's objection to the motion for removal of Juror F. Mr. DiBartolo's attorney's objection, coupled with the trial court's failure to hold a voir dire to determine the outcome of the misconduct on the jury function, thereby deprived Mr. DiBartolo of his right to a fair and impartial jury because had his attorney stipulated to the motion, there is no reasonable possibility that the court would not have granted the motion to remove Juror F before dismissing the alternate jurors.

**D. The trial court abuse it's discretion when it allowed the emergency room doctor to testify regarding the time of death of the victim in violation of ER 702 and ER 104.**

The State of Washington follows that novel scientific, technical or other specialized knowledge may be admitted or relied upon only if generally accepted as reliable by the relevant scientific, technical or specialized community. General acceptance may be found from testimony that asserts it, from articles and publications, from widespread use in the community, or from the holdings of other courts. General acceptance may not be found if there is a significant dispute between qualified experts as to the validity of scientific evidence. When general acceptance is reasonably disputed, it must be shown, by a preponderance of the evidence, at a hearing held under ER 104(a). *State v. Kunze*, 97 Wn. App. 832 (1999).

Under ER 104 and ER 702, the trial court acts as gatekeeper, assessing the reliability and relevance of all scientific evidence. *Reese*, 74 Wn. App. at 559; *Daubert*, 113 S.Ct. at 2795. A reliability assessment is also implicit in any determination of relevance under ER 402. When considering the admissibility of expert scientific testimony, ER 104(a) and ER 702 require a judge to determine (1) whether the expert is qualified to provide scientific testimony, (2) whether the proposed testimony constitutes scientific knowledge, and (3) whether the proposed testimony will assist the trier of fact in resolving an issue of fact. See *Daubert*, 113 S.Ct. at 2796. Mr. DiBartolo now claims that the trial judge completely failed to address the first and second step in its approach to applying ER 702. At trial, Mr. DiBartolo's attorney objected to the evidence testimony of Dr. Penaskovic, the emergency room doctor who treated the victim after the shooting. (See Attachment E).

The use of pCO2 (partial pressure of carbon dioxide) in arterial blood of the deceased is not a valid, accurate or reliable scientific method to calculate the post-mortem interval. There are

no reference sources that support the use of pCO2 to determine the time of death. A search of cases, nationwide, revealed that the use of pCO2 has never been presented in a case to-date. The pCO2 method is a novel, unproven and unaccepted within the scientific community, the basic test, and does not qualify for admissibility. The trial judge abuse it's discretion and further bolstered the prosecution's theory of the events by allowing the damaging testimony.

It is this second step's determination of "scientific knowledge" that ensures the reliability and relevance of the expert testimony. The determination of "scientific knowledge" requires a two-prong inquiry: (1) whether it is more likely than not the expert's methodology and principles are reliable, and (2) whether those principles and methodology can properly be applied to the facts at issue. See *Daubert,* 113 S.Ct. at 2795-97. The Supreme Court listed four, nonexclusive factors for a trial court to examine in this two-prong reliability evaluation: testing; peer review and publication; known or potential error rate; and general acceptance. *Daubert*, 113 S.Ct. at 2796-97. This inquiry into "scientific knowledge" is required regardless of whether the offered scientific evidence is novel or not. *Daubert*, 113 S.Ct. at 2796 n. 11. In ignoring the two-prong inquiry into "scientific knowledge" required by ER 702 and noted above, the trial judge fails to offer a method to determine the underlying reliability of Dr. Penaskovic's testimony and whether the discussions and studies upon which Dr. Penaskovic's relied are in fact reliable. The better approach, and the one taken in Daubert and by the Court of Appeals, is to focus on the reliability of the evidence in all criminal cases, where it remains an initial, required, and dispositive inquiry.

In Washington, expert testimony based on new scientific theories is admissible only if it meets the standard enunciated in *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). Under

this standard, the scientific principle from which deductions are made must be sufficiently established to have gained general acceptance in the scientific community. *State v. Canaday*, 90 Wn.2d 808, 812, 585 P.2d 1185 (1978) (citing Frye). This standard has frequently been applied to determine the admissibility of scientific evidence. See *Allery* ("battered woman syndrome" evidence admissible); *State v. Martin*, 101 Wn.2d 713, 719, 684 P.2d 651 (1984) (hypnosis evidence inadmissible); *State v. Woo*, 84 Wn.2d 472, 473-75, 527 P.2d 271 (1974) (polygraph evidence inadmissible in the absence of stipulation by both parties); *State v. Maule*, 35 Wn. App. 287, 295-96, 667 P.2d 96 (1983) (court disallowed expert testimony regarding characteristics of sexually abused children when no scientific basis for such testimony was cited); *State v. Steward*, 34 Wn. App. 221, 223-24, 660 P.2d 278 (1983) (court disallowed expert testimony regarding alleged propensity of babysitting boyfriends to inflict child abuse); *State v. Mulder*, 29 Wn. App. 513, 514-15, 629 P.2d 462 (1981) ("battered child syndrome" evidence admissible). Expert testimony should be presented to the trier of fact only when the scientific community has accepted the reliability of the underlying principles. *Canady* 90 Wn.2d at 813. "In other words, scientists in the field must make the initial determination whether an experimental principle is reliable and accurate." Id. The *Frye* standard recognizes that "judges do not have the expertise required to decide whether a challenged scientific theory is correct," and therefore courts "defer this judgment to scientists. "If there is a significant dispute between qualified experts as to the validity of scientific evidence, it may not be admitted." *State v. Riker*, 123 Wn.2d 351, 869 P.2d 43 (1994). The admission of scientific testimony involves two related inquiries, each governed by separate standards. First, has the scientific theory or principle from which the evidence is derived garnered

general acceptance in the relevant scientific community under the standard of *Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923)? Second, is the expert testimony properly admissible under ER 702? *Janes*, at 232; *State v. Cauthron*, 120 Wn.2d 879, 885, 846 P.2d 502 (1993).

The trial court should have excluded the expert testimony of Dr. Penaskovic regarding his analysis and calculation of the victim's time of death as not being helpful to the jury under ER 702, which provides that:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Admissibility under this rule hinges on two separate determinations: (1) Does the witness qualify as an expert and (2) Would that expert's testimony be helpful to the trier of fact? Cauthron, 120 Wn.2d at 890. Courts in this state have rejected similar testimony when not shown to be supported by accepted medical or scientific opinion, *Maule*, at 296; *State v. Steward*, 34 Wn. App. 221, 660 P.2d 278 (1983), and generally reject expert testimony on new theories when the record fails to establish its reliability and acceptance within the relevant scientific community. There is no basis in scientific community as a method of determining time of death. Dr. Penaskovic gave his curriculum vitae which did not include any education, training or knowledge in forensic pathology. The doctor's testimony further did not meet the standard of acceptance within the scientific, medical or professional community.

Mr. DiBartolo claims that the trial court failed in not making an independent determination of Dr. Penasckovic's testimony as admissible under ER 104(a) and ER 702, out of the presence of the jury and Mr. DiBartolo has shown that Dr. Penasckovic was not qualified to provide scientific testimony on the time of death of the victim and the court did not make an determination on whether the proposed testimony constitutes scientific knowledge, therefore, the trial judge failed to ensure that the scientific testimony of the doctor was not only relevant, but reliable. The primary reason for this distinction arises out of the burden of proof. In the criminal context where the power of the State stands in marked disproportion to the resources of most defendants, the State should be forced to clear the initial obstacle of general acceptance as described in *Frye*. *Reese*, 74 Wn. App. at 558-59. This higher burden of admissibility is required to protect the liberty interests of defendants and the trial judge abused its discretion in admitting the testimony before making a determination under ER 104.

