FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

OCT 05 2009

JAMES R. LARSEN, CLERK
_____DEPUTY
SPOKANE, WASHINGTON

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WASHINGTON

**THOMAS A. DIBARTOLO**
**(petitioner)**

**v.**

**ELDON VAIL, Secretary,**
**Washington D.O.C.; and,**
**ASHBEL T. WALL, Director,**
**Rhode Island D.O.C., et al**
**(respondent)**



CV-03-0094-EFS

## PETITIONER'S EMERGENCY PETITION
## FOR EXTRAORDINARY RELIEF

### INTRODUCTION

**[1]**  The foregoing petition for extraordinary relief is brought
by Washington State Custodial Inmate, Thomas A. DiBartolo,
petitioner, currently confined to the Maximum Security Facility
of the Rhode Island Department of Corrections, P.O. Box 8273,
Cranston, RI, 02920, having been involuntarily transferred from
the Washington State Department of Corrections, under the state's
Interstate Compact, due to the petitioner's past employment history.

### JURISDICTION

**[2]**  The United States District Court has jurisdiction to pass
upon the within petition, pursuant to **28 U.S.C. §2244** and the
Federal Rules of Civil Procedure, Rule 1 of the Federal Habeas
Corpus.



## AUTHORITY OF CONFINEMENT

[3]  The petitioner is currently confined and/or committed to the Correctional Authorities of the State of Washington, secondary to a conviction for the crime of 1° Premeditated Murder, in the Superior Court of the State of Washington for the County of Spokane, Wa., Case no. 97-1-00336-0.

[4]  The petitioner's transfer to the Rhode Island Department of Corrections is involuntary.

## PROCEDURAL HISTORY

[5]  The crime occured on November 2, 1996 in Spokane, Washington, resulting in the death of Patricia A. DiBartolo.

[6]  The petitioner was arrested on January 29, 1997.

[7]  Jury voir dire began in October, 1997.

[8]  Jury trial began in November, 1997.

[9]  The jury returned a verdict of guilty on Count 1 - 1° Murder on December 12, 1997, following 3 days of deliberation.

[10] A sentencing hearing was held on January 21, 1998, with the prosecution moving for an extraordinary sentence enhancement beyond the range established in the Washington State Sentencing Benchmarks. The petitioner received the highest term of 320 months.

2

[11] All of the petitioner's post trial motions were denied by the trial judge, Neil Q. Reilly.

[12] Attorney Michael Keyes (appointed and paid by the state) passed away during  the preparation of petitioner's direct appeal.

[13] Judge Moreno (petitioner's trial attorney at the time) arranged for an associate, Lorraine Parlange, Esquire, to continue the work of the late Mr. Keyes.

[14] Attorney Parlange filed petitioner's direct appeal on July 13, 2000, in Division III of the Washington State Court of Appeals. [**State v. DiBartolo**, 101 Wash. App. 1039, 2000WL968474 (No. 17261-9-III)].

[15] Division III, Id., denied direct review on July 19, 2000.

[16] The Supreme Court in and for the State of Washington denied a timely filed petition for review. [**State v. DiBartolo**, 143 Wash. 2d 1026, 22 P.3d. 803; (Wash. May 1, 2001) Table No. 70247-1)].

[17] Procedurally, a Personal Restraint Petition ("PRP") followed review by the Court of Appeals and the Washington Supreme Court.

[18] The aforementioned "PRP" was docketed, "**In re Application for Relief from Personal Restraint of DiBartolo**"; [115 Wash. App. 1008, 2003WL 116155 (Wash. App. Div. III (January 14, 2003) No. 21076-6-III)].

[19] Discretionary review by the Washington State Supreme Court was pursued; filed on February 11, 2003 and recognized at No. 73568-9.

[20] A petition for the issuance of a Writ of Habeas Corpus (28 U.S.C. §2254) was submitted, March 26, 2003, to the United States District Court - for the Eastern District of Washington; having been docketed as No. CS-03-094MWL, and denied on September 17, 2005.

[21] A Certificate of Appealability was submitted to the United States Court of Appeals (9th Cir.), seeking review of the denial of the Petition for a Writ of Habeas Corpus (No. 04-35528).

[22] The 9th Cir. declined to issue a Certificate of Appealability.

[23] The United States Supreme Court declined to review the appealed decision of the lower court; **DiBartolo v. Lehman**, 126 S.Ct. 31 (Mem), 162 L.Ed.2d 930, 74 USLW 3129 Sep 02, 2005.

[24] The petitioner was denied access to; and, constructive possession of the material comprising the Spokane County Prosecuting Attorney's case-in-chief, despite countless requests to participate in both his defense and the preparation of appellate strategies and pleadings.

[25] A detailed and chronological history of petitioner's efforts to obtain access to defense and prosecution materials; from

4

arraignment until present, is annexed to the affidavit supporting the instant petition for extraordinary relief. [Affidavit attached hereto as Exhibit A  ]

[26] On April 24, 2009, the petitioner drafted and served upon Judges Moreno and Eitzen, and Attorney Cynthia Jordan, a final request for unfettered, direct access to the prosecutor's case-in-chief, as well as materials possessed by his string of attorneys.

[27] Petitioner has been denied access to legal research materials and texts - at his own expense - by the Rhode Island Department of Corrections; prompting the petitioner to file a civil complaint against the Rhode Island Department of Corrections for violations of his constitutional rights, under the 1st, 6th and 14th amendments. (See, Exhibit B).

[28] To date, petitioner remains - unconstitutionally - without the aforementioned and repeatedly requested access.

## FACTS

[29] Petitioner sought from multiple sources; and/or, on numerous occasions, access to [any] document filed either on behalf of the State of Washington, or the petitioner himself, by any adversarial party, their employees, agents, representatives or replacements.

[30] The entreaty set forth in paragraph number 29 above, was all-

5

inclusive; and unlimited in scope and content - notwithstanding
any objection as to relevancy, admissibility, or claimed
privilege; and did not contemplate production or withholding
of same based upon any duly filed and justly heard and decided
motion pressed by either party.

[31] Petitioner sought from multiple sources; and/or, on numerous
occasions, production of [any] photograph possessed by the
prosecution - mattering not, their use or non-use as part of the
prosecution's case-in-chief, or storage, and media format necessary
to compile and transfer same to petitioner.

[32] The entreaty set forth in paragraph number 31 above, was all-
inclusive; and unlimited in scope and content - notwithstanding
any objection as to relevancy, admissibility, or claimed
privilege; and did not contemplate production or withholding
of same based upon any duly filed and justly heard and decided
motion pressed by either party.

[33] Petitioner sought from multiple sources; and/or, on numerous
occasions, production of [any] video recordings acquired, prod-
uced, captured of otherwise manufactured by the prosecution.

[34] The entreaty set forth in paragraph number 33 above, was all-
inclusive; and unlimited in scope and content - notwithstanding
any objection as to relevancy, admissibility, or claimed
privilege; and did not contemplate production or withholding

of same based upon any duly filed and justly heard and decided
motion pressed by either party.

[35] Petitioner sought from multiple sources; and/or, on numerous
occasions, production of [any] audio recordings acquired, prod-
uced, captured or otherwise manufactured by the prosecution.

[36] The entreaty set forth in paragraph number 35 above, was all-
inclusive; and unlimited in scope and content - notwithstanding
any objection as to relevancy, admissibility, or claimed
privilege; and did not contemplate production or withholding
of same based upon any duly filed and justly heard and decided
motion pressed by either party.

[37] The petitioner has been denied access to the information and
materials, which formed the basis of the investigation, that led
to his indictment, trial and subsequent conviction, based on a
narrowly construed interpretation of Washington State Court Rule
4.7; such being the case, petitioner's pro se status and rights
have been thwarted, despite the fact that Washington State Court
Rule 4.7 authorized access to said information and materials
following redaction.

[38] The petitioner has long contended that a side-by-side legal
evaluation and comparison is required to establish and prove the
false evidence assertions made by this petitioner in his earlier
pleadings to the Court of Appeals.

[39] The petitioner has raised issues in the Washington State Court of Appeals, only to have the reviewing justice refer to the issues as "bare allegations", despite the fact that the petitioner was denied access to the basic raw materials with which to support his claims and the fact that the reviewer and the opposition have access to the information and materials at the click of a mouse button.[1]

[40] The petitioner asserts, based upon a diligent review of the facts, that the numerous issues are ripe for review.[2]

[41] The petitioner's right to raise post conviction issues have been unilaterally, arbitrarily and capriciously undermined by the officials of the Rhode Island Department of Corrections [to who's custody petitioner has been involuntarily transferred] vis-a-vis the denial of access to legal research materials contained in scientific texts purchased at his own expense; thus, further inhibiting his direct access to appropriate courts of competent jurisdiction.[3]

---

1.    The reviewer, Judge John Schultheis, makes the "bare allegations" comment numerous times in his opinion; **In re Application for Relief from Personal Restraint of DiBartolo,** 115 Wash.App. 1008, 2003WL, 116155 (Wash. App. Div. 3, Jan 14, 2003) (No. 21076-6-III).

2.    As a singular example, the petitioner has received a letter from U.S. District Court Justice Robert Whaley. Justice Whaley forwarded a copy of a letter his court received from the FBI/U.S. Department of Justice that explained to the court and prosecutor that a FBI expert witness gave false and misleading testimony in the petitioner's trial. This information will remain unexamined unless this court grants the petitioner access to the basic raw materials necessary to develope this and many other issues. (FBI/USDoJ letter attached as Exhibit C).

3.    Civil complaint: **DiBartolo v. State of Rhode Island,** PC2004-04-0439, respondent's answer and decision denying relief, Procaccini, J., attached as Exhibit D .

[42] The petitioner is preparing to raise the post conviction argument of improper, inaccurate and manipulated photographic evidence; which violated the cannons of evidence law relating to the "physical facts rule", and violations of photographic technique and improper presentation of the photographs by the prosecution at trial.

[43] The petitioner has arranged for the assistance of a Forensic Photography Specialist to review the requested photographic materials and to provide a written opinion to be filed with the petitioner's federal post conviction application.[4]

[44] The continued denial of access to the photographic materials and the subsequent delay caused to the petitioner's post conviction filing jeopardizes the availability of the services of Mr. Pearl (FN4) as he intends to retire.

[45] The petitioner is preparing to challenge the prosecution's trial recreation and demonstration of the crime, through the services of a Forensic Animation/Recreation Specialist, who's services were not available to the petitioner at trial.[5]

[46] The continued denial of access to the requested documents and photographic materials and the subsequent delay caused by the denial leaves the cultivation of this evidence uncompleted.

---

4.   George Pearl, Atlanta Legal Photo Services, 2139 Lindell Drive N/E, Atlanta, Georgia, 30323-4132. (Curriculum vitae attached as Exhibit E)

5.   André Stuart, 21st Century Forensics Animation, 1192 W. Pioneer Parkway, Arlington, Texas, 76013.

**[47]** The petitioner is preparing to charge the prosecutor with malicious prosecution and prosecutorial misconduct in the willful presentation of false evidence at trial.[6]

**[48]** The petitioner has arranged for the assistance of Dr. Constance Gloretta, Esq. (FN6) to review the case materials and render an expert opinion as to the validity of scientific evidence presented at the petitioner's trial; which remains undeveloped as the petitioner has been denied access to the raw materials required by this medical expert.

## STANDARD OF REVIEW

In passing upon a petition for extraordinary relief, the hearing justice is limited by several factors, with respect to his equitable power to actually grant the relief sought. Primarily, but not soley, factors which must be weighed are:

(I)    **Res Judicata**: Or, whether or not the relief prayed for was sought, and the request ruled upon by a court of competent jurisdiction - regardless of success.

(II)    **Laches**: How long has the petitioner waited before seeking the Court's instruction or ruling on the question presented.

(III)    **Availability**: With respect to the extraordinary relief pursued, can petitioner lawfully seek redress from any other court, agency or tribunal; or, under some previously set out statute, law or ordinance.

---

6.    Dr. Constance Gloretta, (a/k/a/) Constance Gloretta, Esq., Johns Hopkins Pulmonary Research Project, Johns Hopkins Medical Center, 30 South Pearl Street., Albany, NY, 12245

(IV)   **Feasibility**: Is it [legally prudent] for the rev-
iewing court to grant the relief desired by the petitioner; [and],
is it physically, procedurally and logistically possible to carry
out a lawfully executed judgment or order.[7]

Needless to say, such factors, or procedurally sequential
linch-pins, must be considered against the applicable segments
or clauses of the 5th, 6th and 14th Amendment to the United States
Constitution. More simply put, the due process implications
presented.

Equally important is the long presented nugget of Constit-
utional principal which defines the 14th Amendment as creating
two merging standards:

A.   State and federal authorities may not over step
fundamental fairness in an arbitrary and capricious manner.

B.   An individual sovereign is free to create - through
its own Constitution - greater protections than those carved out
in the U.S. Constitution; but, may never regardless of the
propelling or compelling source, enact laws that provide less
protection than does the 14th Amendment.

The petitioner, will address each prong individually,
presenting applicable facts or procedural history, as well as
appropriate law, where and when necessary.

---

7.   Review is properly denied when petitioner has legal right to have the
relief sought performed or ceased; but, court makes factual finding of the
impossibility of executing the lawful order due to: passage of time,
destruction or loss of evidence, death of principles or parties, etc.
(Greebligh v. City of Seattle & Monarch Demolition, citation intentionally
omitted.

"It is revolting to have no better reason for a
rule or law than that so it was laid down in the
time of Henry IV. It is still more revolting if
the grounds upon which it was laid down have
vanished long since, and the rule simply persists
from blind imitation."  Oliver Wendall Holmes,
The Path of the Law, 10 Harvard Law Review, 457,
469 (1897).

### ARGUMENT

A.    Res Judicata: Has another court granted or denied the
relief sought?

Before this particular factor may be decided, there must be
an identifcation of the issue or issues raised. Here, that
question may be answered in the most simpliest of terms, consid-
ering that the relief requested is of the most basic origin:

Is the petitioner entitled to full, unfettered access
to the prosecution and defense materials possessed by
the State of Washington, (Spokane County) and, the
defense team, for the purpose of pursuing post appel-
late review of his state conviction?

This question has not been raised by: the petitioner indiv-
idually; any attorney assigned to his defense; or, upon infor-
mation and belief, any other custodial defendant to date. The
affidavit attached hereto as Exhibit "A" illustrates the petit-
ioner's exhaustive undertakings to secure unrestricted access to
the prosecutorial arsenal or tangible, documentary and testimonial
evidence used to secure a wrongful (whether well-intentioned or
not) conviction of Thomas A. DiBartolo for the murder of Patricia
Ann DiBartolo, an act for which he has steadfastly denied respon-
sibility or even the most minimal participation.

Furthermore, evidence pursued by the petitioner below
clearly indicates that he undertook every possible step to

12

preserve the life of his wife of nineteen years and the mother of his five children; not withstanding the fact that he himself was seriously wounded by the assailants claiming his wife's life.

Unfortunately, and procedurally tragic, that evidence was discarded by a jury of his peers, misled by so-called expert testimony as to the time of death element of the first degree murder charge. The prosecutor's entire case teetered back and forth between circumstantial evidence, non-existent science, and malfeasant investigating conduct.

Because there has been no raising of and a ruling upon the question of the petitioner's entitlement to the material sought, this court is not procedurally barred from taking same up now, in the form of a Petition for Extraordinary Relief.

The second issue raised instantly, calls into question the constitutionality of Washington State Court Rule 4.7; in a general sense; as well as with specificity concerning litigants proceeding pro se, on the tails of the unavailability of state appointed assistance of counsel.

Identical to the material access issue, set forth, supra, there has been no raising of. and ruling upon the Court Rule 4.7 question, this Court is also not procedurally barred from taking same up now.

B.    **Laches**: Is the petitioner's request for extraordinary relief inexcusably stale?

According to the oft relied upon Black's Law Dictionary (9th Edition), Laches, or the "Doctrine of Laches", is based upon the legal maxim that "equity aids the vigilant and not those who slumber on their rights".

13

Logic and reason therefore dictate the identification of exactly what right(s) your petitioner seeks to invoke or avail himself of, insofar as the immediate petition is concerned.

That line, unfortunately, is neither unblurred nor perfectly straight. In essence, petitioner's claim for extraordinary relief relies upon the 5th, 6th and 14th Amendments for structural support. More specifically, his state and federal constitutional rights to confront and cross-examine his accusers; and, to present witnesses in his own defense. (**United States v. Agurs**, 96 S.Ct. 2392 (additional citations omitted)).

The intent of the framers, as well as the spirit of the finished product (i.e., the text of both amendments) were both equally wounded by the enactment and implementation of Wash. Crt. Rule 4.7 of the Washington Superior Court Criminal Rules. A moderately conservative jurist may even attribute such wounds to the fatality of the petitioner's defense in the first instance; and, what amounted to futile appellate and post conviction review, spanning eleven years.

In any event, the issues raised in the instant petition; or, perhaps more linguistically correct, the rights asserted, are central to the lack of access to the prosecution materials used to convict the petitioner, and impose a 320 month prison term upon him.

Likewise, the validity, in a constitutional sense, of Rule 4.7, is also called to task.