The Court's error becomes evident by the repeated use of a non-medical term to describe the patient's body. Referring to the trial transcript, (See Attachment F), the transcriptionist mistakenly typed "key pep dent" to describe, in fact, the dependent part of Mrs. DiBartolo's body. In anatomy, the dependent position is the lowest portion of someone's body in relation to gravity. The head is above the thereby the neck is dependent to the head. When lying supine, face up, the back portion of the body is dependent to the front. Attorneys, Prosecutors, and Judges deal in facts of law and do not normally entertain a vast education of medical science. They defer to experts and in doing so create the problem. The lower courts have continued to repeat the mistake, thus demonstrating their misunderstanding of this medically technical testimony. To rule

ignorantly on the admissibility of evidence or testimony violates Mr. DiBartolo's right to be free from prosecution based on false, inaccurate or unreliable evidence.

Dr. Penaskovic's testimony is in direct conflict with his own transcribed report of treatment. The Doctor's discussion of lividity at trial was never addressed in the physician's report dictated the day of the event. (See Attachment G).

**E. The prosecution violated the defendant's due process right and committed misconduct during closing arguments by repeatedly referencing his personal opinion of the defendant's guilt, mischaracterizing the evidence and making statements contrary to witness testimony.**

A defendant's right to a fair trial is denied when the prosecutor makes improper comments and there is a substantial likelihood that the comments affected the jury's decision. *State v. Reed,* 102 Wn.2d 140, 145, 684 P.2d 699 (1984). Public prosecutors cannot appeal to prejudice or seek to procure a conviction "through the aid of passion, sympathy or resentment.'" *Reed*, at 147 (quoting *State v. Case*, 49 Wn.2d 66, 70-71, 298 P.2d 500 (1956)). In addition, an attorney may not mislead the jury in summarizing the evidence during closing arguments. *State v. Reeder*, 46 Wn.2d 888, 892, 285 P.2d 884 (1955). In the absence of an objection by defense counsel, reversal is required only if the misconduct was so prejudicial that it could not have been cured by an objection and a curative instruction. *State v. Stith*, 71 Wn. App. 14, 20, 856 P.2d 415 (1993) (citing *State v. Stover*, 67 Wn. App. 228, 232, 834 P.2d 671 (1992), review denied, 120 Wn.2d 1025 (1993)).

Here, Mr. DiBartolo objects to comments made by the prosecutor during closing arguments.

First, Mr. DiBartolo objects to the prosecutor's statement that Mr. DiBartolo put the murder weapon in his pocket after shooting his wife and that he threw out the glove in his haste to get rid of the murder weapon. Mr. DiBartolo objects to the prosecutor's statements "You saw his ego on the stand, tired of working for minimum wage morons, wanting special exception for him from the police chief on the insurance, threatening these detectives to go to the media to speed up the investigation" (See Attachment H). These statements were followed by the prosecutor's claim that Mr. DiBartolo "executed her when she was not looking, aiming purposefully at a cross angle through the brain"(See Attachment I). These comments do constitute reversible error because there was insufficient evidence to support the prosecution's theory of the glove or the muzzle to surface distance. The record will show that the testimony that the victim was shot at a distance of 6-30 inches is explained by a calculation of the blood splatter that was 1) measured after the defendant drove the vehicle from the park to the hospital and 2) a string test photo that is erroneous in it's use as an illustrative example of blood splatter calculations. (See Attachment J). As a general rule, remarks of the prosecutor, including such as would otherwise be improper, are not grounds for reversal where they are invited, provoked, or occasioned by defense counsel and where [the comments] are in reply to or retaliation for [defense counsel's] acts and statements, unless such remarks go beyond a pertinent reply and bring before the jury extraneous matters not in the record, or are so prejudicial that an instruction would not cure them. These comments by the prosecution are not supported by testimony from State's witnesses. *State v. La Porte*, at 822.4881

Secondly, the prosecutor's comments about Katrina DiBartolo's bias and statements of a

prowler at their home questioned the defendant's failure to call the other girls that were at the house constituted prosecutorial misconduct. (See Attachment K). A statement by counsel clearly expressing a personal belief as to the credibility of the witness or the guilt or innocence of the accused is forbidden. *State v. Sargent*, 40 Wn. App. 340, 343-44, 698 P.2d 598 (1985). The court can now rely upon *State v. Traweek*, 43 Wn. App. 99, 715 P.2d 1148, review denied, 106 Wn.2d 1007 (1986), and reason that the prosecutor's comments were improper because they carried the inference that the defendant had a duty to present evidence of his innocence if that evidence was available to him. *State v. Blair*, cause 23967-8-I (Aug. 23, 1990) slip op., at 13. The prosecutor's comments improperly suggested that the defendant had a duty to call witnesses and prove his innocence. *Traweek*, at 107.

Washington courts have said, in the context of failure of the State to call certain witnesses, that the inference arises "only where, under all the circumstances of the case, such unexplained failure to call the witnesses creates a suspicion that there has been a willful attempt to withhold competent testimony." *State v. Baker*, 56 Wn.2d 846, 859-60, 355 P.2d 806 (1960); see *State v. Nelson*, 63 Wn.2d 188, 191-92, 386 P.2d 142 (1963).

However, in a later case, *State v. Davis*, supra, at 279-80, the requirement was explained as not meaning that in order to obtain the benefit of the missing witness rule in a criminal case one must prove facts sufficient to establish a deliberate suppression of evidence. Instead, the requirement means that one must establish such circumstances which would indicate, as a matter of reasonable probability, that the prosecution [the party against whom the missing witness rule

was sought to be applied in the case] would not knowingly fail to call the witness in question unless the witness's testimony would be damaging. In other words, "the inference is based, not on the bare fact that a particular witness is not produced as a witness, but on his non-production when it would be natural for him to produce the witness if the facts known by him had been favorable."

The test for determining prosecutorial misconduct was stated in *State v. Knapp*, 14 Wn. App. 101, 111, 540 P.2d 898 (1975), citing *State v. Adams*, 76 Wn.2d 650, 660, 458 P.2d 558 (1969), rev'd on other grounds, 403 U.S. 947, 29 L.Ed.2d 855, 91 S.Ct. 2273 (1971):

"It is established that the constitutionally guaranteed fair trial requires a trial in which the attorney representing the state does not throw the prestige of his public office and the expression of his own opinion of guilt into the scales against the accused. Thus, any attempt to impress upon the jury the prosecuting attorney's personal belief in the defendant's guilt is unethical and prejudicial. See *State v. Case*, 49 Wn.2d 66, 298 P.2d 500 (1956), and cases cited therein. Argument of counsel must be confined to the evidence and to fair and reasonable deductions to be drawn therefrom. *State v. Coles*, 28 Wn. App. 563, 625 P.2d 713 (1981).

We now turn to whether the prosecutor's misconduct constitutes reversible error. A prosecuting attorney is a quasi-judicial officer. The court in *State v. Huson*, 73 Wn.2d 660, 663, 440 P.2d 192 (1968), characterized the responsibility and duties of this officer with the following: He represents the state, and in the interest of justice must act impartially. His trial behavior must be worthy of the office, for his misconduct may deprive the defendant of a fair trial. Only a fair trial is a constitutional trial. *State v. Case*, 49 Wn.2d 66, 298 P.2d 500 (1956). We do not

condemn vigor, only its misuse. When the prosecutor is satisfied on the question of guilt, he should use every legitimate honorable weapon in his arsenal to convict. No prejudicial instrument, however, will be permitted. His zealousness should be directed to the introduction of competent evidence. He must seek a verdict free of prejudice and based on reason.