As established, supra, neither of two issues or questions have been raised or filed upon by the Superior Court of Spokane County; or, any reviewing court thereof; up to, and including,

14

our nations highest court.

However, the linch-pin of a Laches decision is not whether or not an issue was previously raised; but, rather, why that issue was not raised; or why that specific right was not asserted until now.

Having said that, your petitioner avers that it would be completely disinguinuine for his adversary to make any claims that he has not attempted, on countless occasions, to gain access to the following material:

A.    a complete copy of the police report (#96-294212), and, any documents filed, (¶29);

B.    a complete copy of any photographs, (¶31);

C.    a complete copy of any video recordings, (¶33);

D.    a complete copy of any audio recordings, (¶35).

[See appendix 1]

Clearly, in the case at bar, the petitioner's assertion of his 5th, 6th and 14th amendment rights are not newly or recently made. On the contrary, petitioner has engaged in an exhaustive trek to see the prosecution's case against him with his own eyes.

C.    **Availability: Is relief available from another tribunal?**

Here, the reviewing court must consider whether or not the petitioner, from a "subject matter jurisdiction" standpoint, is properly before the court. That is; can and, in fact, should he be looking for relief from another court, jurisdiction, agency or tribunal. The procedural history, and lacking results thereof, quickly answer in the negative.

More specifically, your petitioner has been led by the nose, through a maze of broken promises, claimed lack of authority,

finger-pointing and still-continuing denial of his basic const-
itutional rights of, and access to the confrontation of his
accusers.

With all due respect, each and every person possessive of
the authority to hear the petitioner out, have refused, directly
or indirectly, to do so.

D.   **Feasibility**

This question; or, factor, while the absolute simpliest to
answer, is liable to draw the most resistence or opposition from
the adversarial side.

First of all, it must be decided whether or not the documents
and prosecutorial materials sought by the petitioner are still
in existence.

Indeed, the most persuasive indicator that both the prosec-
utor and defense attorney possess dominion and control over the
documentary and tangible evidence comprising the trial/appellate
materials of the lower court is the gleaming reality that not a
single request advanced by your petitioner to the so-called
custodians of these records resulted in a reply attesting to
their unavailability due to loss, destruction, expiration or any
other reason which a hearing justice may fairly pass on a motion
for their [its] production - dispositively. Furthermore, at
least with respect to those documents and things controlled by
defense counsel, petitioner has never been provided with a notice
of their intended destruction or discard.

Finally, any destruction or discard by the prosecutor would
have been completely improper insofar as your petitioner, through

one means or another, has pursued their conveyance continuously since 11/12/2002.

Jurisprudential courtesy and common sense, therefore, fundamentally, if not procedurally, prohibit an eleventh-hour claim in that vein now. The petitioner also posits that as officers of the court, any prosecutor or defense attorney involved in the handling of these particular records, were, and remain duty bound to store and secure them in a manner consistent with both state law, and policies promulgated there from.

Now, assuming in arguendo, the ability to immediately, and without monumental hurdles, locate, itemize and account for the collection of documents and tangible things which have aided the State of Washington in the wrongful conviction of an innocent man; more offensively, a collection of documents and tangible things to which the condemned has never been allowed constitutionally adequate access in order to free himself. The issue of producing same in a manner capable of enduring the cross-country tek to the petitioner is not likely to be a question to have crossed this court's bench. Likewise, exactly who is responsible for preparing and conveying to the petitioner the material sought is probably, at least minimally, novel.

Anticipating logistical objections from the prosecution, petitioner respectfully emphasizes that the issue at hand is feasibility of access or production, not the ease in doing so. Granted, a cross-country exchange of literally thousands of documents cannot be, with a straight face, defined as easy. nevertheless, it is certainly feasible.

The petitioner may receive unlimited United States Mail: and, upon approval with advance notice, may arrange for a United Parcel Services or Federal Express delivery - clearly the most economic of all options, considering the sixteen-thousand plus documents at issue.

Regarding photocopies, same may be provided in either hardcopy format; or, digitized on appropriate media, where upon petitioner may either (a) arrange for access to view them electronically; or, (b) reduce them to hardcopy at his expense.

---

## I. DUE PROCESS

**A. The Fifth Amendment: A General Discussion.**

The guarantee of due process found in the Fifth Amendment of the Federal Constitution declares:

> PRESENTMENT OR INDICTMENT — DOUBLE
> JEOPARDY — SELF-INCRIMINATION — DUE PROCESS
> — COMPENSATION FOR PRIVATE PROPERTY
>
> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

[See, generally, **Washington v Gluckberg**, 117 S.Ct. 2258, 138 L.Ed. 2d 772 (1980).]

The general notion that "No person*** be deprived of life, liberty, or property, without due process of law***", was applied to the states for the first time by resolution and proclamation of Congress on July 21, 1868 and July 28, 1868, respectively. This application was added to the United States Constitution in the form

of the Fourteenth Amendment which the framers delivered as follows:

> **§ 1. Citizenship — Privileges and immunities — Due process — Equal protection of laws.** — All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

In essence, the intent of the Fourteenth Amendment was; and remains today, to act as a prevention against any interference by state governments to the extent that they may <u>not</u> "make or enforce any law which shall abridge the privileges or immunities of citizens of the United States". Interestingly, the framers did not conclude the text of the Fourteenth Amendment on that noticeably broad, and arguably all-encompassing language.

Clearly, had they actually done so, any reasonable person would have no difficulty extracting therefrom the edict that the states must confine their enactments and/or enforcement of laws to those which conform to the Bill of Rights; including, inter alia, the due process clause embodied in the Fifth Amendment.

Instead, Congress left nothing to interpretation as our nation grew in size and number of soverigns which eventually comprised the United States of America. More specifically, a cautious, but nevertheless plain and gramatically simple review of the 2nd sentence of the Fourteenth Amendment evidences the use of a semicolon immediately following the words Unites States. Thus emphasizing, not seperating - or making an independent clause out of the words which follow. i.e. "<u>Nor shall any state deny any person of life, liberty, or property without due process of law</u>". The same gramatical tech-

19

nique is employed to finish out the clause: "<u>;nor deny any person</u> <u>within its jurisdiction the equal protection of the law</u>".

A United States citizen's guaranteed right to due process of law is one of the most important to be found in the Federal Constitution or any amendments thereto. **(Brock v. State of N.C.,** 344 U.S. 424, 73 S.Ct. 349, 97 L.Ed. 456 (1953)).

Moreover, due process guarantees more than fair process; and, the "Liberty" it protects includes more that a mere absence of physical restraint. **(Washington v. Gluksberg,** supra).

------------------------------------------------------------------

**B.   The Inevitable Affect of Overlapping 5th and 6th Amendment Safeguards Given the Restriction(s) Placed Upon the States Under the Fourteenth Amendment to the United States Constitution.**

When confronted with due process concerns eminating from criminal prosecutions it is necessary to actually review and assess the impact of such guarantees upon the umbrella of rights accorded by the Sixth Amendment to the United States Constitution. These fundamental protections are set out in the most basic of terms:

### ARTICLE VI

### RIGHTS OF ACCUSED IN CRIMINAL PROSECUTIONS

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

In the case at bar, the bulk of petitioner's due process claims are linked to the denial of access to the materials which served as the stantions and scaffolding upon which the prosecution stood and climbed in its efforts to "convict" him. It goes without saying –

or need for case and page citations, that our nation's most brilliant and forward-thinking legal minds have made a diamond-cut-distinction between acting to "convict" as opposed to "prosecuting" a defendant. One leaves no room for the presumption of innocence, while the other offers up a quantifiable volume of fair-play and fundamental due process.

Sadly, and, the petitioner submits as completely afoul of the Fifth and Sixth Amendments specifically, and the Bill of Rights generally, whether an accused is "convicted" or "prosecuted" all too often turns on extrinsic factors such as public opinion, resources - both financial and operational, race; and perhaps above all, the crime charged.

Nevertheless, the focus of the instant inquiry must remain precise and laser-guided to the issue of what material the petitioner was permitted access to, and that which he was not.

Breaking down the essential components of the Sixth Amendment supports the finding that a person accused of committing a crime is specifically guaranteed:

1.    A speedy and public trial;
2.    to be informed of the nature and cause of the accusation;
3.    to be confronted with witnesses against him;
4.    to have the compulsory process for obtaining witnesses in his favor;
5.    and, to have the assistance of counsel for his defense.

The petitioner has never claimed a deprivation of his right to a speedy and public trial. Likewise, he asserts no procedural short fall insofar as being informed of the nature and cause of the accusation against him; save for the caveat that such is only the case assuming he was properly indicted and presented with that indictment in which the charges against him should have been laid-out.

Skipping ahead to the assistance of counsel - petitioner did infact have private counsel. Now, following his conviction, he has a state contracted legal assistant (not a representative), who is currently the custodian of the official records of the case.

However, his right to assist trial counsel was impeded so widely as to render it nil. It is here that the petitioner avers that the Fifth and Sixth Amendments begin to become entangled in each other's prohibitions and protections.

The Rationale: The 5th Amendment requires the creation of a system or scheme of laws by which society as a whole must abide. The 6th Amendment, on the other hand, provides very specific rights guaranteed to persons accused of committing a criminal offense. Among those specific guarantees: The right to the assistance of counsel. Moreover, the assistance of counsel afforded the accused must be effective. (See, generally, **Strickland v. Washington and Gideon v. Wainwright**, (citations intentionally omitted).

One of the determining factors upon which an effectiveness analysis is based is the scope of counsel's pre-trial investigation. More aptly stated, "Counsel has an obligation to conduct a reasonable investigation which will allow counsel to make informed decisions about how best to represent his client. In other words, counsel has an [affirmative] duty to make a reasonable [and thorough] investigation or to make reasonable decisions that make particular investigations unnecessary". **Lambert v. Blodgett**, 248 F.Supp. 2d 988, 126 S.Ct. 484.

Presumably, an accused person who is properly represented by counsel, may take some comfort in the notion that counsel will use his legal skills and training to go about ensuring that he is

22

duly protected from a constitutional perspective.

Particularly, counsel must take full advantage of a client's right to a compulsory process, the scope of which has been contemplated to near exhaustion. In so doing, our High Court has continuously, and without exception, read into an accused's right to counsel, and the right to a compulsory process, a linch-pinned, or connected right to assist that attorney in the preparation and presentation of that defense.

Indeed, before a person accused of committing a crime may even be prosecuted, it must be determined that he is of sufficient mental capacity so as to offer "meaningful assistance" to his attorney.

The absolute foundation of an attorney-client relationship is the ability of the accused to communicate with his advocate in terms of "apples-to-apples". When that communication does not exist; or, at some point ceases to exist, then the attorney-client relationsship "snaps like a twig under the foot of Goliath". (Honorable, John F. Sheehan, Jr. (deceased), as counsel for Claus von Bulow, **State v. von Bulow**, 475 A.2d. 995 (RI 1984)).

In the case at bar, your petitioner avers, with due respect to the Washington State Legislature, that his ability to assist in his own defense; and, to further effectuate purposeful appeals, was for all intents and purposes Justice Sheehan's proverbial twig; while the foot of Goliath reared its ugly head (or sole) in the form of Rule 4.7.

Moving forward to the assistance of counsel component; the trial record is clear; Petitioner was represented by private counsel. Now, in what amounts to assistance in name only, the petitioner has been assigned the services of a state contracted

legal assistant whom currently acts as the custodian of the
defense records, but does not represent the petitioner in any
current legal matters before any court.

## WASHINGTON STATE SUPERIOR COURT CRIMINAL RULES: Cr.R. 4.7

The State of Washington regulates the exchange of discovery
between the parties in criminal proceedings by way of Cr.R. 4.7,
which sets forth the following restrictions and requirements:

→**RULE 4.7 DISCOVERY**

**(a) Prosecutor's Obligations.**

(1) Except as otherwise provided by protective orders or as to matters not subject to disclosure, the prosecuting attorney shall disclose to the defendant the following material and information within the prosecuting attorney's possession or control no later than the omnibus hearing:

(i) the names and addresses of persons whom the prosecuting attorney intends to call as witnesses at the hearing or trial, together with any written or recorded statements and the substance of any oral statements of such witnesses;

(ii) any written or recorded statements and the substance of any oral statements made by the defendant, or made by a codefendant if the trial is to be a joint one;

(iii) when authorized by the court, those portions of grand jury minutes containing testimony of the defendant, relevant testimony of persons whom the prosecuting attorney intends to call as witnesses at the hearing or trial, and any relevant testimony that has not been transcribed;

(iv) any reports or statements of experts made in connection with the particular case, including results of physical or mental examinations and scientific tests, experiments, or comparisons;

(v) any books, papers, documents, photographs, or tangible objects, which the prosecuting attorney intends to use in the hearing or trial or which were obtained from or belonged to the defendant; and

(vi) any record or prior criminal convictions known to the prosecuting attorney of the defendant and of persons whom the prosecuting attorney intends to call as witnesses at the hearing or trial.

(2) The prosecuting attorney shall disclose to the defendant:

(i) any electronic surveillance, including wiretapping, of the defendant's premises or conversations to which the defendant was a party and any record thereof;

(ii) any expert witnesses whom the prosecuting attorney will call at the hearing or trial, the subject of their testimony, and any reports they have submitted to the prosecuting attorney;

(iii) any information which the prosecuting attorney has indicating entrapment of the defendant.

(3) Except as is otherwise provided as to protective orders, the prosecuting attorney shall disclose to defendant's counsel any material or information within the prosecuting attorney's knowledge which tends to negate defendant's

guilt as to the offense charged.

(4) The prosecuting attorney's obligation under this section is limited to material and information within the knowledge, possession or control of members of the prosecuting attorney's staff.

**(b) Defendant's Obligations.**

(1) Except as is otherwise provided as to matters not subject to disclosure and protective orders, the defendant shall disclose to the prosecuting attorney the following material and information within the defendant's control no later than the omnibus hearing: the names and addresses of persons whom the defendant intends to call as witnesses at the hearing or trial, together with any written or recorded statements and the substance of any oral statements of such witness.

(2) Notwithstanding the initiation of judicial proceedings, and subject to constitutional limitations, the court on motion of the prosecuting attorney or the defendant, may require or allow the defendant to:

(i) appear in a lineup;

(ii) speak for identification by a witness to an offense;

(iii) be fingerprinted;

(iv) pose for photographs not involving reenactment of the crime charged;

(v) try on articles of clothing;

(vi) permit the taking of samples of or from the defendant's blood, hair, and other materials of the defendant's body including materials under the defendant's fingernails which involve no unreasonable intrusion thereof;

(vii) provide specimens of the defendant's handwriting;

(viii) submit to a reasonable physical, medical, or psychiatric inspection or examination;

(ix) state whether there is any claim of incompetency to stand trial;

(x) allow inspection of physical or documentary evidence in defendant's possession;

(xi) state whether the defendant's prior convictions will be stipulated or need to be proved;

(xii) state whether or not the defendant will rely on an alibi and, if so, furnish a list of alibi witnesses and their addresses;

(xiii) state whether or not the defendant will rely on a defense of insanity at the time of the offense;

(xiv) state the general nature of the defense.

(3) Provisions may be made for appearance for the foregoing purposes in an order for pretrial release.

**(c) Additional Disclosures Upon Request and Specification.** Except as is otherwise provided as to matters not subject to disclosure the prosecuting attorney shall, upon request of the defendant, disclose any relevant material and information regarding:

(1) Specified searches and seizures;

(2) The acquisition of specified statements from the defendant; and

(3) The relationship, if any, of specified persons to the prosecuting authority.

**(d) Material Held by Others.** Upon defendant's request and designation of material or information in the knowledge, possession or control of other persons which would be discoverable if in the knowledge, possession or control of the prosecuting attorney, the prosecuting attorney shall attempt to cause such material or information to be made available to the defendant. If the prosecuting attorney's efforts are unsuccessful and if such material or persons are subject to the jurisdiction of the court, the court shall issue suitable subpoenas or orders to cause such material to be made available to the defendant.

**(e) Discretionary Disclosures.**

(1) Upon a showing of materiality to the preparation of the defense, and if the request is reasonable, the court in its discretion may require disclosure to the defendant of the relevant material and information not covered by sections (a), (c) and (d).

(2) The court may condition or deny disclosure authorized by this rule if it finds that there is a substantial risk to any person of physical harm, intimidation, bribery, economic reprisals or unnecessary annoyance or embarrassment, resulting from such disclosure, which outweigh any usefulness of the disclosure to the defendant.

**(f) Matters Not Subject to Disclosure.**

(1) *Work Product.* Disclosure shall not be required of legal research or of records, correspondence, reports or memoranda to the extent that they contain the opinions, theories or conclusions of investigating or prosecuting agencies except as to material discoverable under subsection (a)(1)(iv).

(2) *Informants.* Disclosure of an informant's identity shall not be required where the informant's identity is a prosecution secret and a failure to disclose will not infringe upon the constitutional rights of the defendant. Disclosure of the identity of witnesses to be produced at a hearing or trial shall not be denied.

**(g) Medical and Scientific Reports.** Subject to constitutional limitations, the court may require the defendant to disclose any reports or results, or testimony relative thereto, of physical or mental examinations or of scientific tests, experiments or comparisons, or any other reports or statements of experts which the defendant intends to use at a hearing or trial.