The prosecutor's conduct in this case was reprehensible and departs from the prosecutor's duty as an officer of the court to seek justice as opposed to merely obtaining a conviction. (CPR) EC 7-13. It is his duty to rely on and address only the evidence presented at trial. Prosecutorial misconduct may deprive the defendant of a fair trial and only a fair trial is a constitutional trial. *State v. Charlton*, 90 Wn.2d 657, 665, 585 P.2d 142 (1978). In cases of prosecutorial misconduct, the touchstone of due process analysis is the fairness of the trial, i.e., did the misconduct prejudice the jury thereby denying the defendant a fair trial guaranteed by the due process clause? *Smith v. Phillips*, 455 U.S. 209, 71 L.Ed.2d 78, 102 S.Ct. 940 (1982); *State v. Weber*, supra. Thus the legal error, if it exists, exists in the fact that petitioner's trial was unfair. Weber, at 169. Therefore, the ultimate inquiry should not be whether the error was harmless or not harmless but rather did the impropriety violate the petitioner's due process rights to a fair trial. A case will not be reversed for improper argument of law by counsel unless such error is prejudicial to the accused, *State v. Estill*, supra at 200, and only those errors which may have affected the outcome of the trial are prejudicial. *State v. Gilcrist*, 91 Wn.2d 603, 612, 590 P.2d 809 (1979). Errors that deny a defendant a fair trial are per se prejudicial. To determine whether the trial was fair, the court should look to the trial irregularity and determine whether it may have influenced the jury. In

doing so, the court should consider whether the irregularity could be cured by instructing the jury to disregard the remark. *Weber*, at 165. Therefore, in examining the entire record, the question to be resolved is whether there is a substantial likelihood that the prosecutor's misconduct affected the jury verdict, thereby denying the defendant a fair trial. *State v. Wheeler*, 95 Wn.2d 799, 807, 631 P.2d 376 (1981); *State v. Charlton*, supra; *State v. Music*, 79 Wn.2d 699, 489 P.2d 159 (1971), vacated, 408 U.S. 940 (1972); *State v. Martin*, 73 Wn.2d 616, 440 P.2d 429 (1968), cert. denied, 393 U.S. 1081 (1969).

*State v. Davenport*, 100 Wn.2d 757, 675 P.2d 1213 (1984) further explains: We realize that attorneys, in the heat of a trial, are apt to become a little over-enthusiastic in their remembrance of the testimony. However, they have no right to mislead the jury. This is especially true of a prosecutor, who is a quasi-judicial officer whose duty it is to see that a defendant in a criminal prosecution is given a fair trial. *State v. Reeder*, 46 Wn.2d 888, 892, 285 P.2d 884 (1955); see also *State v. Case*, 49 Wn.2d 66, 298 P.2d 500 (1956); *State v. Huson*, 73 Wn.2d 660, 440 P.2d 192, cert. denied, 393 U.S. 1096 (1968). The prosecuting attorney misstating the law of the case to the jury is a serious irregularity having the grave potential to mislead the jury and deprived Mr. DiBartolo of his due process rights.

**F. The prosecution violated the defendant's due process rights and committed misconduct when he produced prejudicial and false evidence.**

Mr. DiBartolo claims that the prosecutor violated his due process rights when he knowingly used the perjured testimony of Dr. Penaskovic regarding the victim's time of death. The Supreme Court has held that a "conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 49L. Ed. 2d 342 (1976) (footnote omitted). A recent Ninth Circuit decision which applies this rule is, "even if the government unwittingly presents false evidence." *United States v. Young*, 17 F.3d 1201, 1204 (9th Cir. 1994).

Under *In re Rice*, 118 Wn.2d at 887 n. 2., Mr. DiBartolo must show that the State knowingly used perjured testimony. The defendant claims the testimony given about the victim's time of death, by the emergency room physician who treated the victim's injuries, was made in error. Though the information supported the prosecutor's theory of the crime, it was not valid, reliable, accurate or accepted methodology within the scientific community. The prosecutor used this false evidence to prejudice the jury and seek a conviction of the defendant. The doctor's use of PCO2 levels as a method of calculating time of death is the most prejudicial portion of his testimony.

As prejudicial as this false evidence was against the defendant, it is over-shadowed by the fact that the investigators and the prosecutor had in their possession documents that prove that the testimony the doctor was going to give to the jury was false, yet they chose to present it anyway. Documents from the investigation report, dispute all the information presented by Dr. Penaskovic.

The police report contained copies of the victim's actual laboratory services report. The lab service slip lists the time and date of the blood sample collections, the number of the sample and the group of the tests performed on the samples. The report is computer generated and is marked by the internal clock of that device.

Mr. DiBartolo argues that even if the Court had ruled after an independent inquiry to allow the pCO2 testimony, it still must be presented by the prosecution in a truthful manner. The laboratory reports, (See Attachment L), reflect the different blood gas tests performed by the SHMC lab and the date and time of each test. Page 1 and page 2 of the lab report show tests for: Alcohol, Ethyl Serum, Pregnancy, Renal panel, Hemogram and Prothromin time. These test were conducted on sample No. 4114146, collected at 2147 hours (9:47 pm) on 11/02/96. Page 3 reveals the information that was manipulated and presented to the jury by the prosecution and Dr. Penaskovic and is basis for argument. The lab tests for I-ATAT ABGS were conducted on sample No. 4114939, collected at 2238 hours (10:38 pm) on 11/02/96. Special emphasis should be placed on this sample that was collected 44 minutes after the extensive emergency treatment was halted by Dr. Penaskovic as it was the collection sample that provided the pCO2 levels testified to by the doctor. The treatment report pronounced Mrs. DiBartolo deceased at 2154 hours (9:45 pm).

The pCO2 levels were calculated by Dr. Penaskovic in an attempt to determine the post-mortem interval. (See Attachment E). The prejudicial error occurred when the doctor, over the defense attorney's objection, correlated the calculation of the pCO2 level to the defendant and

victim's arrival time at the Emergency Room, not the time of the blood sample collection. When presented in context to the 9:00 pm arrival time, the 24 ½ minute time frame supported the prosecution's theory of the events. The 24 ½ interval testified to by Dr. Penaskovic should have been deducted from the 2238 hours (10:38 pm) sample collection time. Had Dr. Penaskovic's testimony been accurate, the pCO2 levels would have still concluded a time of death to be at 2213 hours, some 20 minutes after the CPR was stopped by hospital staff..

The investigators and Prosecution received the copies of the records on 7/21/97, via fax. The pages were added to the Police Department's Investigation Report as Pages 02015-02022, as printed at the lower right corner of each page. At some point it became part of the Spokane Police Investigation Report for this case, where it was finally discovered. The fax date on the report demonstrates its exculpatory information contained therein and the Prosecutor knowingly manipulated and misrepresented the data to support their theory. Improper use of or to use evidence know to be false is Prosecutorial Misconduct.

The prosecutor further violated Mr. DiBartolo's due process rights when he produced video of the park to demonstrate visibility in the park that were erroneous and prejudicial (See Attachment M). It is inadmissible as evidence when it does not illustrate or make clear some issue in the case, that is, where they are irrelevant or immaterial, or where they are of such a character as to prejudice the jury.

If the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time,

or needless presentation of cumulative evidence. In order to properly authenticate a photograph or video under the Federal Rules of Evidence, it is necessary to show that chances are sufficiently remote that either evidence is distorted and technically inaccurate as a representation of the scene photographed, or that the video portrays a scene materially different from the scene that is relevant to the issues at trial. Before being admitted in evidence, it must be shown that the video is sufficiently correct to be helpful to the court and the jury, without creating undue prejudice against the defendant or confusion in the mind of the juror. The quantum of authentication, by showing that a photograph or video is reasonably accurate and correct, in order to render it admissible in evidence must be considered in a relative sense, and authentication does not require strict mathematical accuracy.