**(h) Regulation of Discovery.**

(1) *Investigations Not to Be Impeded.* Except as is otherwise provided with respect to protective orders and matters not subject to disclosure, neither the counsel for the parties nor other prosecution or defense personnel shall advise persons other than the defendant having relevant material or information to refrain from discussing the case with opposing counsel or showing opposing counsel any relevant material, nor shall they otherwise impede opposing counsel's investigation of the case.

(2) *Continuing Duty to Disclose.* If, after compliance with these rules or orders pursuant thereto, a party discovers additional material or information which is subject to disclosure, the party shall promptly notify the other party or their counsel of the existence of such additional material, and if the additional material or information is discovered during trial, the court shall also be notified.

(3) *Custody of Materials.* Any materials furnished to an attorney pursuant to these rules shall remain in the exclusive custody of the attorney and be used only for the purposes of conducting the party's side of the case, unless otherwise agreed by the parties or ordered by the court, and shall be subject to such other terms and conditions as the parties may agree or the court may provide. Further, a defense attorney shall be permitted to provide a copy of the materials to the defendant after making appropriate redactions which are approved by the prosecuting authority or order of the court.

(4) *Protective Orders.* Upon a showing of cause, the court may at any time order that specified disclosure be restricted or deferred, or make such other order as is appropriate, provided that all material and information to which a party is entitled must be disclosed in time to permit the party's counsel to make beneficial use thereof.

(5) *Excision.* When some parts of certain material are discoverable under this rule, and other parts not discoverable, as much of the material shall be disclosed as is consistent with this rule. Material excised pursuant to judicial order shall be sealed and preserved in the records of the court, to be made available to the appellate court in the event of an appeal.

(6) *In Camera Proceedings.* Upon request of any person, the court may permit any showing of cause for denial or regulation of disclosure, or portion of such showing, to be made in camera. A record shall be made of such proceedings. If the court enters an order granting relief following a showing in camera, the entire record of such showing shall be sealed and preserved in the records of the court, to be made available to the appellate court in the event of an appeal.

(7) *Sanctions.*

(i) if at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, dismiss the action or enter such other order as it deems just under the circumstances.

(ii) willful violation by counsel of an applicable discovery rule or an order issued pursuant thereto may subject counsel to appropriate sanctions by the court.

The general principles of reciprocal disclosure embodied in CrR 4.7 appear to align copesetically with 5th, 6th and 14th Amendment thresholds and outer limits. However, petitioner submits that one prohibitive clause of the Rule under scrutiny potentially taints the entirety of 4.7.

More specifically, CrR 4.7(h)(3) requires that an attorney exercise continuous custody of any discovery material obtained under Rule 4.7 generally. Historically, this limitation has - without elasticity - prevented defense attorneys from providing copies of police reports and other prosecution documents to the accused. The clumsy result: Attorneys must make time and space

available for the accused to read the material in their office. Even more clumsy, if the accused is in confinement, the attorney must remove his lawyer-hat, and don the cap of a literary tutor and either read the reports to the client or sit idly by while the client/accused reads the material himself.

In the case at bar, the case file is comprised of more than sixteen-thousand (16,000) pages, stored in 9 boxes.[8]

It is difficult, if not impossible to conceed that the framers envisioned such a clumsy and ill-conceived outcome or net result to the 5th, 6th and 14th Amendment combination of due process and equal protection initiatives.

---

**THE WASHINGTON STATE CONSTITUTION : RIGHTS OF THE ACCUSED**
**vs.**
**WASHINGTON STATE SUPERIOR COURT CRIMINAL RULES: CrR 4.7**

---

The Constitution of the State of Washington is not silent as to the rights afforded an accused thereunder; and provides the following:

**SECTION 9 RIGHTS OF ACCUSED PERSONS.** No person shall be compelled in any criminal case to give evidence against himself, or be twice put in jeopardy for the same offense.

**SECTION 22 RIGHTS OF THE ACCUSED.** In criminal prosecutions the accused shall have the right to appear and defend in person, or by counsel, to demand the nature and cause of the accusation against him, to have a copy thereof, to testify in his own behalf, to meet the witnesses against him face to face, to have compulsory process to compel the attendance of witnesses in his own behalf, to have a speedy public trial by an impartial jury of the county in which the offense is charged to have been committed and the right to appeal in all cases: *Provided,* The route traversed by any railway coach, train or public conveyance, and the water traversed by any boat shall be criminal districts; and the jurisdiction of all public offenses committed on any such railway car, coach, train, boat or other public conveyance, or at any station or depot upon such route, shall be in any county through which the said car, coach, train, boat or other public conveyance may pass during the trip or voyage, or in which the trip or voyage may begin or terminate. In no instance shall any accused person before final judgment be compelled to advance money or fees to secure the rights herein guaranteed

---

8.    Spokane County Prosecutor's Office, Ms. Lori Zaagman-Bacon, Assistant Public Records Officer/Paralegal, was contacted and her response describes 9 boxes of records in the Prosecutor's possession. (See, Exhibit F).

It is clear that the Washington Legislative and Judicial Branches collaborated to establish CrR 4.7, supra, in an effort to live up to its own sovereign's constitutional mandates. While reviewing CrR 4.7 for compliance, it is crucial to remain mindful that the guarantee of due process viewed in its procedural aspect, requires no particular form or procedure. **Mitchell v. W.T. Grant, Co.**, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed. 2d 406 (1974). Likewise, due process does not require a state to adopt one procedure over another on the basis that the procedure may produce results more favorable to the party challenging the existing procedure. **Heller v. Doe**, 509 U.S. 312, 113 S.Ct. 2637, 125 L.Ed 2d 257 (1993). rather, due process requires only that certain safeguards exist in whatever procedural form it is afforded. Moreover, the Due Process Clause in no way undertakes to control the power of a state to determine by what process legal rights may be asserted or legal obligations be enforced, provided that the method of procedure adopted for these purposes gives reasonable notice and affords a fair opportunity to be heard before the issues are decided. **Northeast SAV., F.A. v. Hintlian**, 241 Conn. 269, 696 A.2d 315 (1997).

Applying that particular formula to the facts of the case at bar, the fundemental question to be answered is whether or not the inclusion by the Washington State Legislature of a priviso' within CrR 4.7, restricting attorneys from providing clients with unfettered access to the documents detailing the nature of the accusation(s) against him, comports (a) with the Washington State Constitution; and then (b), Whether the rule as interpreted in that particular light, gives rise to any breach of the Four-

teenth Amendment.

The petitioner anticipates that the Sovereign will argue that the complained of restriction is elevated up to or above constitutional standards by the addition of the last sentence of Cr.R. 4.7(h)(3), which states:

> **"Further, a defense attorney [shall] be permittd to**
> **to provide a copy of the materials to the defendant**
> **after making appropriate redactions which are approved**
> **by the prosecuting authority [or] order of the Court."**

In that connection, the petitioner respectfully avers that such an assertion, should it be made, must be rejected by this Court. A lengthly or exhaustive vetting process is not necessary. This particular clause, after giving the words their plain and ordinary meaning **(Arizona State Bd, for Charter Schools v. U.S. Dept. of Educ,** 464 F3d 1003 (C.A.9(Ariz) 2006), is self-defeating.

More concretely stated, the rule arbitrarily allows a prosecutor or the Court, for that matter, to take away the very protection which it purports to provide. The use of the word [shall] denotes mandatory intent. Yet, an attorney [shall] be allowed to disseminate the charging documents or materials to his client only upon approval of the "prosecuting authority" or pursuant to an order of the Court.

The mere notion of a prosecutor being the "gatekeeper" as to what information a client is constitutionally entitled to possess is as ridiculous as it is unsound, when viewed through the permissive - but nevertheless  protective lens of the 14th Amendment. Moreover, it presents an all to stricking resemblance to putting "the fox in charge of the hen-house". If the client is unable to

view the materials with his own eyes, then he is not permitted the opportunity to be heard before the issues are decided (See, **Hintlian**, supra), whereas he has absolutely no inclination as to what the issues might be.

Furthermore, the stench of unconstitutionality is not removed, or improved in the slightest bit, by shifting the prodigious task of determining appropriate redaction measures to the Court. In fact, the vague contours of due process do not leave judges at large to do as they will, and they may not draw on their merely personal and private notions and disregard the limits that bind them in their judicial functions. **Rochin v. California**, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

## CONCLUSION

The State of Washington, vis a vis, the enactment, passage and continuous enforcement of Cr.R. 4.7, has deprived the petitioner of his 5th, 6th and 14th Amendment rights to due process of law, and has left petitioner without recourse for the claimed deprivation. Therefore, in the absence of the remedial intervention of the United States District Court; for the Eastern District of Washington, the petitioner will continue to be incarcerated based upon a conviction achieved on the back of these violations.

**WHEREFORE**, the petitioner prays this Honorable Court grant the following relief.

(1)  Issue judgment declaring Cr.R. 4.7 unconstitutional;

(2)   Order the State of Washington and all relevant

prosecutorial and law enforcement entities to

immediately provide the petitioner with each and

every piece of documentary, scientific, testimonial,

and every other form of evidence which it possessed

at the time of the petitioner's trial; and that which

it has since obtained.

Respectfully Submitted,

Thomas A. DiBartolo, pro se
P.O. Box 8273
Cranston, RI 02920

---

### CERTIFICATION OF MAILING

I, Thomas A. DiBartolo, do hereby certify that I mailed a true
and correct copy of the within document, including exhibits and
attachments, to the Office of the Attorney General, P.O. Box
40100, Olympia, WA, 98504-0100.

September 28, 2009
Date of mailing

Certification

32

**Table of cases, citations and/or rules:**

(in order of appearance)

28 U.S. § 2244

State v. DiBartolo, 101 Wash. App. 1039, 200WL968474 No. 17261-9-III

State v. DiBartolo, 143 Wash. 2d 1026, 22 P.3d 803 (Wash, May 2001)
                    Table No. 70247-1

In re Application for Relief from Personal Restraint of DiBartolo,
      115 Wash. App. 1008, 2003WL116155 (Wash. App. Div. III
      (January 14, 2003))

DiBartolo v. Lehman, 126 S.Ct. 31,(Mem) 162 L.Ed.2d 930, 74 USLW
      3129 Sep. 2, 2005

Greebligh v. City of Seattle & Monarch Demolition (cite Omotted)

U.S. v. Agurs, 96 S.Ct. 2392

Washington v. Gluckberg, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1980)

Brock v. St. of N.C., 344 U.S. 424, 73 S.Ct. 349, 97 L.Ed. 456 (1953)

Strickland v. Washington, (citation omotted)

Gideon v. Wainwright, (citation omitted)

Lambert v. Blodgett, 248 F.Supp. 2d 988, 126 S.Ct. 484

State v. von Bulow, 475 A.2d 995 (RI 1984)

Mitchell v. W.T. Grant, Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed
      2d 406 (1974)

Heller v. Doe, 509 U.S. 312, 113 S.Ct 2637, 125 L.Ed 2d 257 (1993)

Northeast SAV., F.A. v. Hintlian, 241 Conn. 269, 696 A.2d 315 (1997)

Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed.183 (1952)

## List of Exhibits:

(in order of appearance)

Exhibit A: Affidavit and list prepared by petitioner

Exhibit B: RIDOC memos - re: requests for legal materials

Exhibit C: FBI/DoJ letter - Comparitive Bullet Lead Analysis
           Misleading testimony at petitioner's trial

Exhibit D: Civil Complaint - DiBartolo v. State of Rhode Island
           PC2004-04-0439

Exhibit E: Curriculum vitae of George Pearl

Exhibit F: Letter from Spokane County Prosecuting Attorney's
           Office - re: 9 boxes of records

# EXHIBIT A

## AFFIDAVIT

I, Thomas A. DiBartolo, do hereby depose and say:

1.   I was convicted of 1st degree murder on December 12, 1997 and sentenced to 320 months of confinement.

2.   The direct appeal was assigned to Spokane Attorney Michael Keyes, state appointed and paid. Mr. Keyes died and the appeal was reassigned.

3.   The appeal was assigned to Lorraine Parlange, an associate of Maryann Moreno, the trial attorney.

4.   The Washington State Department of Corrections assigns a legal liason to inmates. The attorney assigned to my case is Spokane Attorney Cynthia Jordan.

5.   I have made contact with the Washington State Superior Court in order to redress these issues and the case has landed in the office of Superior Court Judge Tari S. Eitzen.

6.   Following the conviction, I made numerous meaningful and directed requests to my trial attorney, Maryann C. Moreno, in an attempt to receive any and all documents, photographs and audio/video recordings used during the investigation, preparation, presentation and post conviction phases of my case. These requests were denied or ignored and I never received the complete copies as I had requested.

7.   Cynthia Jordan agreed to become the custodian of the record once Ms. Moreno was assigned to a judgship on the Superior Court.

8.   I made numerous meaningful and directed requests to Cynthia Jordan in aa attempt to receive any and all documents, photographs, and audio/video recordings used during the investigation, preparation, presentation and post conviction phases of my case.

36

These requests were denied or ignored and I never received the complete copies as requested. I have since learned that Ms. Jordan is in possession of only eight (8) pages of the police report, which is in excess of 2200+ pages and no photographs or the audio/video recordings. These items are believed to have never been transferred from Moreno to Jordan.

9.    Following years of ignored requests and negative results to my requests for the production of these materials, I petitioned the Spokane Superior Court in hopes of obtaining the discovery materials. The request was first assigned to Judge Leveque, who passed it to the Washington State Court of Appeals. They, in turn, returned it to the Superior Court, claiming a jurisdictional problem, and the petition was assigned to Judge Tari S. Eitzen.

10.   I made contact with Judge Eitzen, explained the issues and requested that she intercede and grant my request for the production of the materials. I filed a motion for production and a habeas corpus. The motions have never been adjudicated and Judge Eitzen issued me a letter stating that my state remedies were exhausted.

11.   The affiant has made every conceivable and legitimate attempt to receive the requested materials necessary for the meaningful preparation and presentation of his post conviction action(s) prior to seeking relief from this Court through a Petition for Extraordinary Relief.

Respectfully Submitted,

Thomas A. DiBartolo, pro se
P.O. Box 8273
Cranston, RI 02920

**List of correspondence between petitioner and parties:**

**Maryann C. Moreno:**

| | | |
|---|---|---|
| 1. | Letter from petitioner to Moreno | 11/12/02 |
| 2. | Letter from Moreno to petitioner | 05/02/03 |
| 3. | Letter from petitioner to Moreno | 05/08/03 |
| 4. | Letter from petitioner to Moreno | undated |
| 5. | Copy of e-mail to Moreno with answer | 06/04/07 |
| 6. | Letter with affidavit to Moreno | 11/24/08 |
| 7. | Letter from petitioner to Moreno | 04/06/09 |

**Cynthia Jordan:**

| | | |
|---|---|---|
| 1. | Letter from WaDOC to petitioner/ re: Jordan | 06/04/98 |
| 2. | Letter from Jordan to Moreno/ re: petitioner | 09/02/03 |
| 3. | Letter from petitioner to Jordan | 01/14/03 |
| 4. | Letter from petitioner to Jordan | 01/17/08 |
| 5. | Letter from petitioner to Jordan | 02/04/08 |
| 6. | Letter from petitioner to Jordan | 03/01/08 |
| 7. | Letter from petitioner to Jordan | 03/11/08 |
| 8. | Letter from petitioner to Jordan | 03/20/08 |
| 9. | Letter from petitioner to Jordan | 05/07/08 |
| 10. | Letter from petitioner to Jordan | 07/02/08 |
| 11. | Letter from petitioner to Jordan | 11/07/08 |
| 12. | Letter from petitioner to Jordan | 11/24/08 |
| 13. | Letter from petitioner to Jordan | 04/06/09 |

**Tari S. Eitzen:**

| | | |
|---|---|---|
| 1. | Letter from Eitzen to petitioner | 06/17/08 |
| 2. | Letter from petitioner to Eitzen | 07/02/08 |
| 3. | Letter from petitioner to Eitzen | 08/15/08 |
| 4. | Letter from petitioner to Eitzen | 08/26/08 |
| 5. | Letter from Eitzen to petitioner | 10/15/08 |
| 6. | Letter from petitioner to Eitzen | 10/28/08 |
| 7. | Letter from petitioner to Eitzen | 11/24/08 |
| 8. | Letter from petitioner to Eitzen | 04/06/08 |

**Judge Leveque:**

| | | |
|---|---|---|
| 1. | Letter from Leveque to petitioner | 05/20/08 |
| 2. | Letter from petitioner to Leveque | 06/04/08 |

# EXHIBIT B

## STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
## DEPARTMENT OF CORRECTIONS
## INTER-OFFICE MEMO

**TO:**     Jake Gadsden, Assistant Director          **DATE:** August 21, 2002

**DEPT:**   Corrections/Institutions & Operations

**FROM:**   Walter T. Whitman, Warden

**DEPT:**   Corrections/Maximum Security/High Security

**SUBJECT:** <u>BOOK ORDERS</u>

     Based on our conversation of 8/20/2002, I have received the needed information from inmate Thomas DiBartolo (attached).  Mr. DiBartolo is a Washington state inmate who is attempting to overturn his conviction.  He is <u>pro se</u> in the legal actions listed.