In demonstrating that the trial court clearly abused its discretion, the petitioner must demonstrate that the court error in allowing the video was of such significance that the trial was fatally infected. The cumulative effect of the prejudicial evidence should be reviewed along with the weight the prosecution placed on that evidence. Where the prosecution relied on the questionable evidence to falsely support the testimony of a witness, illustrate the gruesomeness of a crime scene which was materially changed by time, or when used exclusively during closing argument to elicit the sympathy of the jury, its weight and bearing on the case, in totality, is considerable. These errors are harmful, creating undue prejudice against the defendant, and require reversal.

The prosecutor further caused prejudice when, in preparing for presentation, he placed an in-life 8" X 10" photograph of the victim on an easel directly to his left and in front of the jury stand. During his summation of the case, the prosecutor referred to the victim by pointing to the photograph numerous times. During the prosecutor's closing argument, the 8" X 10" photograph of the victim physically fell from the easel three times, causing a noisy disturbance and drawing the juror's attention to the photograph. The prosecutor had to interrupt his remarks three times and struggle in an attempt to secure the photograph, once more to the easel. The portraying of the victim's photograph, especially in light of the animation of the victim falling three times to the floor, imparted extreme prejudicial damage to the defendant and is without a doubt harmful error. Prosecutors cannot appeal to prejudice or seek to procure a conviction "through the aid of passion, sympathy or resentment." *Reed*, at 147 (quoting State v. Case, 49 Wn.2d 66, 70-71, 298 P.2d 500 (1956).

The cumulative effect of repetitive error may be so flagrant that no instruction can erase the error. *Case*, 49 Page 805 Wn.2d at 73; *Torres*, 16 Wn. App. at 263. The recurrent pause by the prosecutor to pick up and adjust the in-life photo of the victim diverted their minds from the real issue which they had to determine and prejudiced the jury against Mr. DiBartolo.

"The district attorney is a high public officer, representing the state, which seeks equal and impartial justice, and it is as much his duty to see that no innocent man suffers as it is to see that no guilty man escapes. In the discharge of these most important duties he commands the respect of the people of the county and usually exercises a great influence upon jurors. In discussing the

evidence he is . . . given the widest latitude within the four corners of the evidence by way of comment, denunciation or appeal, but he has no right to call to the attention of the jury matters or considerations which the jurors have no right to consider." The case of *State v. Carr* (1930), 160 Wn. 83, 294 P. 1016, contains an excellent discussion of what constitutes a fair trial.

## IV. CONCLUSION

For the reasons set forth in this Habeas Petition, the court should reverse Mr. DiBartolo's conviction, or remand this matter back for a new trial.

Respectfully Submitted:

By: [signature]
THOMAS ANTHONY DIBARTOLO
DOC #109329
P.O. Box 8273
Cranston, RI. 02920

**Subscribed and Sworn** to before me this____day of April,2003.

______________________________
Print name:____________________
Notary Public in and for the State of
Rhode Island, residing at:________
My commission expires:___________

ATTACHMENT A

courtroom?

JUROR: I didn't hear anything.

THE COURT: Did you hear anything in the jury room, did anybody say what happened or did you hear what happened?

JUROR: Yeah. Well, the only thing I know, I guess, I think it was Dave and Curt were coming in or out, the first break, and one of the -- I don't know who it was, an employee said something about (inaudible).

THE COURT: Were you told what was said?

JUROR: No, that is all I heard. That is all I heard.

THE COURT: In any way would that impact you at all?

JUROR: No.

THE COURT: Can you set aside what you heard?

JUROR: Yes. I really did not hear anything.

THE COURT: Can you remain fair and impartial?

JUROR: Yes.

THE COURT: You started to say

something, "While I am in here, if I could say something."

JUROR: This makes neither me so nervous. I think (inaudible). Martin has said something, I don't think he should have said it.

THE COURT: Martin Baron (phonetic)?

JUROR: I don't know his last name. I don't even know why I should talk to you, because it scares the daylights out of me. Can I just tell you a couple comments he's made or that I've heard?

THE COURT: Yes.

JUROR: He said things like -- he said I haven't made a cop, he said I haven't made an (inaudible). Making comments, he personally said, then two or three of the other guys were joking, I forgot what it was, but he had a ponytail, I think it was the -- they were calling him the ponytail man.

Martin, he's always saying something like, come on (inaudible). He's not going to affect my decision. It would be a lot easier if he would just keep his comments to himself.

THE COURT: Do you have questions?

MS. MORENO: Is that basically the gist

of what he said?

JUROR: That is all I personally heard. That is all I personally heard. Maybe somebody else will tell you something more.

THE COURT: Okay. Do you have more questions?

JUROR: He doesn't know I told you this. He makes me nervous.

MR. SWEETSER: I am not even familiar with who he is, but basically what I am hearing you saying is that he's not being serious enough and he's making some inappropriate comments?

JUROR: I don't think he can be impartial.

MR. SWEETSER: If he's not being serious, that's not going to affect your ability to be fair and impartial in this case to the State or to the defense?

JUROR: I don't want it to be. I mean, I just try to -- you know, he acts like -- sometimes it's like he had it in his mind the second day he was here, it's like he --

MR. SWEETSER: I guess what I am saying is that's not going to impact the State?

JUROR: No, I am going to do my own.

MR. SWEETSER: Okay.

MR. STEINMETZ: Do you feel threatened by the other jurors, do you feel threatened by them?

JUROR: You mean like physically?

MR. STEINMETZ: Emotionally.

JUROR: No. By him I do. If he found out I said anything, I am just afraid he'd harass me. I don't know, he gives me butterflies. I used to -- this is how I found out some of the comments, is because I used to go smoke with him on a smoke break, the cafeteria part.

Mary said we have to stop going out there, we have to go out front. They still go out there, as a matter of fact, and I haven't smoked with him for the past week or so, so he always just -- and as (inaudible) it's not really the trial, but it's like Mary, he'd say we own Mary's ass, just things like that.

THE COURT: Maryann?

MS. MORENO: No.

MR. SWEETSER: Nothing further.

THE COURT: I don't want you to discuss with anybody in there what we talked about. You are to disregard anything that you heard that's

not evidence in here.

JUROR: You are not going to tell him anything?

THE COURT: We're not going to tell him anything.

THE COURT: You know everybody here so I am not going to introduce you. The reason I asked you to come in here is it was brought to our attention some comments were made to some jurors outside the presence of the jury this morning.

Did anybody say anything to you outside the presence of the jury?

JUROR: No.

THE COURT: It was also brought to our attention that somebody said something in the jury room about these comments that were made. Did you hear anything?

JUROR: Comments made to whom, to --

THE COURT: Something that was made outside of the jury room. In other words, somebody had some comments made to them outside the jury room and then they went into the jury room and said somebody said something.

JUROR: Oh, no. I just heard somebody

ATTACHMENT B

or something else?

MR. STEINMETZ: You asked about sequestration.

MS. MORENO: I am withdrawing that motion.

THE COURT: What's your motion?

MR. STEINMETZ: Your Honor, we're asking that one juror be removed, and quite frankly, I apologize, I don't know what her name is.

THE COURT: The one that was shaky and nervous?

MR. STEINMETZ: Yes.

THE COURT: That is Brenda Fleming.

MR. STEINMETZ: We're asking that Brenda Fleming be removed. We've heard from the court's bailiff that she was crying the other day in the jury room, apparently she feels threatened by another juror, she was visibly shaken today and, quite frankly, I don't know if there would be a confrontational battle between that juror and the juror she was referring to, which could ultimately end up in a hung jury.

If necessary, we would agree that both jurors be removed. Quite frankly, we're trying

avoid a mistrial or hung jury based upon personalities of these two individuals and that we want them to rely on the evidence upon the evidence to make a decision.

She's made it clear that she doesn't like this man, she I believe, feels threatened by him. She, I don't believe, would be allowed to express her opinion. If she does, she's visibly scared of this man.