     I am requesting that clearance be given for him to purchase the text that he needs to prepare his case through a distributor such as Barnes & Noble.

     If you approve this request, the central mail room will have to be notified so that the book(s) are not turned away.

WW:ml
cc: Thomas DiBartolo
    File
doc:books/#28

40

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
## INTER-DEPARTMENTAL MEMO
## MAXIMUM / HIGH SECURITY

Memorandum to: Thomas DiBartolo

Identification #:   109329

From:  James Weeden, Warden

Department:  Maximum/High Security

Date:  September 4, 2003

Subject:  **Book Request**

Your request for the book titled " What the Corpse Revealed: Murder and the Science of Forensics Detection" is denied. This topic is considered detrimental to security and my denial is within the guidelines of policy # 24.01-3DOC "Inmate Mail".

Cc: File

41

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
## INTER-DEPARTMENTAL MEMO
## MAXIMUM / HIGH SECURITY

Memorandum to: Thomas DiBartolo

Identification #: 109329

From: James Weeden, Warden

Department: Maximum/High Security

Date: April 13, 2005

Subject: **Forensic Science Books**

Information found in forensic science books is a public safety risk inside a prison system. Educating convicted offenders on forensic techniques goes against the mission of this department. Your March 3, 2005 request for the forensic science books is denied.

CC: File

42

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
## INTER-DEPARTMENTAL MEMO
## MAXIMUM / HIGH SECURITY

*H1-46*

Memorandum to:  Thomas DeBartolo

Identification #:  109329

From:  James Weeden, Warden

Department:  Maximum/High Security

Date:  December 16, 2005

Subject: **Forensic Publications**

I have reviewed the list of forensic publications you submitted for approval and find them unsuitable for inmate possession.

Cc: File

43

# EXHIBIT C

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF WASHINGTON

**ROBERT H. WHALEY**
Judge

Post Office Box 283
Spokane, Washington 99210-0283
(509) 353-2170

January 30, 2009

Mr. Tom DiBartolo
109329
Rhode Island Department of Corrections
Maximum Security
P O Box 8273
Cranston, RI 02920

RE:    DiBartolo v. Porter, *et al.*
       CV-03-094-MWL

Dear Mr. DiBartolo;

Enclosed is a copy of a letter received by the Court.  The Court wanted the parties
to have a copy.

Thank you.

Sincerely,

*Michelle Fox*

Michelle Fox
Courtroom Deputy to Judge Whaley

Enc.

45



U.S. Department of Justice

Federal Bureau of Investigation

RECEIVED
UNITED STATES DISTRICT COURT

**JAN 27 2009**

U.S. DISTRICT JUDGE
ROBERT H. WHALEY

In Reply, Please refer to
File No.

January 20, 2009

Larry D. Steinmetz
Office of Prosecuting Attorney
County-City Public Safety Building
1100 W. Mallon Avenue
Spokane, WA 99260-0270

Re:     Case Name: Thomas DiBartolo 97-1-00336-0
        FBI File Number: 95A-HQ-1229642

Dear Mr. Steinmetz:

This letter follows up on our previous communication regarding bullet lead analysis conducted by the Federal Bureau of Investigation (FBI) Laboratory.

A review of the testimony provided by an FBI Laboratory examiner on the subject of compositional analysis of bullet lead was conducted on a transcript of that testimony. The goal of the review was to determine if there was a suggestion by the examiner that a bullet fragment or shot pellet was linked to a single box of ammunition without clarification that there would be a large number of other bullets or boxes of bullets that could also match those fragments or shot pellet. Science does not support the statement or inference that bullets, shot pellets, or bullet fragments can be linked to a particular box of bullets. Further, any testimony stating bullets came from the same source of lead is potentially misleading without additional information regarding approximate numbers of other "analytically indistinguishable" bullets that also originated from that same source. Finally, any testimony regarding the geographical distribution of analytically indistinguishable bullets exceeds the data currently available.

I regret that you were mistakenly informed in a letter dated May 27, 2008, that the review of our examiner's testimony was deemed appropriate by our internal review team. We have since realized that the examiner failed to provide sufficient information to the jury to allow them to understand the number of bullets potentially produced from a single melt of lead. We apologize for any confusion this may have caused in your decisions related to this case.

Your office is encouraged to consult appellate specialists in your jurisdiction to determine whether you have any discovery obligations with respect to the finding stated above. As directed by the Department of Justice, we are notifying the Chief Judge of the court in which this case was tried of the results of our review by copying him or her on this letter.

46

Comparative Bullet Lead Analysis Review Process
January 20, 2009


      Additionally, you should be aware that the FBI is cooperating with the Innocence Project. The Innocence Project is interested in determining whether improper bullet lead analysis testimony was material to the conviction of any defendant, and, if so, to ensure appropriate remedial actions are taken. In order to fully assist them in their evaluation, the FBI will provide the Innocence Project information from our files, including a copy of the FBI expert's trial testimony in this case and our assessment of that testimony.

      Further questions regarding our review of your case or the general issue of bullet lead examinations may be addressed to Marc LeBeau at: FBI Laboratory Division, 2501 Investigation Parkway, Room 4220, Quantico, VA 22135 (703-632-7408). General legal questions should be directed to Assistant General Counsel James Landon, Office of the General Counsel, FBI Headquarters, Washington, DC 20535 (202-324-1724).

                         Sincerely,

                         *D. Christian Hassell /MH*

                         D. Christian Hassell, Ph.D.
                         Director
                         FBI Laboratory


cc:  Robert H. Whaley
      Eastern District of Washington
      P.O. Box 1493
      Spokane, WA  99210

# EXHIBIT D

State of Rhode Island and Providence Plantations

State of Rhode Island                           Superior Court
Providence, SC

Thomas A. DiBartolo, pro se     )   CA#_____
Plaintiff                       )
                                )
vs                              )
                                )
State of Rhode Island Department )
of Corrections, et al           )
                                )
and                             )
                                )
Ahsbel T. Wall, Director        )
                                )
and                             )
                                )
Jake Gadsden, Assistant Director )
                                )
and                             )
                                )
Robert McCutcheon, Grievance    )
Coordinator                     )
                                )
and                             )
                                )
James Weeden, Warden            )
Maximum Security                )
Defendants                      )

## COMPLAINT

This is a civil action that is being filed by the Plaintiff, Thomas A DiBartolo, pro se, an inmate at the Adult Correctional Institution in Cranston, Rhode Island for civil rights violations and deprivation of Constitutional liberties.

## JURISDICTION

1.   The instant case is filed pursuant to Title 8, Chapter 2, Section 14, of the Rhode Island General Laws, as amended.

## PARTIES

2.   The Plaintiff, Thomas A. DiBartolo, pro se, is an incarcerated inmate at the Adult Correctional Institution in Cranston, Rhode Island.

49

3.    Defendant, State of Rhode Island Department of Corrections, et al, is the governing state agency responsible for the custody of the Plaintiff and the protection of his civil rights guaranteed by the Constitution of the State of Rhode Island and the Constitution of the United States. The State of Rhode Island Department of Corrections, et al, is sued in its entirety.

4.    Defendant, Ashbel T. Wall, is the Director of the Department of Corrections, Adult Correctional Institute at Cranston, Rhode Island. He is sued in his individual capacity.

5.    Defendant, Jake Gadsden, is the Assistant Director of the Department of Corrections, Adult Correctional Institute at Cranston, Rhode Island. He is sued in his individual capacity.

6.    Defendant, Robert McCutcheon is the Grievance Coordinator for the Department of Corrections, Adult Correctional Institute at Cranston, Rhode Island. He is sued in his individual capacity.

7.    Defendant, James Weeden is the Warden of the Maximum Security Facility of the Department of Corrections, Adult Correctional Institute at Cranston, Rhode Island. He is sued in his individual capacity.

8.    All Defendants have acted under the color of State Law and Official Authority at all times relevant to this complaint.

## FACTS

9.    In 1997, Plaintiff was convicted in Washington State Superior Court and subsequently transferred to the Adult Correctional Institution at Cranston, Rhode Island.

10.    The Plaintiff has been representing himself, pro se, in his psot-conviction relief efforts through the Washington State Court of Appeals and now has advanced to the United States District Court of the 9th Circuit.

11.    Part of the Plaintiff's argument in the District Court is the violation of Due Process and Constitutional Rights through prosecutorial errors regarding false scientific evidence presented during the trial.

12.   Through the years of preparation of the post-conviction brief, the Plaintiff has been researching every available source of information, regarding specific scientific evidence, including websites, printed studies, medical journals and medical and forensic science texts.

13.   The Plaintiff has paid the cost of all of the material sent to him at this facility.

14.   The Plaintiff has accomodated the Adult Correctional Institute Staff's concern with the usage of previous texts, using them within a restricted location and at restricted times as set by the Administration of this facility.

15.   The Plaintiff has accomodated the wishes of the Administration and paid the extra costs of sending the previous materials to a third party outside of this facility for safe keeping.

16.   In August 2003, the Plaintiff made a verbal request to Defendant James Weeden for authorization to receive, at Plaintiff's expense, the text "What the Corpse Revealed: Murder and the Science of Forensic Detection", for use in further studies into the science of determining time of death, critical to the Plaintiff's post-conviction argument.

17.   The Defendant Weeden advised the Plaintiff to make a written request to him for the text.

18.   The Plaintiff made the request immediately via the interdepartmental mail system.

19.   No copy of the original request is available except the copy sent to the Defendant Weeden due to the Legal Library's copy machine being disabled.

20.   On September 4, 2003, the Plaintiff received a Memo from Defendant Weeden denying authorization for the research text, claiming it would be a detriment to the security of this facility and policy guidelines, under policy #24.01-3 Inmate Mail.

21.   The Plaintiff contacted the Maximum Security Grievance Coordinator, who advised the Plaintiff to appeal the Warden' decision to the Assistant Director in writing.

22.  On September 10, 2003, the Plaintiff mailed an appeal to Assistant Director Gadsden, via Interdepartmental mail.

23.  To date, the September 10, 2003 appeal remains unanswered.

24.  On September 21, 2003, the Plaintiff a follow-up appeal to Assistant Director Gadsden, via interdepartmental mail.

25.  To date, the September 21, 2003 appeal also remains unanswered.

26.  On October 2, 2003, the Plaintiff recontacted the Maximum Security Grievance Officer, who advised the Plaintiff to file an official Level 1 grievance.

27.  The Plaintiff filed the Level 1 grievance with the grievance officer on October 3, 2003.

28.  The Level 1 grievance was denied on October 7, 2003, restating the same justification as on the Warden's memo of September 4, 2003.

29.  On October 20, 2003, the Plaintiff filed a Level 2 grievance with the Adult Correctional Institute Director, Defendant Wall.

30.  On November 2, 2003, the Level 2 grievance was denied restating and misstating the justification given on the Level 1 grievance.

31.  As noted on the Level 2 grievance form, the decision has been rendered without anyone from the Adult Correctional Institute Administration reviewing the research text or its actual contents.

32.  The Level 2 grievance was denied by the Adult Correctional Institute's Grievance Coordinator, Defendant Robert McCutcheon.

## CLAIMS

33.  The actions of the Defendants have denied the Plaintiff access to legal research material, violating his Constitutional right to access to the courts.

34.  The actions of the Defendants, by its unlawful censorship, has caused the Plaintiff to suffer detrimental harm in the preparation of his post-conviction claims for relief.

35.   The actions of the Defendants violates the Plaintiff's First Amendment right to free speech and press.

36.   The actions of the Defendants violates the Plaintiff's Fifth Amendment right to due process of law.

37.   The actions of the Defendants violates the Plaintiff's Fourteenth Amendment right to due process of law.

38.   The actions of the Defendants foreed the Plaintiff to file his post-conviction briel in the District Court of the U.S. Eastern Division of the 9th Circuit, without the benefit of any and all scientific research material available to all parties.

39.   The actions of the Defendants have placed undo prejudice against the Plaintiff's claims in U.S. Court.

40.   The actions of the Defendants have subjected the Plaintiff to psychological trauma and stresses, having been forced to submit his brief without the benefits guaranteed him in the United States Constitution, bearing on his efforts to seek justice within the courts for a wrongful conviction.

<u>RELIEF</u>.

The Plaintiff prays that this Honorable Court enter the following relief:

A.   Issue a Declaratory Judgment against the named Defendants that they acted with willful and wanton disregard for the Constitutional rights of the Defendant when they:

1.   Barred his legal research and access to the court for his post-conviction relief preparation.

2.   Censored the Plaintiff from receiving and utilizing legal and forensic research material in the preparation of his post-conviction brief.

3.   Caused the Plaintiff to suffer extreme psychological trauma and stress by their unlawful actions.

B.   Order the Adult Correctional Institutional Administration to review the Inmate Mail Policy #24.01-3DOC and make necessary adjustments to sais policy to allow inmates to receive publications relevant and beneficial to the preparation of any legal action.

C.   To grant Punative Damages in the ammount of Ten Thousand Dollars ($10.000.00) against the listed Defendants each.

D.   Grant any and all other relief that the Plaintiff may be entitled to under the law.

Respectfully Submitted

Thomas A. DiBartolo
Plaintiff / pro se
PO Box 8273
Cranston, RI  02920

Appendix 1:

## PARTIES

Plaintiff:

Thomas A. DiBartolo, #109329, Maximum Security
PO Box 8273
Cranston, RI   02920


Defendants:

State of Rhode Island Department of Corrections, et al
40 Howard Ave
Cranston, RI   02920

Ashbel T. Wall, Director
40 Howard Ave
Cranston, RI   02920

Jake Gadsden, Assistant Director
40 Howard Ave
Cranston, RI   02920

Robert McCutcheon, Grievance Coordinator
40 Howard Ave
Cranston, RI   02920

James Weeden, Warden, Maximum Security
PO Box 8273
Cranston, RI   02920

STATE OF RHODE ISLAND            SUPERIOR COURT
PROVIDENCE, SC


THOMAS A. DI BARTOLO

      v.                        C. A. NO. 04-0439

JAMES WEEDEN, et al

## ANSWER OF DEFENDANTS A. T. WALL, JAKE GADSDEN, ROBERT MC CUTCHEON, JAMES WEEDEN

Now come Defendants A. T. Wall, Jake Gadsden, James Weeden and Robert McCutcheon and hereby answer Plaintiff's complaint as follows:

1.  The assertions made in Paragraph No. 1 in the Plaintiff's complaint is jurisdictional in nature and therefore no response by Defendants is required.

2.  Defendants admit those allegations contained in Paragraphs Nos. 2 through 9, 18, 20, 27 through 29 and 32.

3.  The Defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraphs Nos. 10 through 14, 19, 21 and 26.

4.  Defendants deny all remaining allegations contained in the Plaintiff's complaint and leave Plaintiff to his proof.

## FIRST DEFENSE

Plaintiff's complaint should be dismissed for lack of subject matter jurisdiction.

## SECOND DEFENSE

Plaintiff does not allege any facts that would support a valid claim under 42 U.S.C. § 1983. Plaintiff does not state any claim against Defendants cognizable in this court.

## THIRD DEFENSE

This action is barred by the doctrine of sovereign immunity.

## FOURTH DEFENSE

The Defendants have the benefit of all express and implied exceptions to the statutory waiver of sovereign immunity.

## FIFTH DEFENSE

At all times material to the allegations in the Complaint, the Defendants were in the exercise of due care and Defendants, in good faith, duly fulfilled any and all duties owed to the Plaintiff, if in fact, any duties were owed.

## SIXTH DEFENSE

The Defendants at all times acted reasonably and in good faith and did not violate any clearly established constitutional rights of the Plaintiff. Accordingly, Defendants assert the defense of qualified immunity.

## SEVENTH DEFENSE

Defendant A. T. Wall, to the extent that he is sued in his official capacity as Director of the Rhode Island Department of Corrections has the benefit of his status as sovereign, together with all privileges and immunities which inure to said status; Defendant Jake Gadsden, to the to the extent that he is sued in his official capacity as Assistant Director Institutions/Operations of the Rhode Island Department of Corrections; Defendant James Weeden, to the to the extent that he is sued in his official capacity as Warden of the Maximum Security facility at the Rhode Island Department of

Corrections; Defendant Robert McCutcheon, to the extent that he is sued in his official capacity as Grievance Coordinator of the Rhode Island Department of Corrections all having the benefit of theis status as sovereigns, together with all privileges and immunities which inure to said status.

WHEREFORE, Defendants demand entry of judgment in their favor, plus costs and attorney fees.

Respectfully submitted,
By Their Attorney,

Michael B. Grant, Esq., Bar No. 3864
Deputy Chief Legal Counsel
Rhode Island Department of Corrections
40 Howard Avenue
Cranston, Rhode Island 02920

## CERTIFICATION

The undersigned hereby certifies that on this, the 16th day of March, 2004, I mailed a true copy of the within Answer to Thomas DiBartolo, P. O. Box 8273, Cranston, R. I. 02920.