If necessary, we're asking that they both be removed so that the jury can come to a decision on the evidence and not based upon personalities.

THE COURT: Do you want to talk to your client first?

MS. MORENO: Yes.

THE COURT: You need to do that. So I guess we'll just stop right now and you go talk to him. Are you going to have any additional motions?

MS. MORENO: Well, I had that motion that I brought up this morning.

THE COURT: I'll ensure you a proceeding with the motion.

MS. MORENO: I believe that the comment

ATTACHMENT C

you have to disregard it, that is kind of ringing the bell twice. I don't know.

THE COURT: If you bring a motion, you have to tell me what relief you want. I am not going to say I am going to grant the motion. I won't address the motion unless you tell me you want.

MS. MORENO: Perhaps a statement to the jury that the defendant does not have to call or present evidence. I don't know. I don't know, let me talk to my client.

THE COURT: Let's go off the record. You go talk to him about those two things and come back in and let's get this wrapped up.

MS. MORENO: What was the first one?

MR. SWEETSER: The two jurors.

THE COURT: Motion on getting rid of one and/or two jurors.

(Recess taken.)

THE COURT: We're on the record. Did you have an opportunity to discuss the State's motion?

MS. MORENO: Yes, I did. We are not requesting that any jurors be struck.

THE COURT: Are you in opposition to

the motion?

MS. MORENO: Yes, we are.

THE COURT: Any arguments you want to make about it?

MS. MORENO: Well, based on -- we're trying to find out if there's been any misconduct or any influence to these jurors so we can make an informed decision on a mistrial. They came in, have been cooped up with each other, living with each other for eight weeks now, of course they're going to be like this, but to me that is what makes the jury, the differing and varying. I don't think there's anything wrong, any wrongdoing, by either of them.

THE COURT: Response?

MR. STEINMETZ: Judge, we're not accusing any jurors of wrongdoing, but it's very apparent that this jury is very bothered and obviously or impliedly she's scared of this man, the comments that he's been making. She thought it would be important enough to bring it to the court's attention, not on the court's initiative but on her own initiative.

She -- I don't know, she was trembling. It's my fear that these two are going

to lock horns not based upon the evidence but based upon the personalities of the individuals and that we're going to get a mistrial, and we have three perfectly good alternates out there and I am requesting that the court replace not -- if not one, both of these individual jurors and that the two alternates take their place so that this verdict can be arrived at on the evidence and not on personalities.

MS. MORENO: I don't think it's for us to look at a crystal ball to determine what these people are thinking. I mean, personally they may not like each other, but who knows when it comes to deliberating on the facts. I don't think we can boot them just because they have a different -- come from different places.

THE COURT: (Inaudible) I am a little nervous about others and that sort of thing, but she's been nervous throughout these proceedings. The motion is denied. Counsel, you have a motion?

MS. MORENO: No.

THE COURT: Are you withdrawing the motion?

MS. MORENO: I can't think of any way

ATTACHMENT D

To : Whom It May Concern

From : Thomas A. DiBartolo

Date : January 23, 2003

Re : Affadavit of Facts - Trial Nov/Dec 1997

This affadavit is written by Thomas A. DiBartolo and duly notarized. It serves as a report of facts centered around the trial and specifically the actions of my attorney Maryann Moreno, Deputy Prosecutor Stienmetz and the Honorable Judge Rielly, during inquiry into jury misconduct and tampering.

The facts are as follows:

1) The actual date of the event is unknowm to me in memory, but it was at the end of the trial.

2) As I recall, it was during the afternoon session, following mid-day recess.

3) I was escorted into the courtroom and waited for my attorney to arrive.

4) Ms. Moreno entered the courtroom from the Judge's chamber door and took a seat beside me at the defense table.

5) Ms. Moreno informed me that there had been a problem with some of the jurors, but she, the prosecutor and the judge had handled it in chambers, in my absence.

6) Ms. Moreno advised me that it was mostly "housekeeping", but as it had already been resolved in chambers without my presence, she needed me to sign a waiver of appearance.

(continued)

7) Ms. Moreno produced a waiver form, which I signed in compliance with her need, having entrusted my best interests to her for my defense.

8) It was a short time later that court convened and all parties were brought in, except the jury.

9) Mr. Stienmetz filed a motion to strike the juror or both jurors in fear that their misconduct had created an environment of bias and fear so as to place the entire trial in jeopardy of a mistrial.

10) Ms. Moreno addressed the court with her concerns, "we're trying to find out if there's been any misconduct or any influence to these jurors so we can make an informed decision on a mistrial."

11) The comments of the judge led me to believe that he also had some deep concerns about the mind set and impartiality of the jurors.

12) Following some dialogue pertaining to the events of tampering and misconduct, Judge Rielly denied the motion to dismiss the jurors.

13) I do not recall if there was any more court business or testimony from witnesses that day.

14) It was later that Ms. Moreno informed me of the facts of the tampering (courthouse security guard) and the misconduct (juror biased against me from the beginning, the reporting juror who was to nervous and visibly shaking and the second juror who confirmed the misconduct and bias).

(continued)

15) Ms. Moreno never discussed with me the actions and in chambers agreement to be some part of her trial strategy. The dynamics of the jury, nor the effect the misconduct and bias could have on the jury, was ever discussed.

16) Following this event, the jury went into deliberation and three days later returned a verdict of guilty.

17) I have and will maintain that I am innocent of this crime and wrongfully imprisoned. I believe the verdict was delivered due to individual bias and the bias created by the false evidence presented by the state.

The information presented in this affadavit are sworn to be true and correct.

Sincerely,

Thomas A. DiBartolo

Thomas A. DiBartolo
PO Box 8273
Cranston, RI 02920

Subscribed and sworn to me this 23rd day of January, 2003.

______________________________

Notary for the State of Rhode Island

My commission expires on 9/22/05.

ATTACHMENT E

carbon dioxide level is in the blood, what their oxygen level is and what their acid base status is, how acidic or alkalied their blood is.

Q What is a normal, quote normal carbon dioxide level in someone who has just expired?

A Someone in a resting state who doesn't have any other medical problems the PCO or the carbon dioxide level usually is about 40.

Q When was the blood drawn from Patty DiBartolo?

A It was drawn about four or five minutes after she arrived in the emergency room department.

Q And what was her carbon dioxide level?

A Her carbon dioxide level was 94.9.

Q What does that suggest to you?

A That suggests that she had not been breathing for a while.

Q By a while, how -- can you narrow that down to minutes?

A I called one of our staff pulmonologists this morning because when I was reviewing the blood gas issue last night in preparation of coming here and because I wanted to get an idea if it's been established how quickly the carbon dioxide level will climb in someone who isn't actively breathing, and I talked to the chief pulmonologist at Harborview this morning and he said --

MS. MORENO: I am going to object at this point.

THE COURT: Basis?

MS. MORENO: Approach?

THE COURT: Yes.

(Following held outside the hearing of the Jury.)

MS. MORENO: It is hearsay and I am not so sure he is a expert on this. He can testify he can read it, but I don't think he can testify to what it means and it is hearsay.

MR. STEINMETZ: (Inaudible.)

MS. MORENO: I think we are going one step further than asking him to make like a forensic determination. That's what the whole goal is. He does not have firsthand knowledge.

THE COURT: (Inaudible.)

(Following held within the hearing of the Jury.)

THE COURT: The objection is overruled. Why don't you restate the question for the doctor.

Do you still recall the question, Doctor?

THE WITNESS: Yes.