STATE OF RHODE ISLAND                          SUPERIOR COURT
PROVIDENCE, SC

THOMAS A. DIBARTOLO

      V.                                      C. A. NO. 04-0439

A.T. WALL, et al

## MEMORANDUM

## STATEMENT OF FACTS

Plaintiff is currently an inmate in the Maximum Security Facility at Adult Correctional

Institution (hereinafter ACI) in Cranston, Rhode Island. (Complaint ¶ 1.) Plaintiff was

transferred to the ACI from Washington State, where he was convicted in Washington State

Superior Court in 1997. (Complaint ¶ 9.) Plaintiff has been representing himself, pro se, in his

post-conviction relief claims through the Washington State Court of Appeals and has now filed

in the United States District Court for the 9th circuit. (Complaint ¶ 10.) In August of 2003,

plaintiff made a request to James Weeden (warden of the Maximum Security Facility at the ACI)

for authorization to receive the scientific textbook, What the Corpse Revealed: Murder and the

Science of Forensic Detection. (Complaint ¶ 16.) Warden Weeden subsequently denied

authorization for the research text because he considered it to be a detriment to the security of the

facility and policy guidelines under policy #24.01-3 Inmate Mail. (Complaint ¶ 20.)

Consequently, plaintiff filed this action alleging defendants denied plaintiff access to legal

research material and thus alleges violations of his constitutional rights of access to the courts as

protected by the First and Fourteenth Amendments.

2

## STANDARD OF REVIEW FOR A MOTION TO DISMISS

This Court must grant a motion to dismiss for failure to state a claim upon which relief can be granted when it is clear beyond a reasonable doubt that the plaintiff is not entitled to relief from the defendant under any set of facts that could be proven in support of plaintiff's claim. See, Bruno v. Criterion Holdings, Inc., 736 A.2d 99 (R.I. 1999). Furthermore, this Court must accept the allegations of plaintiff's complaint as true and must view the allegations in the light most favorable to the plaintiff. Id. at 99. Moreover, the Rhode Island Supreme Court has stated that a motion to dismiss must be granted when it is clear that plaintiff's pleading leaves no doubt whatsoever that plaintiff could not succeed at trial. See, St. James Condominium Association v. Lokey, 676 A.2d 1343 (R.I. 1996). In the present case, plaintiff's complaint must be dismissed pursuant to Rhode Island Superior Court Rules of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted for the following reasons.

Summary judgment is a proceeding in which the proponent must demonstrate that he or she is entitled to judgment as a matter of law and that there are no genuine issues of material fact. *Palmisciano v. Burrillville Racing Association*, **603 A.2d 317 (R.I. 1992).** With respect to a motion for summary judgment, the court does not pass on the weight or the credibility of the evidence but must consider the affidavit and other pleadings in a light most favorable to the party opposing the motion. *Id.* at 317.

## SUMMARY JUDGMENT

The summary judgment burden on the moving party may be discharged by showing that there is an absence of evidence to support the non-moving parties' case. *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 325 (1986).  Although the moving party must show initially the absence of a genuine issue concerning any material fact, this is not construed to mean that the moving party must produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue in which the non-moving party bears the burden of proof, but should instead be understood as requiring the moving party to discharge his burden by showing that there is an absence of evidence to support the non-moving party's case.  *Id.*  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time of discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.

## ARGUMENT

The plaintiff's complaint alleging defendants denied him access to legal research material therefore violating his constitutional rights of access to the courts as protected by the First and Fourteenth Amendments must be dismissed because the United States Constitution does not require prisoners to be able to conduct generalized research, but only that they be able to present their grievances to the courts.  Furthermore, the plaintiff fails to establish an actual injury that demonstrates how the alleged shortcomings of library or legal assistance hindered his efforts to pursue a legal claim.  Finally, the complaint must be dismissed because prison administrators, and not the courts, are to make the difficult judgments concerning the institutional operations of prisons.

I.  **PLAINTIFF'S CLAIM MUST BE DISMISSED BECAUSE THE U.S. CONSTITUTON DOES NOT REQUIRE THAT PRISONERS BE ABLE TO CONDUCT GENERALIZED RESEARCH.**

61

This Court must dismiss plaintiff's complaint because the U.S. Constitution does not require that prisoners be able to conduct generalized research, "but only that they be able to present their grievances to the courts." Lewis v. Casey, 518 U.S. 343, 360 (1996). As a general rule, "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." Id. at 346. However, prisoners do not have a fundamental right to conduct any type of generalized research they deem fit to pursue their claims. Id. at 360.

The U.S. Supreme Court's ruling in Lewis is dispositive. In that case, twenty-two inmates of the Arizona Department of Corrections filed a class-action suit alleging a violation of their constitutional rights of access to the courts. See Id. at 346. The U.S. Supreme Court held that the fundamental constitutional right of access to the courts

> does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

Id. at 355.

In the present case, plaintiff stated in his complaint that he wanted the textbook What the Corpse Revealed: Murder and the Science of Forensic Detection in order to "further [his] studies into the science of determining time of death. (Complaint ¶ 16.) The text sought in this case is not legal in nature and would not ensure a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the court. Lewis, 518 U.S. at 351. The text in question concerns the science of forensic evidence, not legal practice or substantive law.

5

Furthermore, as the U.S. Supreme Court stated in <u>Lewis</u>, the U.S. Constitution does not require that prisoners be able to conduct generalized research, "but only that they be able to present their grievances to the courts." <u>Id</u>. at 360.  Since the item sought is not legal material that can be used to assist plaintiff in the preparation and filing of meaningful legal papers, plaintiff's claim is without merit.  Any possible impairment to plaintiff's case results from the incidental (and constitutional) consequences of conviction and incarceration.  <u>Id</u>. at 355.  The complaint makes clear that plaintiff was able to present his alleged grievances to the various Washington State and Federal Courts and thus plaintiff's claim is meritless.  (Complaint ¶ 38.)

Therefore, plaintiff's complaint should be dismissed for failure to state a claim upon which relief can be granted.

## II.   PLAINTIFF'S COMPLAINT MUST BE DISMISSED BECAUSE IT FAILS TO ESTABLISH AN "ACTUAL INJURY."

Even assuming that the textbook <u>What the Corpse Revealed: Murder and the Science of Forensic Detection</u> is deemed legal material, plaintiff's complaint must be dismissed because it fails to allege any actual injury suffered in plaintiff's efforts to pursue a legal claim.  In order to prevail on claims that constitutional rights were violated, a plaintiff must show an "actual injury" by "demonstrating that the alleged shortcomings in the library or legal assistance hindered his efforts to pursue a legal claim." <u>Lewis</u>, 518 U.S. at 351.  The U.S. Supreme Court has stated that an actual injury is, "actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim." <u>Id</u>. at 348.

In <u>Lewis</u>, the U.S. Supreme Court held that "[b]ecause there is not an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." <u>Id</u>. at 351.  Insofar as the right is concerned, "meaningful access to the

courts is the touchstone, and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." Id.  For example, an inmate might show

> that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known.  Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.

Id.

In the present case, plaintiff fails to state how denial of the textbook What the Corpse Revealed: Murder and the Science of Forensic Detection hindered his efforts to pursue a legal claim.  In fact, plaintiff alleges that his claims were filed in the Eastern Division for the 9th Circuit and all deadlines were met.  Plaintiff has filed a number of post conviction relief petitions and other civil matters as follows:

1. In 2001, Plaintiff filed a petition for review, which was denied by the Washington Supreme Court. State V. DiBartolo, 143 Wash.2d 1026, 22 P.3d 803 (Wash. May 01, 2001) (TABLE. NO. 70247-1).
2. In May of 2004, Plaintiff filed a Petition for Writ of Habeas Corpus in the United States District Court for the Eastern District of Washington, which was subsequently denied and dismissed with prejudice.  See attached judgment of dismissal.
3. In September of 2005, Plaintiff filed a Writ of Certiorari with the United States Supreme Court, which was also denied. Dibartolo v. Lehman, 126 S.Ct. 31 (U.S. 2005).

See Statement of Undisputed facts.

Plaintiff has failed to allege, nor can he demonstrate actual injury, and thus his claims must be dismissed for failure to state a claim upon which relief can be granted.

## III.    PLAINTIFF'S CLAIMS MUST BE DISMISSED BECAUSE PRISON ADMINISTRATORS ARE TO MAKE THE DIFFICULT JUDGMENTS CONCERNING INSTITUTIONAL OPERATIONS.

This Court must dismiss plaintiff's complaint because the U.S. Supreme Court has stated that "prison administrators, and not the courts, are to make the difficult judgments concerning

institutional operations." <u>Lewis,</u> 518 U.S. at 361.  "Subjecting the day-to-day judgments of

prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to

anticipate security problems and to adopt innovative solutions to the intractable problems of

prison administration."  <u>Id</u>.

In <u>Lewis</u>, the U.S. Supreme Court held the following:

> [A] prison regulation impinging on inmates' constitutional rights is valid if it is
> reasonably related to legitimate penological interests. Such a deferential standard
> is necessary, if prison administrators, and not the courts, are to make the difficult
> judgments concerning institutional operations. Subjecting the day-to-day
> judgments of prison officials to an inflexible strict scrutiny analysis would
> seriously hamper their ability to anticipate security problems and to adopt
> innovative solutions to the intractable problems of prison administration.

<u>Id</u>.

In the present case, plaintiff requested that the text <u>What the Corpse Revealed: Murder</u>

<u>and the Science of Forensic Detection</u> be delivered to him at the Maximum Security Facility of

the ACI.  (<u>Complaint ¶ 16</u>.)  Plaintiff was denied authorization for the research text by the

warden of the Maximum Security Facility at the ACI.  Plaintiff's complaint states that he

received a memo from the warden stating that the denial was due to the fact that it would be a

detriment to the security of the facility and policy guidelines under policy #24.01-3 Inmate Mail.

(<u>Complaint ¶ 20</u>.)  Because the ordering of an outside textbook to be delivered to a Maximum

Security Prison Facility is an operational function that is reasonably related to legitimate

penological interests, it is up to prison administrators, and not the courts, to determine the

appropriateness, concerning the safe running of institutional operations.  <u>Lewis,</u> 518 U.S. at 361.

Therefore, plaintiff's claim must be dismissed.

## IV.    PLAINTIFF'S CLAIMS ARE BARRED BY THE PROCEDURAL DEFAULT RULE

The courts adhere to a strict policy barring claimants from re-litigating issues for post conviction relief which they failed to raise on direct appeal. Franco v. State of Rhode Island, 1988 R.I.Super. Lexis 64. Such policy is rooted in our legal system's strong interest in respecting the finality of judgments and discouraging those who have been convicted of a crime from filing petition after petition for post conviction relief. State v. Carvalho, 450 A.2d 1102 (1982). The U.S. Supreme Court reaffirmed the strength of the procedural default rule, stating that it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments. Massaro v. Unites States, 538 U.S. 502 (2003). A claimant may raise a defaulted claim only if they can demonstrate that they have good cause for failure to raise the claim on direct appeal, and that their failure to act on appeal prejudiced the defendant at trial. Id.

In our case, Mr. DiBartolo originally raised six claims on direct appeal. State of Washington v. DiBartolo, 2000 Wash. App. Lexis 1195. He contended that the court erred in (1) admitting evidence of his extramarital affairs; (2) excluding expert testimony regarding perception and memory reliability of witnesses in stressful situations; (3) excluding claimed excited utterance testimony; (4) denying his motion for change of venue; (5) denying his mistrial motion; and (6) denying his motion for new trial based upon juror misconduct. Id. Mr. DiBartolo's conviction was affirmed on appeal by the Washington Court of Appeals. Id. Subsequently, while incarcerated, Mr. DiBartolo requested access to a book entitled, "What the Corpse Revealed: Murder and the Science of Forensics Detection." He claimed that access to the book was needed in his efforts for filing a post conviction relief petition. However, Mr. DiBartolo was seeking to file the petition based on evidence regarding the time of death of his spouse, an evidentiary argument that he failed to raise along with the other six claims on direct

appeal. Therefore, such argument amounts to a procedurally defaulted claim, and is deemed waived for purposes of re-litigation.

## CONCLUSION

For the foregoing reasons, defendant A.T. Wall respectfully requests that this Court enter an order dismissing the plaintiff's complaint.

Respectfully Submitted
By His Attorney,

Michael B. Grant
Deputy Chief Legal Counsel
R. I. Department of Corrections
40 Howard Avenue
Cranston, Rhode Island 02920

67                              10

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, SC          Filed December 14, 2006          SUPERIOR COURT

| THOMAS A. DiBARTOLO | : | |
| | : | |
| vs. | : | C.A. No. PC 04-0439 |
| | : | |
| A.T. WALL, et al. | : | |

## DECISION

**PROCACCINI, J.**    Thomas DiBartolo (Mr. DiBartolo), the plaintiff in this case, is currently an inmate at the Maximum Security Facility at the Adult Correctional Institution (ACI) in Cranston, Rhode Island.   While incarcerated, Mr. DiBartolo sought access to a certain forensic text to aid him in his quest for post-conviction relief.   The ACI officials denied his request, and thereafter Mr. DiBartolo filed this complaint against the Rhode Island Department of Corrections (RIDOC) and its officials, arguing that his constitutional right to access the courts has been violated.   Subsequently, the RIDOC filed a motion to dismiss Mr. DiBartolo's complaint, or, in the alternative, for summary judgment as to all of Mr. DiBartolo's claims.   Mr. DiBartolo objects to the motion.

### Facts and Travel

In 1997, Mr. DiBartolo was convicted of the first degree murder of his wife in the Washington State Superior Court and was subsequently transferred from Washington to the ACI for incarceration.   Since his conviction, Mr. DiBartolo has been representing himself pro se in several unsuccessful post-conviction relief proceedings in the federal and Washington state court systems.   Currently, Mr. DiBartolo states that he is preparing further state and federal post-conviction relief claims, seeking a vacation of his conviction on the argument that false forensic evidence related to the victim's time of

death was presented at his trial and led to his wrongful conviction. In preparing his case for post-conviction relief, Mr. DiBartolo used materials purchased at his own expense, which he would read in a secluded area before shipping them to a third party outside of the prison system. In August of 2003, while conducting his research, Mr. DiBartolo sought access to a particular forensic text entitled, "What the Corpse Revealed: Murder and the Science of Forensic Detection." On September 4, 2003, the Warden of the Maximum and High Security facilities, James Weeden, denied Mr. DiBartolo's request pursuant to RIDOC policy #24.01-3 (Inmate Mail), on the grounds that the book was detrimental to the safety of the prison. Mr. DiBartolo unsuccessfully appealed this decision up the chain of command at the ACI. In response to the denial, Mr. DiBartolo filed this petition, arguing that the RIDOC and its officials violated his constitutional right of access to the court by denying him access to this text.

The RIDOC has moved to dismiss Mr. DiBartolo's complaint, arguing that: (1) Mr. DiBartolo's claims are barred by the procedural default rule, as he failed to raise the issue of false forensic evidence related to the time of death in his direct appeal; (2) Mr. DiBartolo's constitutional claim is fatally flawed because he has failed to establish an actual injury; and (3) it is the duty of the prison administrators, not the courts, to make decisions concerning institutional operations of the prison.

### Standard of Review

This Court will grant a motion to dismiss under Rule 12(b)(6) "'when it is clear beyond a reasonable doubt that the plaintiff would not be entitled to relief from the defendant under any set of facts that could be proven in support of the plaintiff's claim.'" Hendrick v. Hendrick, 755 A.2d 784, 793 (R.I. 2000) (citations omitted). In making this

determination, the Court "views the facts in the light most favorable to the nonmoving party." Giuliano v. Pastina, Jr., 793 A.2d 1035, 1036 (R.I. 2002) (citations omitted). "Rule 12(b)(6) does not deal with the likelihood of success on the merits, but rather with the viability of a plaintiff's bare-bones allegations and claims as they are set forth in the complaint." Hyatt v. Vill. House Convalescent Home, Inc., 880 A.2d 821, 823-824 (R.I. 2005) (citations omitted).  Accordingly, the Court will "analyze each of the counts in plaintiff's complaint in light of the notably lenient standards of our Rule 12(b)(6) jurisprudence. Under those standards, it must be assumed that the allegations in the complaint are true. Further, a Rule 12(b)(6) motion is not to be granted unless the defendant can establish that plaintiff has no entitlement to relief." Id.

## Analysis

**Procedural Default Rule**

The RIDOC first alleges that Mr. DiBartolo's petition should be denied because the time of death issues he will raise in his federal and state post-conviction relief efforts are barred by the procedural default rule.  On the direct appeal from his conviction, Mr. DiBartolo raised six issues; he argued that the court erred in (1) admitting evidence of his extramarital affairs to show motive and intent; (2) excluding expert testimony regarding perception and memory reliability of eyewitnesses who make observations while under stress; (3) excluding claimed excited utterance testimony purportedly identifying another suspect; (4) denying his motion for change of venue due to media publicity; (5) denying his mistrial motion after a courthouse security guard made comments to jurors during trial; and (6) denying his motion for a new trial based upon juror misconduct during deliberations.  The state argues that, as Mr. DiBartolo did not raise the evidentiary issue

70

regarding time of death in his direct appeal, he cannot raise it in either his state Personal Restraint Petition or his federal claims. For support, RIDOC cites <u>Massaro v. Unied States</u>, 538 U.S. 502 (2003). In that case, the Supreme Court found that federal ineffective assistance of counsel claims can be raised for the first time in a collateral action under 28 USCS 2255, regardless of whether the petitioner could have raised the issue on direct appeal. However, the RIDOC argues that in <u>Massaro,</u> regardless of the holding as to ineffective assistance of counsel claims, the Supreme Court reaffirmed the strength of the procedural default rule. In that case, the Supreme Court noted that "the general rule [is] that claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice." The RIDOC argues that this general rule should be applied in this case, barring Mr. DiBartolo's new post-conviction relief claims, and making his request for resources moot.