A (Continued) Based on studies in anesthesia where an individual was put to sleep in the operating room and paralyzed, meaning that they relaxed the muscles of the patient and the machine ventilator is doing all the breathing for the patient, studies have been done where

the oxygen supply will be stopped for a period of time and then the carbon dioxide level measured in the blood and then graphs have been developed to show how much the carbon dioxide level goes up per minute. And in the first minute it jumps about 8 millimeters of CO2. And then thereafter it increases about two to three millimeters of CO 2 per minute afterwards. And so based upon that, the difference between her measured carbon dioxide level, which was 95 and baseline CO2 assuming things were baseline when the incident occurred, which was 40, that's a difference of 55. And so in the first minute, in the first minute it would jump 8, so that would be 55 minus 8. And then that would leave about 47 millimeters left, and assuming the CO2 climbed two millimeters per minute, two divided into 47 would give 23-and-a-half minutes plus one minute for the initial jump, which would be a minimum of 24-and-a-half minutes that the victim had stopped breathing and stopped perfusing at that point.

But my caveat here is that the studies were done in patients that were in the operating room. They were under anesthesia; conditions were controlled. In a situation like this, we can't necessarily assume that that was the case at the time of death. And the other thing is that because she didn't have any oxygen on her

at the time the incident occurred and her oxygen level began to drop, when oxygen level drops cellular death begins to occur unless C02 was produced, and so that can cause a slower increase in the C02, which means the bottom line here is that I think this 24-and-a-half minutes is probably conservative.

Q And is that consistent with the other physical observations that you made?

A Well, I said before was that it appeared, in my clinical impression, that she had been down from 30 to 45 minutes. And I think that with a minimum based upon the blood gas of 24-and-a-half minutes I think I can state with a reasonable degree of certainty that the incident occurred at least 30 minutes before when I saw her.

MR. STEINMETZ: Thank you, Doctor. No further questions.

THE COURT: Cross-examination, Counsel.

CROSS-EXAMINATION

BY MS. MORENO:

Q Good morning, Doctor.

A Good morning.

Q It appears to me that, please correct me if I'm wrong, that you are basing your estimate on the time of

death on I think two main things: The lividity that you observed and then this last thing that you testified to regarding the C02 level; is that right?

A Correct.

Q And correct me if I am wrong, but those are both things that you had to reserve before giving an opinion on?

A Correct.

Q And my understanding was that you checked the lividity issue by doing research in I think the library?

A To the pathology department at Sacred Heart.

Q Was it a particular book you looked at?

A It was a reference that they had down there about time of death.

Q And the same for the C02 level, my understanding was that you consulted with someone else?

A Correct, but I also had my medical text and I researched it through that way, as well.

Q It appears to me that a number of measures were used to try to save Mrs. DiBartolo?

A Yes.

Q Is that right? And I think in one of your reports you indicated that the nurses and yourself, and I am not sure if there are other doctors there worked on her for about 20 minutes?

ATTACHMENT F

balloon in the same way the stomach is stretchy distendable, hollow organ. When it is filled with food and full of liquid, if the muscle if the muscle is relaxed as someone in a comatose state is, in a relaxed state that content will just want to empty itself without any active or cortical or thinking process on the part of the patient. It is a passive process.

Q Doctor, do you have an opinion with regard to the length of time that the Patty DiBartolo was dead when she arrived at the hospital?

A Based upon her mottled appearance, the appearance of the blood settling and the key pep dent part of her body, based upon her absence of vital signs her slow cardiac activity, I estimated that her time of death occurred between 30 and 45 minutes before I saw her.

Q If the cardiac activity is present when you observed her, how do you explain that?

A In someone with a normal heart, cardiac, electrical cardiac activity can persist. I have seen it in some cases even up to over an hour because in a healthy heart, the heart wants to keep beating. It is the body's way of trying to keep itself alive and electrical activity will continue for sometimes a significant period of time after the patient stops breathing and is neurologically dead.

ATTACHMENT G

Dibartolo, Patricia A
00918506 **UPDATED REPORT** **PAGE 1 OF 3**

---

TREATMENT DATE: 11/02/96

CHIEF COMPLAINT: Gunshot wound to the head.

HISTORY OF PRESENT ILLNESS: The patient is an approximately 39-year-old female who was brought in by her husband after she sustained a gunshot wound to the head, according to the patient's husband, who appeared to be severely emotionally upset. He states that both his wife and he were shot during an attempted robbery and struggle. Details of the scuffle are unknown to me at this time. No history could be obtained from the patient because of a comatose state. All efforts were directed toward resuscitation of the patient and little history could be obtained.

PAST MEDICAL HISTORY: Unknown.

Allergies: Unknown.

Medications: Unknown.

Habits: Unknown.

REVIEW OF SYSTEMS: Not obtainable.

PHYSICAL EXAMINATION:

Vital Signs: No spontaneous heartbeat or respirations. On the monitor, the patient was in an agonal rhythm.
General: On general examination, the patient appeared pale, cyanotic with rubor changes of her chest and extremities.
HEENT: She had a large amount of bleeding from an apparent wound to the patient's head. Her hair was matted with blood and vomitus. Pupils were fixed and dilated.
Lungs: Breath sounds were absent.
Cardiac: Cardiac sounds were absent. Femoral pulse was absent.

---



The information contained in this report is CONFIDENTIAL. This information is not to be released without proper authorization.

DIAGNOSTIC DATA: Trauma battery was obtained. Pregnancy test was negative. WBC 5100, hemoglobin 14.4, hematocrit 43.1, PT 11.4. Arterial blood gas showed pH 6.987, PCO2 94.9, PO2 28, base excess -9 (pre-intubation). Sodium 140, potassium 7.1, chloride 110, CO2 18, anion gap 12, BUN 12, creatinine 0.9, calcium 9.8, glucose 212. Ethanol was less than 3.

EMERGENCY ROOM COURSE: Anesthesia was present and managed the airway. Several attempts at oral intubation were unsuccessful but anesthesia because of a perfuse amount of blood and vomitus present. The patient continued to vomit multiple times. Suctioning was used aggressively to keep the oropharynx clear; however, because of large amounts of vomitus and foreign material in the oral cavity, intubation was difficult. Anesthesia also tried nasotracheal intubation unsuccessfully. Finally, on the third or fourth try, anesthesia was successful in placing a 7-0 ET tube, 22 cm at the teeth, and she demonstrated good, diminished but present, bilateral breath sounds. NG tube was placed to empty the patient's stomach after it was obvious that the patient continued to vomit, to facilitate stomach emptying early in the intubation attempts. A left antecubital IV line was begun and after intubation, the patient was 5 mg of IV Epinephrine. At several intervals during the resuscitation, the patient demonstrated an organized complex; however, she continued to have absent pulses.

CPR was continued during the entire resuscitation with good femoral pulses auscultated on ultrasound. When CPR was held, however, the patient's pulses were absent.

During CPR, the patient demonstrated arterial bleeding from the head wound, which was located by palpation posterior and inferior to the right ear. She had blood exiting from the left auditory canal. There were no other obvious wounds to the head.

Trauma code was called when the patient arrived in the emergency department. Dr. Clyde arrived to the emergency department in short order. Despite resuscitation measures, the patient continued to demonstrate no neurological function, and continued to show fixed and dilated pupils, absence of spontaneous respirations and absence of any movement of her arms or legs.



The information contained in this report is CONFIDENTIAL. This information is not to be released without proper authorization. 02010

Dibartolo, Patricia A
00918506



She was declared dead at 21:54. The coronary was called. He was coming to investigate. The police have also come to investigate the circumstances of the patient's death.

D:11/02/96
T:11/04/96 12:39 P
SGP/bgb
cc:

Dictated and Authenticated by:
Stephen G. Penaskovic, M.D.



The information contained in this report is CONFIDENTIAL. This information is not to be released without proper authorization.

ATTACHMENT H

thing as a perfect crime.

Details are missed, details of the story are forgotten, things in the plan that could not be contemplated arise. You saw the defendant on the witness stand. This is a selfish, egotistical man that thinks only of his own needs.