The procedural default rule conserves judicial resources and preserves the finality of judgments, rendering it an important underlying principle of the American justice system. However, it does not appear that this Court is the proper forum to determine the potential viability of Mr. DiBartolo's petitions – particularly his Washington state Personal Restraint Petition – vis a vis the procedural default rule.

The Washington Court Rules of Appellate Procedure allow a petitioner to file a Personal Restraint Petition to challenge an unlawful conviction. A conviction will be deemed unlawful, inter alia, if "[m]aterial facts exist which have not been previously presented and heard, which in the interest of justice require vacation of the conviction, sentence or other order entered in a criminal proceeding. . ." Wash. RAP 16.4. This language indicates that petitioners may use the Personal Restraint Petitions to raise

challenges to convictions based on previously undiscovered evidence that could not possibly have been raised on appeal. In addition, there is Washington case law in which Personal Restraint Petitions that raised issues nearly identical to those raised on appeal were dismissed, suggesting that these petitions are, in part, to be used to litigate newly discovered claims. See State v. Wright, 61 Wash.App. 819, 810 P.2d 935 (1991) (review denied). Therefore, this Court will not dismiss Mr. DiBartolo's petition for the forensic text on the basis of the procedural default rule, for it cannot be said with certainty that the federal or Washington state courts will dismiss his underlying petitions on this basis.

**Establishment of an "Actual Injury"**

In Lewis v. Casey, 518 U.S. 343 (1996), the United States Supreme Court held that in order for an inmate to make a prima facie case that his constitutional right to access the courts has been denied, he must establish that the inadequacies of the prison resources resulted in an "actual injury." The RIDOC argues that Mr. DiBartolo's complaint is fatally flawed because he has not demonstrated how the denial of this particular textbook actually injured his efforts to pursue a legal claim. Mr. DiBartolo argues that he *was* injured because he cannot fully prepare the argument for his post-conviction relief petitions without this book.

The issue before the Court, therefore, is whether the RIDOC's denial of this particular text so injured Mr. DiBartolo in his effort to seek post-conviction relief that it rose to the level of a constitutional violation of his right to access the courts. In Bounds v. Smith, 430 U.S. 817 (1977), the United States Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing

prisoners with adequate law libraries or adequate assistance from persons trained in the law." Bounds, 430 U.S. at 828.  In Lewis, the Supreme Court re-examined this issue and clarified the duties that the prison authorities have to ensure that the prisoners' rights are protected.  The Supreme Court clearly stated that prison officials are not constitutionally obligated to enable inmates to become "litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." Id. at 355.  However, the prison must provide tools "that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." Id. In order to prevail on a constitutional claim, however, the inmate must be able to show that the lack of resources actually caused him injury.

> "He might show, for example, that a complaint he prepared
> was dismissed for failure to satisfy some technical
> requirement which, because of deficiencies in the prison's
> legal assistance facilities, he could not have known. Or that
> he had suffered arguably actionable harm that he wished to
> bring before the courts, but was so stymied by inadequacies
> of the law library that he was unable even to file a
> complaint." Lewis, 518 U.S. at 351.

However, the Supreme Court also found that prison officials do not need to provide the inmate with every possible resource in order to avoid causing him an "actual injury."

> ". . . [S]everal statements in Bounds went beyond the right
> of access recognized in the earlier cases on which it relied,
> which was a right to bring to court a grievance that the
> inmate wished to present. . . . These statements appear to
> suggest that the State must enable the prisoner to discover
> grievances, and to litigate effectively once in court. . . .
> These elaborations upon the right of access to the courts
> have no antecedent in our pre-Bounds cases, and we now
> disclaim them." Lewis, 518 U.S. at 354. (Emphasis added.)

In the instant case, the denial of the forensic text has not prevented Mr. DiBartolo from accessing the courts.  Although the book may aid Mr. DiBartolo in his research,

73

Lewis makes it clear that the prison is not required to help the inmate litigate effectively once in court. Id.  Mr. DiBartolo has been able to file several petitions in the Washington state courts and the federal court system.  See, e.g., State v. DiBartolo, 143 Wash.2d 1026, 22 P.3d 803 (Wash. 2001); DiBartolo v. Lehman, 126 S.Ct. 31 (U.S. 2005) (denial of certiorari); In re Application for Relief from Personal Restraint of DiBartolo, 115 Wash.App. 1008 (Wash.App. Div.3 2003).    The fact that Mr. DiBartolo has been able to obtain the legal knowledge necessary to file his claims properly, and that he currently has one claim on appeal in the federal system, indicates that the denial of the forensic text in question did not wholly prevent him from accessing the courts.  It is clear from Lewis, and the subsequent interpretation of it by the lower courts, that there is no constitutional mandate that an inmate be given access to every text in publication that may possibly aid him in his argument.

In addition, other lower courts have interpreted Lewis to find that inmates' rights have not been abridged as long as they are able to present their grievances to the Court, even if the prison officials have not provided every tool requested.  Indeed, some courts have found that an inmate's constitutional right to access the courts was not denied even when the prison officials provided that inmate with fewer resources than Mr. DiBartolo has been given.  See, e.g., Davidson v. Murray, 371 F. Supp. 2d 361 (D.N.Y. 2005) (finding that the prison officials' denial of certain law books and writing supplies to an inmate did not violate his constitutional rights to access the courts when the inmate was able to file several appeals and claims in the courts); Stotts v. Salas, 938 F. Supp. 663 (D.Haw 1996) (holding that an inmate's lack of access to out of state law books and his 21-day deprivation of legal materials did not constitute actual injury).

Comparatively, it appears that Mr. DiBartolo has been given more resources than inmates in these other states. The RIDOC allowed Mr. DiBartolo to purchase as many scientific books as possible before deeming certain books to be a safety risk. In addition, his complaint does not allege any shortcomings in the law library or legal resources provided by the RIDOC. The RIDOC's relative generosity lends even further credence to the Court's finding that Mr. DiBartolo's rights have not been violated.

**Deference to Prison Administrators**

The Court's decision to grant the RIDOC's motion to dismiss is further bolstered by the deference this Court gives to the director of the RIDOC in making decisions concerning the security of the facility. Indeed, this deference is of such import that the Legislature has enacted a statute to ensure that the prison officials are allowed the proper amount of discretion. R.I.G.L. 1956 § 42-56-10. This statute grants the director of the RIDOC power to determine which actions will be necessary to ensure the security of the prison. Specifically, the statute gives the director the power to "[m]aintain security, safety, and order at all state correctional facilities . . ." § 42-56-10(2).

The Rhode Island Supreme Court has long interpreted this statute to find that the director's decisions on maintaining order, safety, and security in the prison receive strong deference. See, e.g., Dep't of Corr. v. R.I. Bhd. of Corr. Officers, 867 A.2d 823 (R.I. 2003); Vose v. Rhode Island Bhd. of Correctional Officers, 587 A.2d 913 (R.I. 1991); State of Rhode Island Department of Corrections v. Rhode Island Brotherhood of Correctional Officers, 725 A.2d 296 (R.I. 1999).

Here, the RIDOC argues that the requested texts would provide a safety risk to the prison community, as such forensic science texts could allow Mr. DiBartolo or another

inmate to tamper with a crime scene within the institution. The prison officials, who are well-acquainted with the day-to-day running of the facility and the particular safety risks inherent in such an institution, are best situated to determine which books pose a threat to the prison, and thus their decisions on these matters will be given deference. Moreover, this Court finds that the prison officials have acted reasonably and in good faith in balancing the interests of Mr. DiBartolo with the safety and security concerns of the institution.

### Conclusion

This Court finds that the RIDOC's denial of Mr. DiBartolo's request for this particular forensic text does not constitutionally violate his right to access the courts, as Mr. DiBartolo has failed to establish that such denial caused him to suffer an "actual injury." As such, the facts alleged in the complaint do not state a claim upon which relief can be granted, and, accordingly, RIDOC's motion to dismiss Mr. DiBartolo's complaint is granted.

Counsel shall submit an order for entry.

# EXHIBIT E

## CURRICULUM VITAE
## OF
# GEORGE S. PEARL

DOB - 01-10-1949 VICKSBURG, MS.
ATLANTA LEGAL PHOTO SERVICES, INC.
2139 LIDDELL DRIVE, NE
ATLANTA, GEORGIA 30324-4132   TELEPHONE: 404-872-2577  FAX: 404-872-0548

Photo Evidence Cases to date: Thousands; Expert testimony in several hundred issues
since 1978 heard in Federal, Superior, State Courts and others.

Update of: March 16, 2009

| I TRAINING | |
|---|---|
| 1967-1968, 1973-1975 | B.S. - University Of Southern Mississippi, in Hattiesburg, MS. Major: Radio, Television & Film Minor - Marketing |
| 1968/72 | United States Navy, / Electronics Avionics "A" and ARC-27 Schools, U.S. Navy, Millington, TN. and Corpus Christy, TX.1975 Viet Nam Service in War Zone. Honorable Discharge...E-5 rank. |
| 1978 | Studied Civil Evidence Photography at 40 hour accredited course by Northeastern University, Boston, MA. Ben Cantor, JD and co-author "Photographs In Civil Litigation" as leader. |
| 1984 | Cable Atlanta TV production & studio course work, exams & certification. |

| II PROFESSIONAL EXPERIENCE | |
|---|---|
| 1972 - 73 | INSTRUMENTATION ELECTRONICS TECHNICIAN, US ARMY CORPS of ENGINEERS, US Waterways Experiment Station, Vicksburg, MS. |
| 1975-76 | ASSISTANT DIRECTOR OF MEDICAL PHOTOGRAPHY with University Medical Center in Jackson, MS. |
| 1977-78 | STATE COORDINATOR of Heritage Photography Project "Vanishing Georgia" for Georgia Department of Archives & History. |
| 1978 | OWNER/OPERATOR - Opened Atlanta Legal Photo Services, Inc., d/b/a present ALPS EVIDENCE & PHOTO. |
| 1983 | STAFF INSTRUCTOR - University of Wisconsin Department of Engineering and Applied Science. Lectured course in: 'Effective Use Of Photography As Legal Evidence'. |
| | |

| III. GUEST SPEAKER & LECTURER | | |
|---|---|---|
| 1980 | IAQDE - Independent Association Of Questioned Document Examiners, Inc. | |
| 1980 | Southern Methodist School Of Law. | Subject: 'Document Photography' |
| 1980 | Atlanta Claims Association | Subject: 'Demonstrative Evidence & Claims Adjuster |

| | | or How To Lower Your Loss Ratios' |
|---|---|---|
| 1981 | E.P.I.C. seminar - Evidence Photographers International Council Cherry Hill, NJ. | Subject: 'Procedures In Evidence Photography' |
| 1981 | Melvin Belli seminar Atlanta, GA. | Subject: 'Demonstrative Evidence'. |
| 1982 | IAQDE - Independent Association Of Questioned Document Examiners, Inc. Providence, RI. (October) | Subject: 'Photographic Forgery Examination Procedures For The Questioned Document Examiner' |
| 1983 | University of Wisconsin Department of Engineering and Applied Science. | As a Staff Instructor - lectured course in: 'Effective Use Of Photography As Legal Evidence', "Intra- Oral Photography" workshop, & "Night Visibility Photography" |
| 1983 | E.P.I.C. seminar - Evidence Photographers International Council Orlando, FL. (February/March) | Expert Witness / Moot Court |
| 1984 | Tri-State Legal Photographers association / Ultra-Tech. Marketing. Jamaica, NY. (October) | Subject: 'Evidence Photography' |
| 1985 | Dekalb County Camera Club & Cobb County Camera Club (GA.) | Subject: 'Evidence Photography For The Legal Profession' |
| 1985 | E.P.I.C. seminar - Evidence Photographers International Council Dallas, TX. (March) | Instructor |
| 1985 | E.P.I.C. seminar - Evidence Photographers International Council New York City (July) | Instructor |
| 1985 | Georgia Police Academy, Atlanta, Georgia | As Staff Instructor taught a week long course (August) Subject: 'Evidence & Crime Scene Photography' |
| 1986 | Georgia Association Of Legal Assistants | Subject: 'Court Room Visual Aids For Everyone'. |
| 1986 | E.P.I.C. seminar - Evidence Photographers International Council Philadelphia, PA. (October) | |
| 1987 | July - Highway Accident litigation. Use of Experts Seminar. | Speaker on Demonstrative Evidence and uses of special maps & diagrams. |
| 1988 | AFDE - Association Of Forensic Document Examiners, Second Annual Symposium Of Questioned Document Examination Milwaukee, WI. | Paper delivered: 'Admittance Of Photographic Evidence In Our Courts For The Document Examiner' |
| 1988 | State Bar Of Georgia, Criminal Litigation Section | Subject: 'Photographic Forgery In Our Courts' |
| 1988 | Dekalb Trial Lawyers Association | Subject: 'Demonstrative Evidence & Evidence Photography' |
| 1988 | Cobb County Trial Lawyers Association | Subject: 'Video & Demonstrative Exhibits For Use In Court Or In Settlement' |
| 1988 | Expert Expo | Subject: 'Demonstrative |

| | | Evidence Production At ALPS' |
|---|---|---|
| 1989 | Tri-State Legal Photographers Association and E.P.I.C. Annual Meeting & symposium held in Elizabeth, NJ. April/May | Speaker / Instructor |
| 1990 | G.T.L.A. - Georgia Trial Lawyers Association (April 19 thru April 21) | Subject: 'Demonstrative Evidence - Going First Class Without Mortgaging The Farm' |
| 1990 | The Institute Of Continuing Legal Education In Georgia (May 11) | Subject: 'Maps & Diagrams' |
| 1990 | Professional Legal Assistants Association (June 8) | Subject: 'Demonstrative Evidence And The Paralegal' |
| 1990 | Georgia State Law School (October 4) | Subject: 'Demonstrative Evidence' |
| 1990 | E.P.I.C. seminar - Evidence Photographers International Council Albuquerque, NM (November) | Subject: 'Demonstrative Evidence' |
| 1992 | E.P.I.C. seminar - Evidence Photographers International Council, New York City | Instructor: Evidence Photography |
| 1993 | Advanced Truck Accident Investigation & Claims Handling seminar - for Truck Insurance Adjusters (September 24, 1993) | Subject: 'Nighttime Photography Demonstrating Conspicuity In Under-ride Accidents'. |
| 1994 | E.P.I.C. seminar - Evidence Photographers International Council, Hartford, CT. | Subject: 'Video Tape Evidence' |
| 1995 | E.P.I.C. seminar - Evidence Photographers International Council Denver, CO. | Subject: 'Surveillance Photography', Board Certification, & Copy Rights of the Evidence Photographer as they Pertain to the Law. |
| 1996 | JOHN MARSHALL SCHOOL OF LAW Atlanta, Georgia (May 20, 1996) | Subject: 'Demonstrative Evidence' |
| 1996 | E.P.I.C. seminar - Evidence Photographers International Council, Tempe, Arizona | Subject: Aspects of Evidence Photography |
| 1997 | JOHN MARSHALL SCHOOL OF LAW - Senior Class Atlanta, GA. (October 16, 1997) | Subject: Demonstrative Evidence & Evidence Photography |
| 1997 | EVIDENCE PHOTOGRAPHERS INTERNATIONAL COUNCIL Dallas, TX. October 31 - November 2, 1997 | Subject: Tips & Techniques Of Evidence Photography |
| 1998 | EVIDENCE PHOTOGRAPHERS INTERNATIONAL COUNCIL Atlanta, Ga. October 30 - November 1, 1998 | Chairman: of the seminar ' Fall School of Forensic Evidence Photography'<br><br>Instructor: Personal Injury Workshop<br><br>Speaker: 'Conspicuity & Night Visibility Photography'<br><br>Speaker: 'Precision Aerial Photography - oblique & vertical' |