The world revolves around him, he's never wrong. You saw his ego on the stand, tired of working for minimum wage morons, wanting special exception for him from the police chief on the insurance, threatening these detectives to go to the media to speed up the investigation.

You saw the anger of this man on the witness stand, a man thinking only of his own needs, he will deceive when it's to his own benefit. I suggest to you the defendant is a type of person who could commit murder whether he needs to, for his own benefit, for his own gain, without regard for his children, without regard for his wife.

No one is going to burden him with the financial constraints of a divorce, nope, wasn't in the cards. Let's start by looking at the circumstances behind the murder.

ATTACHMENT I

likely explanation, that the defendant executed her when she was not looking, aiming purposefully at a cross angle through the brain stem. She would die quickly. Is it a coincidence or is it murder?

The defendant says he did not see Patti when the first shot went off. She was less than three feet from the barrel of the revolver. We all know about peripheral vision. The farther away we are from an object, the greater the peripheral vision. I can still see my hands. If I move back, I can see more.

The defendant tells us from the illumination of the van dome light he could clearly see the butt of the gun in the shooter's hand, that the grip was loose, for its reason for going forth, however, the defendant's vision only went to the end of the revolver barrel, even under his version as he grabbed for it.

The defendant tells us and tells the detectives he did not see Patti when he got into the van to get his Glock after he fired three shots at the fleeing suspects. Only after this did he look to the other side of the van, look to the other side of the window, this side, yelled,

ATTACHMENT J

Q And were you able to interpret that blood spatter? And if so, can you tell the jury?

A Yes, I was. By looking at individual spots in this spatter pattern on the area "G", I selected the spots that gave the best indication of directionality. In other words, their shape was nice. It wasn't -- they weren't deformed in shape and I picked the ones that were the furthest out at the edge of the pattern. Because the longer distance you run a straight line, the better your information is.

It's the same idea that a long level works better than a short level if you're using a carpenter's level and that kind of thing. So I wanted to get the ones that were the furthest out in the pattern and the ones that showed the best direction. And what I did at that point was take pieces of string right next to the drops on the van and using the instrument I showed you earlier, the protractor, the blood stain protractor, I pulled those strings to the angle that was indicated by the photograph I showed you of the different blood drop angles.

I determined which angle best fit that blood drop. I pulled that string to the appropriate angle by setting the protractor on the van and running it up to the appropriate degrees, pulled the string out and held it there. And took the next blood spot and pulled that string out to the appropriate angle and I looked for a spot where

those two strings would cross.

The spot where the strings converge from the different -- I used, if I recall, 10 spots on this particular scene. So where all of those strings come together to one cluster, maybe not one individual pinpoint because that's typically not the way that -- that blood is applied. Usually a -- an injury or a bloody object's bigger than a pinpoint, so where those droplets come together to a small cluster, I marked that, both for height and for a location on the concrete floor of the garage.

Once I had that position marked, then I went back and measured it in relationship to the van. And that showed me what the probable point of origin was for this blood spatter pattern that included the rear hubcap of the vehicle and the area behind the open rear fender well.

Q And what was that point of origin?

A The blood spatter pattern on the rear bumper behind the passenger side rear wheel originated approximately six inches forward of the center of the rear hubcap and approximately four inches away from the van and at a height very close to the ground, approximately four inches from the ground.

And I would double check my notes on that to make sure on those inch measurements.

MR. SWEETSER: May I approach the witness,

Your Honor?

THE COURT: Yes.

A (by Mr. Pellegrin) And I double checked my notes from the crime scene and that's correct. Six . . .

Q (by Mr. Sweetser) Could you measure that, sir?

A Yes. (Witness complies.) We're only looking at six inches forward of the center of the hubcap and four inches out from the side of the van. And . . .

Q Could you place this piece of tape in that location?

A (Witness complies.) And very near to the ground. So you're looking at a spot about as close to the rear of the passenger side tire as you could get really.

MR. SWEETSER: May I approach the witness, Your Honor?

THE COURT: You may.

Q (by Mr. Sweetser) I'm handing you what's been marked State's Exhibit 201 and been previously admitted. Can you place that in the machine and tell the jury what it shows?

A Yes. State's Exhibit 201 is a photograph that shows -- it illustrates the technique that I used to run these strings from the spots on the van. And you can see one, two, three, four, five, six, seven strings there in the photograph, anyway. But you -- it's also important to note that as I just showed you the point of origin that I determined using this technique is about where the pointer's

showing on the floor of the garage. So this was done for illustrative purposes.

And this not -- I'm not holding the strings where they were when I took my measurements. I took the measurements with the help of another person and marked the spots actually on the concrete as I was going. And then after I was done, I held all the strings up to show what a point of origin would look like just to give you an idea of what -- what we're working with is where these strings come back to a common spot here. And that spot should be about where the bloody object or bleeding injury was when that blood was deposited in the air.

MR. SWEETSER: May I approach the witness, Your Honor?

THE COURT: Yes.

Q (by Mr. Sweetser) Sir, I'm handing you State's Exhibit 299 which has been previously admitted. Can you look at that, please?

A Yes.

Q Can you orient the location of the injury?

A Yes. The injury appears to be about halfway between the top of the right ear in the back of the skull, on the back right side of the skull.

Q Assuming that that is the point of origination of the blood spatter on the back of the van, would you have an

ATTACHMENT K

save his wife, that he was in a hurry, he wanted to get Patti into the van and down to the hospital and that's the reason he didn't make the 911 call until 18th and Perry.

Now for the first time the story changes. After he fired the three shots in rapid succession it's possible he took a minute to place her in the van.

When confronted by the physical evidence the defendant must try to explain to you why all that blood, the river of blood, at the crime scene. When you look at all of these independent witnesses and put them together and the physical evidence, it leads to an inescapable conclusion, the defendant was making sure his wife was dead prior to driving her to Sacred Heart Hospital. The witnesses are consistent, they corroborate each other.

Defense counsel will argue Katrina DiBartolo, the defendant's doctor, disputes our independent witnesses. Remember Gewalt and Garcia have nothing to gain. When they testified and they gave information to the police, they did not know the significance of their testimony.

When they testified and told officers

days after the shooting it was at the beginning of a Cops episode, that was not important to them. Katrina, on the other hand, loves her dad, has an obvious interest and bias, has the motive to say her dad was wearing a winter coat in August at a shooting range.

If there was really a prowler, wouldn't defense have called the other girls at the house to corroborate her story? Why does this only come out a week ago when she talked with investigators the first time?

Now let's consider the timing of the two shots in relationship to the three shots that were heard later and what it means in relationship to the purported fleeing suspects.

Detective Bays testified that at the hospital the defendant's statement was that he only saw suspect number two when he was a distance of 40 to 50 yards, and this is how he could determine that suspect number two was a foot away when he fired the three shots he could see their silhouettes in the darkness.