80

| 1999 | IAPP World Conference  - Quebec, Canada | Speaker: PANORAMIC GROUP FORMATION PHOTOGRAPHY |
|---|---|---|
| 1999 | E.P.I.C. seminar - Evidence Photographers International Council, Irvine, Ca. | Speaker / Instructor Personal Injury, Panoramic Evidence Photography |
| 2000 | E.P.I.C. seminar - Evidence Photographers International Council, Phoenix, Arizona | Speaker / Instructor |
| 2001 | IAPP World Conference – NAPA Valley, CA. | Speaker: Panorama Evidence Photography |
| 2001 | E.P.I.C. seminar - Evidence Photographers International Council, Atlanta, Georgia | Speaker / Instructor: Personal Injury Photography, |
| 2002 | E.P.I.C. seminar - Evidence Photographers International Council, New Orleans, LA. | Speaker / Instructor: Aerial Photography, Night Visibility & Conspicuity Photography and Demonstration |
| 2003 | E.P.I.C. seminar - Evidence Photographers International Council, San Diego, CA. | Speaker / Instructor: Aerial Photography- Oblique & Scale Vertical, Conspicuity & Night Visibility Studies.  Assistant Instructor: Accident Photography Workshop. |
| 2003 | PLAINTIFF'S MEDICAL MALPRACTICE... INSTITUTE OF CONTINUING LEGAL EDUCATION IN GEORGIA | Speaker: ADMISSIBILITY & USE OF DAY IN THE LIFE VIDEO PRODUCTIONS |
| 2004 | IAPP World Conference – Monterey, CA. | Speaker: GROUP SHOOT'IN |
| 2004 | E.P.I.C. seminar - Evidence Photographers International Council, Albuquerque, New Mexico | Speaker: Panoramic Evidence |
| 2005 | IAPP World Conference – Springfield, Mass. | Speaker: Ray Tracing & Spacing, Finding the Nodal Point in Optical Lenses, Framing |
| 2005 | E.P.I.C. seminar - Evidence Photographers International Council, Atlanta, GA. | Speaker / Instructor: Gadgets & Gizmos for the Evidence Photographer.  Seminar Chairman |
| 2006 | E.P.I.C. seminar - Evidence Photographers International Council, Long Beach, CA | Wreaked Vehicle Photo Workshop Instructor Helper |
| 2008 | E.P.I.C. seminar - Evidence Photographers International Council, Tampa, FL. | Speaker/ Tips & Tricks for the Evidence Photographer plus... Speaker / Instructor:  Axial Lighting & Workshop |

| V. PROFESSIONAL ORGANIZATIONS & AFFILIATIONS | | |
|---|---|---|
| 1977 to present | E.P.I.C. - The Evidence Photographers International Council | Life Member |

| | | |
|---|---|---|
| 1977 to (1987 or 88)? | P.P.A. - Professional Photographers Of America | In 1979 awarded after Board review to 1997 review Qualified Evidence Photographer's standing & Certified Professional Photographer (CPP). *Presently out of almost 20,000 members of P.P.A., I am 1 of 7 members internationally were rated "Q" in the field of evidence photography. |
| 1985 to 1987 | National Forensic Center - National Advisor on Evidence Photography. | |
| 1986 to about 1992 or 3? | DESA - Demonstrative Evidence Specialists Association - | Board Member \ A Founding Member. |
| 1986 to present | AFDE - Association Of Forensic Document Examiners, Inc | Board Member / A Founding Charter Member.<br><br>Association President 1992-1993.<br><br>Board Certified QUESTIONED DOCUMENT EXAMINER & Handwriting Expert - Oct. 7, 1993. |
| 1988 – to? 2001- 2003 | APCL - Association Of Professional Color Laboratories | Member |
| 1988 to? 2001- 2003 | PMA - Photo Marketing Association International | Member |
| 1989 to Present | I.A.P.P. – International Association of Panoramic Photographers | "Qualified" Member<br>Board Member |
| 2001 to 2006, 2008 to Present | ASMP – American Society of Media Photographers, Inc. | 'General' Member |
| | | |
| | | |
| | | |
| | | |

| PROFESSIONAL ATTENDANCE: | | |
|---|---|---|
| 1979 September | E.P.I.C. Seminar | Minneapolis, MN. |
| 1978 September | E.P.I.C. Seminar | Cherry Hill, NJ |
| 1980 September | E.P.I.C. Seminar | Los Angeles, CA. |
| 1984 July/August | E.P.I.C. Seminar | Rochester, NY. (Kodak) |
| 1996 November | E.P.I.C. Seminar | Tempe, Arizona |
| 1997 Oct./Nov. | E.P.I.C. Seminar | Dallas, Texas |

| 1998 Oct./Nov. | E.P.I.C. Seminar | Atlanta, Georgia |
|---|---|---|
| 1998 Oct./Nov. | E.P.I.C. Seminar | Newport Beach - Irvine, California |
| Continuing…to date each year. | E.P.I.C. Seminar | San Diego, CA. |
| 2006 Nov. | E.P.I.C. Seminar | Long Beach, California |
| 2009 Nov. | E.P.I.C. Seminar | Phoenix, Arizona |

| OFFICES HELD / ACHIEVEMENTS / AWARDS: | | | |
|---|---|---|---|
| 1979 to 2007 | E.P.I.C | | Officer- Board Of Management, EPIC Web Master |
| 1980 (April) | E.P.I.C. seminar | Atlanta, GA. | SEMINAR CHAIRMAN |
| 1982 | E.P.I.C. - Evidence Photographers International Council. | | PRESIDENT |
| 1985 (March) | E.P.I.C. | Seminar held in Dallas, TX. | SEMINAR CHAIRMAN |
| Received July 21 | E.P.I.C. seminar | New York City | FELLOWSHIP & BOARD CERTIFICATION for CIVIL EVIDENCE PHOTOGRAPHY |
| 1989 April | E.P.I.C. | Evidence Photographer Of the YEAR- 1989 | R. C. HAKANSON MAN OF THE YEAR AWARD -awarded by E.P.I.C for Outstanding Achievements and Furtherance of Education and Learning for others in the Field of Evidence Photography |
| 1997 | STATE OF TEXAS BOARD OF PRIVATE INVESTIGATORS & PRIVATE SECURITY AGENCIES | | CERTIFIED INSTRUCTOR RATING |
| 1997 | 1997 IAPP World Conference | Moab, Utah. | Award presented for Panoramic Photography - KODAK INTERNATIONAL AWARD OF PHOTOGRAPHIC EXCELLENCE |
| 1998 | E.P.I.C. seminar | Atlanta, Georgia | SEMINAR CHAIRMAN |
| 1999 | 1999 IAPP World Conference | Quebec, Canada | Award presented for Panoramic |

| | | | Photography – <u>FUJI FILM INTERNATIONAL AWARD OF EXCELLENCE IN PHOTOGRAPHY</u> Also Awarded: <u>QUALIFIED PANORAMIC PHOTOGRAPHER</u> rating from IAPP – Oct. 1999. |
|---|---|---|---|
| 2004 | E.P.I.C. seminar - Evidence Photographers International Council | Albuquerque, New Mexico | 2004 NIKON FORENSIC PHOTOGRAPHER OF THE YEAR AWARD |
| 2005 | I.A.P.P. | Springfield, MA. | Board of Management 2005 - First Place International Contest |
| | | | |

| V. PROFESSIONAL LISTINGS (*present & past) | |
|---|---|
| Law Directory | MARTINDALE HUBBLE |
| THE VERDICT- | Georgia Trail Lawyers Association |
| EXPERT SERVICES DIRECTORY- | National Forensic Center |
| WHO'S WHO IN PROFESSIONAL IMAGING | PPA |
| LAW COMPUTER BANKS | LEXUS & WEST |
| WHO'S WHO IN PHOTOGRAPHIC MANAGEMENT | |
| MULTIMEDIA & IMAGE MANAGEMENT | High School Textbook has a whole section on me & my company – March 2003 |
| | |
| | |
| | |
| | |
| | |

| VI. PUBLICATIONS | | | |
|---|---|---|---|
| 1982 | "CROSS EXAMINING THE PHOTOGRAPH – PHOTOGRAPHIC FORGERY & MISREPRESENTATION". | Article on cross-examining the photograph - photographic forgery & misrepresentation. How lawyers get tricked and mostly do not understand the use | The Champion and in Expert & The Law |

| | | | |
|---|---|---|---|
| | | of photographic evidence. How their lack of understanding has dire effects in court. How proper examination can help their case. | |
| 1982 | "SHUTTER SHERLOCK" | Section in the Atlanta Weekly Magazine devoted my work as an evidence photographer here in Atlanta. | Atlanta Weekly Magazine published by the Atlanta Journal/Constitution. |
| 1982 | "MODERN TRIALS" | Case Reviews explaining the evidence photographic techniques and demonstrative evidence production used. | - By Melvin Belli - 2nd edition, vol. 4 & vol. 5 and supplement - case reviews |
| 1983 | "THE BRIDGES CASE - A CASE REVIEW" | Explaining the evidence photographic techniques and demonstrative evidence production techniques used in the case. | Evidence Photographers International Council - Journal of Evidence photography fall issue. |
| 1984 | "CLOSE-RANGE PHOTOMAPS" | Close range photogrammetry & surveying: state of the art, crime & accident section. How we turn scale vertical aerial photographs into courtroom maps for use by experts and witnesses. | American Society Of Photogrammetry & America Congress On Surveying & Mapping 1984 Convention - San Antonio, TX. |
| 1986 | "VIDEO FOR EVIDENCE" | Explaining to photographers who are not in the field of evidence, how videography can be used for cases in litigation. | Studio Photography Magazine / a National Publication |
| 1987 | "THE REMOTE AUTO SENSING AIRCRAFT PHOTO PROBLEM" | Showing how low flying aircraft were measured remotely automatically and then measurements made by Photogrammetry. | E.P.I.C. - Journal of Evidence Photography- spring issue. |
| 1987 | "TOOLS OF THE TRADE" | Showing what specialized equipment is Used for the document examiner and their | Journal of Forensic document Examination - February issue. |

| | | usages. | |
|---|---|---|---|
| 1988 | "TECHNICALLY SPEAKING...MAGNIFICATION" | Showing how magnification works in relationship to enlargement. | Journal of Forensic Document Examination - fall issue. |
| 1990 | "CONDEMNATION PHOTOGRAPHY" | How to demonstrate with photography that a certain property has greater value than is being offered for it. | Journal Of Evidence Photography E.P.I.C. - spring/summer issue |
| 1990 | "R. C. HAKANSON MAN OF THE YEAR AWARD" | Article about me and my achievements in the field of Evidence Photography. | Journal Of Evidence Photography - E.P.I.C. - spring/summer issue |
| 1990 | "TECHNICALLY SPEAKING - A TALK WITH...GEORGE PEARL" | In Depth Interview with me about my work. | Visual Evidence Magazine - April issue |
| 1990 | "EVIDENCE PHOTOGRAPHY - THE GIANT KILLER" | What Professionally Prepared EVIDENCE PHOTOGRAPHY can do for your case. | The Verdict - G.T.L.A. - Georgia Trial Lawyers Association - June/July/August issue |
| 1990 | "VIDEO FOR EVIDENCE" | The IN'S & OUT'S of shooting video for use in litigation. | Demonstrative Evidence Specialists Association - membership newsletter - fall issue. |
| 1990 | "TECHNICAL PROFILE - PHOTOGRAPHIC FORGERY AND MISREPRESENTATION" | How some photos used in the legal system might be forged or be misrepresented in their presentation to cause confusion with the Jury. | DESA - fall issue of membership newsletter |
| 1990 | "MEMBER PROFILE - GEORGE S. PEARL, ALPS EVIDENCE & PHOTO" | In depth interview about my work and me. | DESA - fall issue of membership newsletter |
| 1990 | "USING DEMONSTRATIVE EVIDENCE TO ACHIEVE A SATISFACTORY SETTLEMENT" | How to use Demonstrative Evidence to help achieve a satisfactory award or settlement. | (G.T.L.A.) The Verdict Magazine - September/October issue |
| 1991 | "GETTING A HANDLE ON FORGERY" | How so many documents can be non-genuine but taken for granted in litigation cases. What to look out for and what to do | The Verdict - (G.T.L.A.) - May/June issue |

| | | about it. | |
|---|---|---|---|
| 1991 | Photograph of 3 MIA's holding a sign supposed to have been still being held captive in Viet Nam. | Regarding my examination & opinion of the 'MIA photograph' - in July 1991 - | Interviewed & quoted by: NEWSWEEK Magazine. (*Also see television sector) |
| 1991 | "MAPS & DIAGRAMS: VITAL TRIAL TOOLS" | Dealing with why it is so important to have SCALE diagrams and maps when dealing in litigation. | (G.T.L.A.) -The Verdict Magazine - July/August issue. |
| 1992 | "WHAT CERTIFIED FORENSIC REVERSE PROJECTION RESECTIONAL COMPARISON PHOTOGRAMETRY CAN DO FOR YOUR CASE!" | How to get the measurements that should have been made when the pictures were originally taken, although now some time later. | (G.T.L.A.) -The Verdict Magazine - January/February issue. |
| 1992 | "THE NIGHT VISIBILITY CASES" | The importance of linking the scene illumination in photography to what is being shown to a Jury in the Court Room. | (G.T.L.A.) -The Verdict Magazine - March/April issue. |
| 1992 | "THOUGHTS ON THE DAY IN THE LIFE VIDEO" | Explaining what and how a video production of this type should be done for use at trial. | (G.T.L.A.) -The Verdict Magazine - July/August issue. |
| 1992 | "LITIGATION MODELS" | How scale models can help the witnesses re-enact the accident to better explain the causation to a Jury. | (G.T.L.A.) -The Verdict Magazine - November/December issue |

| 1994 | "DAY IN THE LIFE VIDEO" | Thoughts on how to shoot a production of this type. | Journal of Evidence Photography / EPIC Journal, April\May issue. |
| 1996 1997 | "Tall Tripods Made Easy" | Home-building special tripod for high filming. | EPIC Journal- January/February Issue  IAPP PANORAMA Journal March 1997 |
| 1997 | "The Double Shoot Group Photo, #8 Cirkut –vs- 70mm Roundshot" | The professional differences in shooting a 100 year old Cirkut camera verses a modern 70mm roll film model. | The PANORAMA Journal of IAPP |
| 1998 | "HI-LUX: A BRIGHT IDEA COMES | Importance of having | EPIC Journal-30th |

| | | | |
|---|---|---|---|
| | TO LIFE" | a bright viewfinder screen in your camera for shooting evidence scenes. | Anniversary Issue - Spring/Summer 1998 |
| 1998 | "SCANNING EVIDENCE PHOTOMACROGRAPHY" | Increasing macro depth of field using specialized scanning equipment designed and built for that purpose. | EPIC Journal-30th Anniversary Issue - Spring/Summer 1998 |
| 2000 | " Pearl's Flip Flop" | Specialized camera bracket production | IAPP PANORAMA Journal Mar. 2000 |
| 2002 | "The WIDEPAN 140° Panorama Camera" | History and the production and characteristics of the Pro-2 Camera | IAPP PANORAMA Journal, Spring 2002 |
| 2003 | "40 Years Later…JFK Assassination Causes Reverse Projection Photogrammetry Study in Dallas." | How the procedure and usage of Reverse Projection Photogrammetry helped to locate the exact position of the "BadgeMan" on the Grassy Noll. | EPIC Journal-36th issue – Fall 2002 |
| 2003 | "Evidence & Photography, an Interview With George S. Pearl." | My work in this field of Evidence Photography and some useful suggestions for investigators. | The Legal Investigator, Official Journal of the National Association of Legal Investigators. – May 2003 Issue |
| 2003 | "Finding the Proper Lens & Degree of Rotation for Group Shooting With the Roundshot Super 220VR." | Mathematical procedure and explanation of photographic procedures. | IAPP PANORAMA Journal, Spring 2002 |
| 2003 | "Film JAM With the Roundshot Super 220VR" | What it is, Why it Happens, & What to Do About it. | IAPP PANORAMA Journal, Fall- Winter 2003 |
| 2004 | "A Lens With a Different Tilt" | Scheimpflug Principle of depth of field control as it is applied to new lens as used on Rotational Panoramic Photographic Equipment. | IAPP PANORAMA Journal, Fall- Winter 2003 |

| | | | |
|------|---|---|---|
| 2005 | "Roundshot 220VR Owners Take Note" | How to find the Nodal Points of all Subject lenses used with the 220VR and how to program the new computer settings for those points. | IAPP **PANORAMA** Journal, Spring/ Summer 2005 |
| 2005 | "Ray Tracing & Spacing" | Complex guide to tracing rays of light through optical lenses and then projection of those rays to correct positions to scale to form formations of correct perspective for the rotational camera | IAPP **PANORAMA** Journal, Fall / Winter 2005 |
| 2005 | "The In-Klein-O-Matic Becomes the Ultimate in Depth of Field Control" | In depth report of my work with Bruce Klein to perfect and fabricate the world's first Scheimpflug Principle depth of field control new medium format lens board as used on Rotational Panoramic Photographic Equipment. | IAPP **PANORAMA** Journal, Fall / Winter 2005 |
| 2005 | "Getting High" | How to make use of ladders on top of each other over a vehicle to reach a stable 25 foot shooting height | IAPP **PANORAMA** Journal, Fall / Winter 2005 |
| 2005 | "Gaining Perspective – Preparing Photographs for Correct Presentation in the Courtroom" | Explaining how to present photographic evidence to a Jury so that it is not misleading. | **Evidence Technology Magazine**, January – February, 2005 |
| 2008 | Techniques: Shooting Panoramic Aerials | 3 main methods to achieve professional results shooting aerial pans | IAPP PANORAMA MAGAZINE, Fall / Winter issue |
| 2009 | The Focal Point…New Tools for Photographers | New tools / products for the forensic photographer and CSI investigators | Evidence Technology Magazine, January – February issue. |

| VII. TELEVISION | | |
|---|---|---|
| 1991 July | Regarding my examination & opinion of the 'MIA Photograph' | Interviewed by: ABC NIGHTLINE for information only<br><br>CNN INTERNATIONAL NEWS |

| | | |
|---|---|---|
| | | HOUR – Appeared Live on CNN<br><br>GOOD MORNING AMERICA, for information<br><br>Quoted by: LARRY KING LIVE |
| 1991 - Present | Appearances for various requests to explain and consult on photographic evidence and questioned document examination findings and procedures. | Several Prime Time Atlanta news, radio talk shows, and magazine interviews / |
| 2003 | Filmed for 2 days in Dallas at "Grassy Knoll" for the Discovery Channel – Did Reverse Projection Photogrametry of Mary Moorman camera photo. Showed exact position of the *Badgeman* on the Grassy Knoll. | Unsolved History production on JFK Assassination |
| | | |

- CV on George S. Pearl's background & qualifications as a **BOARD CERTIFIED QUESTIONED DOCUMENT EXAMINER is available upon request.**
- **THIS CV is as complete as I can remember, but I am not a** *historian* **and there are things missing. I do reserve the right to update and make changes as they are noted and required. Thank you.**

# GEORGE S. PEARL

## *Board Certified Questioned Document Examiner & Handwriting Expert*

### CURRICULUM VITAE
### Update : 1999

| STUDY |
|-------|

**1974**    **UNIVERSITY OF SOUTHERN MISSISSIPPI -** Began study of questioned document examination and handwriting

**1975**    **UNIVERSITY OF SOUTHERN MISSISSIPPI -** Received Bachelor of Science degree

**1979**    **Studied briefly with Dr. Dan Vomhof, Certified Document Examiner of Expert Witness Services, LaMasa, California, who recommended me for membership with the Independent Association of Questioned Document Examiners, Inc. (IAQDE)**

**1979**    **INDEPENDENT ASSOCIATION OF QUESTIONED DOCUMENT EXAMINERS - (IAQDE) - -** After passing all written exams and form blindness testing, I was accepted for membership in IAQDE on October 9, 1979.