How long does it take young males to run 40 to 50 yards? Remember back in high school or grade school, whatever, they would always do

ATTACHMENT L

Case 2:03-cv-00094-EFS Document 1 Filed 03/26/03





101 West Eighth Ave.
P.O. Box 2555
Spokane, WA 99220-2
(509) 455-3065
1-800-442-8535

# LABORATORY REPORT

## SACRED HEART MEDICAL CENTER
## DEPARTMENT OF LABORATORY MEDICINE

MARK E. WILLIAMSON, M.D., DIRECTOR

Pat Name: DIBARTOLO,PATRICIA A — Page: 1
Unit #/Acct #: 000000918506/S000009634850 — Admit date: 11/02/9
Loc: E
Phys-Service: NO,ATTENDING PHYSICIAN - EMR

Sun Nov 03, 1996 01:28 pm

4114146

Collected: 11/02/96 2147 Received: 11/02/96 2153 Spec: Blood

*STAT*STAT*STAT*
*STAT*STAT*STAT*

| ALCOHOL,ETHYL SERUM | Result | HL | Ref Range | Low | Result Normal | Hi |
|---|---|---|---|---|---|---|
| Ethanol(mg/dl): | <3 | | None detected | | | |
| Ethanol(gm/dl): | <0.003 | | None detected | | | |

4114146

Collected: 11/02/96 2147 Received: 11/02/96 2153 Spec: Blood

*STAT*STAT*STAT*
*STAT*STAT*STAT*

| PREGNANCY TEST,SERUM | Result | HL | Norm Range | Low | Result Normal | Hi |
|---|---|---|---|---|---|---|
| Pregnancy Test, (mIU/ml): | Negative | | | | | |

4114146

Collected: 11/02/96 2147 Received: 11/02/96 2153 Spec: Blood

*STAT*STAT*STAT*
*STAT*STAT*STAT*

| RENAL PANEL | Result | HL | Norm Range | Low | Result Normal | Hi |
|---|---|---|---|---|---|---|
| Sodium(mmol/L): | 140 | | 135-148 | | X | |
| Potassium(mmol/L): | 7.1 | * | 3.5-5.1 | | | |
| Chloride(mmol/L): | 110 | * | 98-109 | | | X |
| CO2(mmol/L): | 18 | * | 22-29 | X | | |
| Anion Gap : | 12 | | 7-16 | | X | |
| BUN(mg/dl): | 12 | | 8-21 | | X | |
| Creatinine S(mg/dl): | 0.9 | | 0.4-1.3 | | X | |
| Calcium(mg/dl): | 9.8 | | 8.4-10.4 | | X | |
| Glucose(mg/dl): | 212 | * | 80-115 | | | |
| Phosphorus(mg/dl): | 4.9 | | 2.8-4.1 | | | |

02021

DIBARTOLO,PATRICIA A



101 West Eighth Av
P.O. Box 2555
Spokane, WA 99220-2555
(509) 455-3065
1-800-442-8535

# LABORATORY REPORT

## SACRED HEART MEDICAL CENTER
## DEPARTMENT OF LABORATORY MEDICINE

MARK E. WILLIAMSON, M.D., DIRECTOR

Pat Name: DIBARTOLO,PATRICIA A — Page: 2
Unit #/Acct #: 000000918506/S000009634850 — Admit date: 11/02/96
Loc: E
Phys-Service: NO,ATTENDING PHYSICIAN - EMR

Sun Nov 03, 1996 01:28 pm

**************************************************************************

4114146

Collected: 11/02/96 2147 Received: 11/02/96 2153 Spec: Blood
*STAT*STAT*STAT*
*STAT*STAT*STAT*

| HEMOGRAM | Result | HL | Norm Range | Low | Result Normal | Hi |
|---|---|---|---|---|---|---|
| WBC(X10^9/L: | 5.1 | | 3.5-11.0 | | X | |
| RBC(X10^12/: | 4.60 | | 3.70-5.10 | | X | |
| HGB(gm/dl): | 14.4 | | 12.0-16.0 | | X | |
| HCT(%) : | 43.1 | | 34.0-45.0 | | X | |
| MCV(fl) : | 93.7 | | 80.0-100.0 | | X | |
| MCH(pg) : | 31.2 | | 27.0-34.0 | | X | |
| MCHC(gm/dl): | 33.3 | | 32.0-35.5 | | X | |
| RDW(%) : | 12.5 | | 11.0-15.0 | | X | |
| lt(X10^9/L: | 33 | * | 130-400 | X | | |
| MPV(fl) : | 7.4 | | 7.0-11.5 | | X | |

4114146

Collected: 11/02/96 2147 Received: 11/02/96 2153 Spec: Blood
*STAT*STAT*STAT*
*STAT*STAT*STAT*

| PROTHROMBIN TIME | Result | HL | Norm Range | Low | Result Normal | Hi |
|---|---|---|---|---|---|---|
| Protime, Pt(sec): | 11.4 | | 10.7-13.5 | | X | |
| PT, Pop Mean(sec): | 12.2 | | | | | |
| INR : | 0.95 | | Average Therapeutic Range = 2.0-3.0 | | | |
| Fib Scrn(mg/dl): | 176 | * | 190-400 Low in liver disease,DIC. High in pregnancy,contraceptive use,acute inflamm., tissue damage. | X | | |



101 West Eighth Ave.
P.O. Box 2555
Spokane, WA 99220-2
(509) 455-3065
1-800-442-8535

# LABORATORY REPORT

## SACRED HEART MEDICAL CENTER

## DEPARTMENT OF LABORATORY MEDICINE

MARK E. WILLIAMSON, M.D., DIRECTOR

Pat Name: DIBARTOLO,PATRICIA A Page: 1
Unit #/Acct #: 000000918506/S000009634850 Admit date: 11/02/96
Loc: E 11/03/96
Phys-Service: NO,ATTENDING PHYSICIAN - EMR
Mon Nov 04, 1996 04:21 am

**************************************************************************

-------
4114939
-------

Collected: 11/02/96 2235 Received: 11/03/96 2154 Spec: Blood,IStat

| I-STAT ABGS *********** | Result | HL | Norm Range | Low | Result Normal | Hi |
|---|---|---|---|---|---|---|
| pH arterial(pH Unit: | 6.987 | \|*\| | 7.37-7.47 | X | | |
| PCO2 arterial(mm Hg): | 94.9 | \|*\| | 32-43 | | | X |
| PO2 arterial(mm Hg): | 28 | \|*\| | 65-80 | X | | |
| TCO2(mmol/L): | 26 | \|*\| | 19-24 | | | X |
| HCO3(mmol/L): | 23 | \| \| | 23-28 | | X | |
| BE(mmol/L): | -9 | \|*\| | -2.5 - +2.5 | X | | |
| O2(%) : | 27 | \|*\| | 92.0-99.9 | X | | |

---

End of Report - 11/4/96 0422

02612

ATTACHMENT M

CALVIN WALKER, called as a witness on behalf of the Plaintiff, herein having been previously sworn on oath, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. STEINMETZ:

Q Good afternoon, Sergeant.

A Good afternoon.

Q Sgt. Walker, when you were at the scene on November 2, November 3, 1996, were you present when a video was taken of the scene?

A Through portions of that video, yes.

Q Have you reviewed that video?

A Yes, I have.

Q Is that a true and accurate reflection of the way the scene appeared on November 2 and 3rd, 1996?

A Yes, it is.

MR. STEINMETZ: Your Honor, the State has inserted both 149A, a video in the TV. At this time State is moving for admission.

THE COURT: Counsel, did you want to voir dire?

MS. MORENO: Sure.

VOIR DIRE EXAMINATION

BY MS. MORENO:

Q Do you know what time this video was taken?

A I do not recall the exact time. It was done prior to the evidence collection. It was done by Detective Stanley.

Q What time was the evidence collection?

A I don't have that time either exactly. It was prior to 5:00 in the morning.

Q So sometime before 5:00 in the morning?

A I believe so, yes.

MS. MORENO: I have no objection.

THE COURT: 149A is admitted.

(State's Exhibit No. 149A admitted.)

THE COURT: Were you going to play that now?

MR. STEINMETZ: Yes.

THE COURT: The reason I say that is do you want us to take off some the lights?

MR. STEINMETZ: Yes.

THE COURT: We can't turn them all out, but let's turn off what we can.

DIRECT EXAMINATION (resumed)

BY MR. STEINMETZ:

Q Sergeant, if you could leave the witness stand.

THE COURT: Did you want to move that closer to the jury? You can do that.

MR. STEINMETZ: If we can pull it closer to the