**1979**    **UNIVERSITY OF SAN DIEGO, SCHOOL OF LAW -** October 15 thru October 19 - Attended the IAQDE week long seminar in questioned document examination (over 40 hours of classroom instruction).

**1980**    **ROBERTSON DOCUMENT & HANDWRITING EXAMINERS -** Panama City, Florida - August - Studied under Edna W. Robertson who was President of IAQDE from 1978-1979 & the author of "FUNDAMENTALS OF DOCUMENT EXAMINATION" (*from 1980 to the present, I have studied & worked with Mrs. Robertson over 100 hours)

**1980**    **SOUTHERN METHODIST UNIVERSITY, SCHOOL OF LAW -** September 28 thru October 3 - IAQDE seminar (over 40 hours of classroom instruction) - speaker on document photography

**1981**    **INDEPENDENT ASSOCIATION OF QUESTIONED DOCUMENT EXAMINERS (IAQDE) -** October 19 thru October 23 - Springfield, Illinois - (over 40 hours of classroom instruction in questioned document examination)

**1982**    **AMERICAN ACADEMY OF FORENSIC SCIENCE , QUESTIONED DOCUMENTS SECTION -** February 8 thru February 11 - Orlando, Florida

**1982**    **INDEPENDENT ASSOCIATION OF QUESTIONED DOCUMENT EXAMINERS (IAQDE) -** October 10 thru October 15 -Providence, Rhode Island - (over 40 hours of classroom instruction) - speaker on Photographic Forgery

**1983**    **O. W. COBURN SCHOOL OF LAW at ORAL ROBERTS UNIVERSITY** October 16 thru October 21 - Tulsa, OK. - IAQDE seminar - (over 40 hours of classroom instruction in questioned document)

**1985**    **INDEPENDENT ASSOCIATION OF QUESTIONED DOCUMENT EXAMINERS (IAQDE) -** October 6 thru October 21 - Portland, Oregon - (over 40 hours of classroom instruction in questioned document) - Instructor in Video Spectro Scanner & associated equipment

**1985**    **INDEPENDENT ASSOCIATION OF QUESTIONED DOCUMENT EXAMINERS (IAQDE) -** October 8 - Portland, Oregon - gained IAQDE Board Certification after final testing and board review

**1986**    **INDEPENDENT ASSOCIATION OF QUESTIONED DOCUMENT EXAMINERS (IAQDE) -** September 12 thru September 17 - seminar in Toronto, Canada

ALPS EVIDENCE & PHOTO  2139 Liddell Drive Atlanta, Georgia 30324 USA
Local : 404-872-2577 Fax : 404-872-0548 National : 1-800-USE-ALPS *pin 2577
E-Mail : ALPSLABS@mindspring.com  Web Site : www.ALPSLABS.com

91

| 1986 | ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS - AFDE - September - became a founding member |
|------|------|
| 1987 | ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS - AFDE - May 29 thru June 1 - Atlanta,  Georgia - Symposium - Chairman of the First AFDE Symposium On Questioned Document Examination. I instructed on inks, papers, and other examination of documents and indented writings. Became Certified Document  Examiner status in AFDE after testing. |
| 1988 | ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS - AFDE - May - Milwaukee, Wisconsin - Presented paper "Admittance Of Photographic Evidence In Our Courts For The Document Examiner". Board Member of AFDE. |
| 1989 | ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS - AFDE - May 13 thru May 15 - Portland, Oregon - attended symposium |
| 1990 | ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS - AFDE - May 3 thru May 7 - San Antonio, Texas - written examination and re-certified through testing. |
| 1991 | ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS - AFDE - October 10 thru October 14 - Boston, MA. - attended symposium. |
| 1992 | ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS - AFDE - October 8 thru October 11 - Rolling Meadows / Chicago, Illinois . Spoke on computerized handwriting identification  in respect to the dynamics of the writer. Installed as President of AFDE 1992-1993 term. |
| 1993 | ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS - AFDE - October 6 thru October 12 - Cleveland, Ohio . Spoke on "Stop Watch Method Of Handwriting Examination". |
| 1994 | ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS - AFDE - September 15 thru September 18 - symposium in Las Vegas, NV.. Chairman for Board Certification Testing. Introduced proto-type of new mini-video spectroscanner being developed at ALPS EVIDENCE & PHOTO. |
| 1995 | ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS - AFDE - August 6 thru August 10 - joint symposium with the Seventh Biennial Conference Of The International Graphonomics  Society at the University Of Western Ontario, London, Ontario, Canada. Basic & applied issues in handwriting  & drawing research. |

ALPS EVIDENCE & PHOTO   2139 Liddell Drive Atlanta, Georgia 30324 USA
Local : 404-872-2577 Fax : 404-872-0548 National : 1-800-USE-ALPS *pin 2577
E-Mail : ALPSLABS@mindspring.com   Web Site : www.ALPSLABS.com

92



SM

# ALPS EVIDENCE & PHOTO

Atlanta Legal Photo Services, Inc.

2139 LIDDELL DRIVE, N.E., ATLANTA, GEORGIA  30324      (404) 872-2577
Fax  (404) 872-0548                    NATIONALLY CALL:  1-800-USE-ALPS    *pin 2577

## 1978

M y firm, ATLANTA LEGAL PHOTO SERVICES, INC. d/b/a ALPS EVIDENCE & PHOTO, was started June 8, 1978, and I began to accept work as an independent document examiner in August of 1980.

ALPS EVIDENCE & PHOTO provides *a complete demonstrative evidence service* to the legal profession, insurance field, large corporations, governmental agencies, law enforcement, and private individuals. We deal with objects of evidence & documents on an ongoing daily basis, and we maintain our own laboratory for the examination of documents.

Some of the equipment in common use at my 5,000 square foot laboratory includes long & short wave ultraviolet lighting equipment, video spectroscanner, magnifying devices and lamp, black & white photocopy machine, color photocopy machine, transparency maker, light transmission table, special rules, grids, scales, and other measuring equipment, stereoscopic microscope, copy stands both vertical & horizontal with up to 8" X 10" film cameras. Complete color, and  black & white processing labs for  all aspects of document photography and special photographic sheet & roll film and photo materials, plus a wide assortment of special exciter & barrier filters for testing and other document examination uses. Also, I have equipment for the electrostatic development of indented writing impressions. I also have on hand, chemistry and apparatus for performing thin layer ink chromatography and also paper analysis. We have a video spectroscanning apparatus for detection of inks. I also maintain a reference library at ALPS as part of my independent laboratory.

ALPS EVIDENCE & PHOTO  2139 Liddell Drive Atlanta, Georgia 30324 USA
Local : 404-872-2577 Fax : 404-872-0548 National : 1-800-USE-ALPS *pin 2577
E-Mail : ALPSLABS@mindspring.com   Web Site : www.ALPSLABS.com

93

# PROFESSIONAL ORGANIZATIONS & AFFILIATIONS

| A.F.D.E. | ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS | Founding Member (Sept. 1986) - to present<br>Past President<br>Past Board Member<br>Past Chairman of Board Certification |
|---|---|---|
| E.P.I.C. | EVIDENCE PHOTOGRAPHERS INTERNATIONAL COUNCIL | Member  1977 to present.<br><br>Offices held : Vice-President<br>　　　　　　　　President<br>　　　　　　　　Board Of Management<br><br>Awards & Degrees : Certified as a Professional Evidence Photographer.<br>　　　　　　　　Fellow<br>　　　　　　　　R.C. Hakanson award 'Evidence Photographer Of The Year' - 1989 |
| D.E.S.A. | DEMONSTRATIVE EVIDENCE SPECIALISTS ASSOCIATION | Founding Member<br>Board of Directors |
| P.P.A. | PROFESSIONAL PHOTOGRAPHERS OF AMERICA | Member 1978 - 1997<br><br>Note : out of approximately 20,000 + members, I am recognized as 1 of 7 Qualified Evidence Photographers in the nation; and also a Certified Professional Photographer as listed in 'Who's Who In Professional Imaging'. |
| I.A.Q.D.E. | INDEPENDENT ASSOCIATION OF QUESTIONED DOCUMENT EXAMINERS | 1979-1986 Board Certified Document Examiner |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

ALPS EVIDENCE & PHOTO   2139 Liddell Drive Atlanta, Georgia 30324 USA<br>Local : 404-872-2577 Fax : 404-872-0548 National : 1-800-USE-ALPS *pin 2577<br>E-Mail : ALPSLABS@mindspring.com   Web Site : www.ALPSLABS.com

94

# PUBLICATIONS

| | | |
|---|---|---|
| **"A NEGATIVE IS A NEGATIVE"** | a new method for retrieving complete typewritings or other information from spent carbon papers. | **INSIGHT Magazine - 1979 winter issue -  published by Independent Association of Questioned Document Examiners (IAQDE)** |
| **"CROSS EXAMINING THE PHOTOGRAPH......PHOTOGRAPHIC FORGERY & MISREPRESENTATION",** | How jurors are often mislead to the wrong verdict after viewing an improperly presented photograph. This article could help you win your case ! | **THE CHAMPION - May 1982 issue - an official news publication of the National Association Of Criminal Defense Lawyers** |
| **"TOOLS OF THE TRADE" -** | In depth examination and explanation of the equipment required in a questioned document laboratory. | **Journal Of Forensic Document Examination - February 1987 issue** |
| **"TECHNICALLY SPEAKING......MAGNIFICATION "** | Technical article with complete overview on the differences between enlargement and magnification. | **Journal Of Forensic Document Examination - Fall 1988 issue** |
| **"GETTING A HANDLE ON FORGERY"** | What attorneys need to understand before taking on a questioned document case or realizing that they even have a questioned document case in the first place. | **The Verdict - May/June 1991 issue - published by Georgia Trial Lawyers Association** |
| **"THE STOPWATCH METHOD OF DISGUISED SIGNATURE IDENTIFICATION"** | A unique approach and technique for the identification of who wrote certain disguised writings produced by reduced speed by the writer. | **Journal of Forensic Document Examination - Fall 1994 issue** |
| | | |
| | | |
| | | |
| | | |
| | | |

ALPS EVIDENCE & PHOTO   2139 Liddell Drive Atlanta, Georgia 30324 USA
Local : 404-872-2577 Fax : 404-872-0548 National : 1-800-USE-ALPS *pin 2577
E-Mail : ALPSLABS@mindspring.com   Web Site : www.ALPSLABS.com

# SPEAKER / LECTURER / INSTRUCTOR

| | |
|---|---|
| A.F.D.E. - | ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS, INC. |
| E.P.I.C. | EVIDENCE PHOTOGRAPHERS INTERNATIONAL COUNCIL |
| STATE BAR OF GEORGIA | Criminal Defense Section |
| G.T.L.A. | GEORGIA TRIAL LAWYERS ASSOCIATION |
| UNIVERSITY OF WISCONSIN - | Milwaukee, WI. |

**\* NOTE : I have lectured numerous times before EPIC, IAQDE, and AFDE on the subjects of document examination, forensic photography, demonstrative evidence, and photographic forgery.**

| | | |
|---|---|---|
| SOUTHERN METHODIST UNIVERSITY, SCHOOL OF LAW | (over 40 hours of classroom instruction). Speaker on Document Photography. | September 28 thru October 3, 1980 IAQDE seminar |
| INDEPENDENT ASSOCIATION OF QUESTIONED DOCUMENT EXAMINERS (IAQDE) | (over 40 hours of classroom instruction) - speaker on Photographic Forgery | October 10 thru October 15, 1982 Providence, Rhode Island |
| INDEPENDENT ASSOCIATION OF QUESTIONED DOCUMENT EXAMINERS (IAQDE) | (over 40 hours of classroom instruction in questioned document) - Instructor in Video Spectro Scanner & associated equipment | October 16 thru October 21, 1985 Portland, Oregon |
| ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS - AFDE | Symposium - Chairman of the First AFDE Symposium On Questioned Document Examination. I instructed on inks, papers, and other examination of documents and indented writings. Became Certified Document Examiner status in AFDE after testing. | May 29 thru June 1, 1987 Atlanta, Georgia |
| ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS - AFDE | Presented paper "Admittance Of Photographic Evidence In Our Courts For The Document Examiner". Board Member of AFDE. | May 1988 Milwaukee, Wisconsin |
| ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS - AFDE | Spoke on "Stop Watch Method Of Handwriting Examination". Completed AFDE Board Certification program and received Board Certification at this meeting. | October 6 thru October 12, 1993 Cleveland, Ohio |
| | | |

ALPS EVIDENCE & PHOTO   2139 Liddell Drive Atlanta, Georgia 30324 USA
Local : 404-872-2577 Fax : 404-872-0548 National : 1-800-USE-ALPS *pin 2577
E-Mail : ALPSLABS@mindspring.com   Web Site : www.ALPSLABS.com

# PROFESSIONAL OPINION RENDERED

| | | | |
|---|---|---|---|
| 1991 July | 'MIA photograph' | regarding the 'MIA photograph' presented by Colonel McDonald of the MIA Organization which was brought to me for examination and the rendering of my professional & expert opinion as to it's authenticity. Rendered 'NON-GENUINE' opinion. | **Interviewed By :** ABC Nightline CNN International News Hour (Live) Good Morning America Newsweek Magazine **Quoted By :** Larry King Live Newsweek Magazine |
| 1997 April June | ATLANTA CENTENNIAL PARK | alleged letter from Olympic Park Bomber | **Interviewed by :** numerous television stations |
| 1997 April June | JON BENET RAMSEY case | letter allegedly left by murderer | **Interviewed by :** numerous television stations |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

ALPS EVIDENCE & PHOTO   2139 Liddell Drive Atlanta, Georgia 30324 USA
Local : 404-872-2577 Fax : 404-872-0548 National : 1-800-USE-ALPS
E-Mail : ALPSLABS@mindspring.com   Web Site : www.ALPSLABS.com

97

# EXHIBIT F



S P O K A N E                    C O U N T Y

STEVEN J. TUCKER
PROSECUTING ATTORNEY

OFFICE OF PROSECUTING ATTORNEY

MAIL TO:
Civil Division
1115 W. Broadway Avenue
Spokane, WA 99260-0270
(509) 477-5764  FAX: 477-3672

May 22, 2009

**Kelly Canary**
**Attorney At Law**
**Innocence Project NW Clinic**
**University of Washington School of Law**
**William H. Gates Hall, Suite 265**
**P.O. Box 85110**
**Seattle, Washington 98145**

Re: *Public Records Request Regarding Thomas DiBartolo*

Dear Kelly:

Please be advised, after an objectively reasonable search of 9 boxes of records maintained by the Spokane County Prosecutor's Office, I was unable to locate any records falling within the parameters of the above-referenced public records request.

With this correspondence, I am closing my file on your public records Request.

Sincerely,

LORI ZAAGMAN-BACON
Assistant Public Records Officer/Paralegal

☐
Criminal Department
1100 W. Mallon Avenue
Spokane, WA 99260-0270
(509) 477-3662 FAX: 477-3409

☒
Civil Department
1115 W. Broadway
Spokane, WA 99260-0270
(509)477-5764  FAX:477-3672

☐
Domestic Violence Unit
901 N Monroe, Suite 200
Spokane, WA 99201
(509) 835-4500 FAX:835-4552

☐
Drug/Property Department
721 N. Jefferson
Spokane, WA 99260-0270
(509) 477-6416  FAX: 477-6450

☐
Juvenile Department
1208 W. Mallon Avenue
Spokane, WA 99260-0270
(509) 477-6046  FAX: 477-6444